Dennis J. HASTERT, Harris Fawell, John E. Porter, Philip M. Crane, Henry J. Hyde, and Robert H. Michel, Plaintiffs,

v.

STATE BOARD OF ELECTIONS, John J. Lanigan, Theresa M. Petrone, Richard A. Cowen, Lawrence E. Johnson, David E. Murray, Langdon D. Neal, Wanda L. Rednour, and Hannelore Huisman, Defendants.

Wilfredo NIEVES, Al Johnson, Linda D. Coronado, Bobby Rush, Jesus Garcia, Rev. Willie Barrow, Rafael Boria, Miguel Del Valle, Robert L. Lucas, Leon D. Finney, Jr., Rev. Clay Evans, Joseph Gardner, Luis V. Gutierrez, Regner Suarez, Joseph Berrios, Miguel A. Santiago, Neomi Hernandez, Plaintiffs,

v.

ILLINOIS STATE BOARD OF ELECTION COMMISSIONERS, John J. Lanigan, Theresa M. Petrone, Richard A. Cowen, Hannelore Huisman, Lawrence E. Johnson, David E. Murray, Langdon D. Neal, and Wanda L. Rednour, Defendants.

Cardiss COLLINS, Charles Hayes, Rev. Wilbur N. Daniels, Rev. Claude S. Wyatt, Howard B. Brookins, Donald L. Williams, Percy Giles, and Ricky Hendon, Plaintiffs,

v.

STATE BOARD OF ELECTIONS, John J. Lanigan, Theresa M. Petrone, Richard A. Cowen, John P. Dailey, Lawrence E. Johnson, David E. Murray, Langdon D. Neal, and Wanda Rednour, Defendants.

Ann ROSEBROOK, Daryl Barklow, Amiel Cueto, Richard Mark, Jeanelle Norman, Carolyn Toney, Lee Babcock, Raymond Oliver, Barbara Poshard, William Mathews, Gerald Hawkins, and Eva Savala, Plaintiffs,

v.

STATE BOARD OF ELECTIONS, John J. Lanigan, Theresa M. Petrone, Richard A. Cowen, Lawrence E. Johnson, David E. Murray, Langdon D. Neal, Wanda L. Rednour, and Hannelore Huisman, Defendants.

The CHICAGO URBAN LEAGUE, Craig R. Collins, Mark Allen, and Nikolas C. Theodore, Plaintiffs,

v.

STATE BOARD OF ELECTIONS, John J. Lanigan, Theresa M. Petrone, Richard A. Cowen, John P. Dailey, Lawrence E. Johnson, David E. Murray, Langdon D. Neal, and Wanda L. Rednour, Defendants.

Nos. 91 C 4028, 91 C 4154, 91 C 4643, 91 C 4656 and 91 C 5472.

United States District Court, N.D. Illinois, E.D.

Nov. 6, 1991.

Roger P. Flahaven, James R. Carroll, Asst. Attys. Gen., Chicago, Ill., for defendants Illinois State Bd. of Elections, et al.

Tyrone C. Fahner, Richard S. Williamson, Lori E. Lightfoot, George J. Tzanetopoulos, Mayer, Brown & Platt, Charles Frank Marino, David M. Marino, Chicago, Ill., for plaintiffs Hastert, et al. in No. 91 C 4028.

Linda Reyna Yanez, Arturo Jauregui, Mexican American Legal Defense and Educational Fund and Ruben Castillo, Kirkland & Ellis, Chicago, Ill., for Hispanic plaintiffs in Nieves, et al. in No. 91 C 4154.

Judson Miner, Jeff Cummings, Davis, Miner, Barnhill & Galland, Chicago, Ill., for African–American plaintiffs in Nieves, et al. in No. 91 C 4154.

James D. Montgomery, Jean Templeton, James D. Montgomery & Associates, Chicago, Ill., for plaintiffs Cardiss Collins, et al. in No. 91 C 4643.

Edward T. Joyce, Paul A. Castiglione, Joyce & Kubasiak, P.C., Chicago, Ill., for plaintiffs Rosebrook, et al. in No. 91 C 4656.

Mark S. Grotefeld, Mark Emil Leipold, Robins, Kaplan, Miller & Ceresi, Chicago, Ill., for plaintiffs Chicago Urban League, et al. in No. 91 C 5472.

Nathaniel R. Howse, Howse & Howse and Robert E. Pincham, Jr., Robert E. Pincham, Jr., Ltd., Chicago, Ill., for intervening plaintiff Gus Savage.

R. Eugene Pincham, Chicago, Ill., for intervening plaintiffs Harold Washington Party, et al.

Leonard Amari, Amari & Locallo, Chicago, Ill., for intervening plaintiff Frank Annunzio.

James D. Adducci, Michael C. Dorg, Michael F. Braun, Schuyler, Roche & Zwirner, Chicago, Ill., for intervening plaintiff Sidney R. Yates.

Margaret Daley, Richard A. Devine, Pope & John, Ltd., Chicago, Ill., for intervening plaintiff Michael Zalewski.

Joseph A. Cari, Jr., Coffield, Ungaretti, Harris & Slavin, Chicago, Ill., for intervening plaintiff Alvin L. Winkler.

Anton R. Valukis, Jeffrey D. Colman, Thomas D. O'Neill, Jenner & Block, Chicago, Ill., and Clyde L. Kuehn, Kuehn & Trentman, Belleville, Ill., for intervening plaintiffs Johnny Scott and Ben Howard.

Harvey M. Grossman, Roger Baldwin Foundation of ACLU, Inc. and William T. Barker, Sonnenschein Nath & Rosenthal, Chicago, Ill., amicus curiae for A.C.L.U.

## MEMORANDUM OPINION AND ORDER

Before KANNE, Circuit Judge, NORGLE, District Judge, and CONLON, District Judge.

CONLON, District Judge.

In these consolidated cases, the court is called upon to select a congressional redistricting plan for the State of Illinois. Following the tabulation of the 1990 decennial census, the Office of the Clerk of the United States House of Representatives informed the Governor of Illinois that Illinois is now entitled to only twenty representatives due to population changes reflected in the 1990 census. Illinois currently has twenty-two representatives. The Illinois General Assembly failed to undertake its constitutional obligation to devise a new congressional districting scheme for the state. Defendant Illinois State Board of Elections ("the Board") is presently bound to conduct the upcoming 1992 congressional elections under the terms of the 1981 congressional district plan implemented in *In re Congressional Districts Reapportionment Cases*, No. 81 C 3915, slip op. (N.D.Ill. Nov. 23, 1981), *aff'd sub nom. Ryan v. Otto*, 454 U.S. 1130, 102 S.Ct. 985, 71 L.Ed.2d 284 (1982). Plaintiffs, various citizen-voters of the state of Illinois and certain of their congressional representatives, filed these actions seeking a declaration that the existing congressional district scheme is impracticable and, more importantly, unconstitutional because of population and demographic changes reflected in the 1990 decennial census. Plaintiffs also seek to enjoin the Board from conducting the upcoming 1992 Illinois congressional elections under the 1981 plan.

The absence of a state-approved congressional redistricting plan has prompted certain of the plaintiffs to propose their own congressional redistricting plans in substitution of the existing plan. We conclude that the present congressional district plan is both unconstitutional and impracticable due to population and demographic changes represented in the 1990 census. We therefore proceed to analyze the competing congressional redistricting proposals submitted by the various plaintiffs under the relevant constitutional and legal goals and criteria enumerated by the Supreme Court.

## BACKGROUND

### I. General Background

The results of the 1990 census, issued early in 1991, show that the population of the State of Illinois increased from 11,426,-518 to 11,430,602 between 1980 and 1990, an increase of 4,084 or 0.0357%. The new census figures mandate a reduction in the number of congressional seats apportioned to Illinois from 22 to 20. This is so because the Illinois population increased in smaller

proportion than the United States as a whole.[1]

The release of the 1990 census data and the resulting reapportionment of congressional seats triggered the provisions of Article 4, § 3 of the Constitution of the State of Illinois, under which the Illinois General Assembly is charged with the obligation of implementing a constitutionally sound congressional redistricting plan by June 30, 1991.[2] The Illinois General Assembly failed to meet its constitutionally mandated June 30, 1991 deadline. Indeed, that legislative body did not bring any redistricting proposal to the floor for debate, much less a vote.

## II. Pre–Trial Proceedings

The Republican Party members of the current Illinois congressional delegation filed the initial action on June 27, 1991. *Hastert v. State Board of Elections*, No. 91 C 4028. The *Hastert* plaintiffs seek a declaration of the unconstitutionality of the present congressional districts due to population changes reflected in the 1990 census and ask the court to enjoin the Board from conducting the 1992 congressional elections under the current congressional district plan. Additionally, the *Hastert* plaintiffs submit for court approval their own statewide redistricting proposal to replace the current plan. On July 3, 1991, the Chief Judge of the Seventh Circuit Court of Appeals convened this three-judge district court panel to hear the *Hastert* action, as required under 28 U.S.C. § 2284(a).[3]

Also on July 3, 1991, a group of Hispanic and African–American resident-voters filed a similar action, styled *Nieves v. Illinois State Board of Elections*, No. 91 C 4154. In addition to seeking relief similar to that requested in the *Hastert* action, the *Nieves* plaintiffs seek the creation of an Hispanic majority congressional district which, they argue, is now mandated under Section 2 of the Voting Rights Act, 42 U.S.C. § 1973, because of demographic and population changes reflected in the 1990 census. To this end, the *Nieves* plaintiffs have submitted for court approval a proposed redistricting map for the minority districts in and around the City of Chicago. Upon subsequent motion by the *Nieves* plaintiffs, the *Nieves* action was consolidated with the *Hastert* action and assigned to this panel on July 17, 1991.

On July 24, 1991, a group of resident voters from various Illinois congressional districts, ostensibly acting on behalf of certain Democratic Party members of the Illinois congressional delegation, filed their own action, styled *Rosebrook v. State Board of Elections*, No. 91 C 4656. The *Rosebrook* plaintiffs submitted a statewide redistricting proposal. On the same day, Representative Cardiss Collins of the 7th Congressional District and Representative Charles Hayes of the 1st Congressional District, as well as various resident-voters from their respective African–American majority districts, jointly filed an action similar to those filed by the *Hastert* and *Nieves* parties. *Collins v. State Board of Elections*, No. 91 C 4643. The *Collins* plaintiffs submitted a redistricting plan which, like the *Nieves* plaintiffs, solely concerns the configuration of the minority districts in and around the City of Chicago. The *Rosebrook* and *Collins* actions were subsequently consolidated with the *Hastert* and *Nieves* cases in August 1991.

On July 31, 1991, this court ordered the publication of notice of these consolidated proceedings in daily newspapers in Alton, Belleville, Carbondale, Chicago, Rockford, and Springfield, Illinois. The published no-

---

**1.** The population of the United States as a whole increased from 226, 545, 805 to 248, 709, 873, an increase of 22,164,068 or 9.7835%.

**2.** Article 4, § 3(b) of the Illinois Constitution provides in relevant part that

In the year following each Federal decennial census year, the General Assembly shall redistrict the Legislative Districts ... [by] June 30 of that year....

**3.** 28 U.S.C. § 2284(a) directs that

A district court of three judges shall be convened when otherwise required by an Act of Congress, or when an action is filed challenging the constitutionality of the apportionment of congressional districts or the apportionment of any statewide body.

tice invited any person or group desiring to participate in the proceedings to file a petition to intervene by August 28, 1991. After consulting with the parties, the court scheduled the close of discovery for October 3, 1991. Trial was set on October 7, 1991.

The court granted petitions to intervene filed by: Alvin Winkler, a resident of the 3rd Congressional District; Rep. Frank Annunzio, of the 11th Congressional District; Rep. Sidney R. Yates, of the 9th Congressional District; Rep. Augustus A. Savage, of the 2nd Congressional District; Michael Zalewski, a resident of the 3rd Congressional District; Johnny Scott and Ben Howard, acting individually and in their representative capacities as members of the St. Clair County and Madison County, Illinois, chapters of the National Association for the Advancement of Colored People ("NAACP"); and the Harold Washington Party, a political party recognized under the Illinois Election Code, Ill.Rev.Stat. ch. 46, ¶ 10-2. Of these plaintiff-intervenors, only Rep. Savage and the Harold Washington Party, acting in tandem, submitted their own redistricting proposal and map. Winkler, Zalewski, Rep. Annunzio and Rep. Yates adopted the redistricting proposal of the *Rosebrook* plaintiffs.

Finally, the Chicago Urban League filed its own action and proposed minority district plan on August 29, 1991, *Chicago Urban League v. State Board of Elections*, No. 91 C 5472. The Chicago Urban League purports to represent the interests of resident voters in the existing African-American majority congressional districts. The *Chicago Urban League* action was consolidated with the *Hastert* action on September 3, 1991.

On September 20, 1991, we granted the Board's unopposed motion that it be permitted to abide by the judgment resulting from these proceedings without providing a defense or adopting an adversarial role. The Board remains a necessary nominal defendant because it is obligated under the terms of the order issued in *In re Congressional Dist. Reapportionment Cases*, No. 81 C 3915, slip op. (N.D.Ill. Nov. 23, 1981),

to conduct the upcoming 1992 congressional elections under the 1981 congressional district plan until we issue a superseding order. The adversarial circumstances necessary to constitute a case or controversy arise solely from competing redistricting plans submitted by the various plaintiffs. Accordingly, the Board has played no active role in these proceedings and agrees to abide by the judgment of this court.

The participants were directed to submit proposed witness lists and summaries of their proposed testimony. The resulting submissions posed the prospect of a lengthy and complex trial, due in part to the large number of participants and proposed witnesses. In addition, some of the proffered testimony was either directed to matters outside the proper scope of this court's inquiry, or cumulative of the statistical data that necessarily comprises the principal evidence in this case. Accordingly, we took measures to focus the parties on the relevant constitutional and legal criteria and to streamline the proceedings in a manner that would still enable the parties to present a complete record on the serious constitutional matters at issue. By streamlining the proceedings, our goal was to issue our judgment on the merits in a timely fashion so as to allow any of the participants adequate time for appeal to the Supreme Court prior to the December 16, 1991 filing deadline for nominating petitions for the March 17, 1992 Illinois congressional primary elections. We sought to obviate any need for enjoining the Board from conducting the congressional election according to the statutorily dictated schedule, *see* Ill.Rev.Stat. ch. 46, ¶ 10-6, as was necessary during the 1981 Illinois congressional redistricting proceedings.

Consequently, we followed the precedent of congressional redistricting panels working under similar time constraints, *see, e.g., In re Pennsylvania Congressional District Reapportionment Cases*, 567 F.Supp. 1507, 1508-09 (M.D.Pa.1982), *aff'd sub nom. Simon v. Davis*, 463 U.S. 1219, 103 S.Ct. 3564, 77 L.Ed.2d 1405 (1983), and directed the parties to submit their evidence in the form of affidavits and depositions, supplemented by any maps and sta-

tistical data the parties deemed relevant. During the two-day trial on October 7 and 8, 1991, each participating party was permitted to proceed on the basis of a single proposed plan and map.[4] The parties were permitted to examine and cross-examine expert witnesses. Finally, the parties argued their positions through the submission of trial and post-trial briefs.

The parties worked diligently during discovery and the two-day trial to resolve numerous areas of significant disagreement in their competing plans. The pre-trial proceedings were marked by a succession of amendments to the principal redistricting proposals, with each of the new amended plans incrementally eliminating a complex area of potential conflict. The most significant agreement reached by the parties prior to trial concerned an agreement about the configuration of the proposed Hispanic majority district.

All parties agreed throughout the proceedings that population and demographic changes within the City of Chicago from 1980 to 1990 mandated the creation of an Hispanic majority district. The creation of an Hispanic district necessarily entails a radical reshaping of the political landscape in and around Chicago. Not surprisingly, the significant political ramifications of the creation of an Hispanic district initially spawned radically different proposals regarding the form this proposed district might take. By reaching an agreement on the configuration of a proposed Hispanic district, the parties greatly simplified a perplexing issue. Indeed, an agreement on this issue may be the crucial factor in facilitating the creation of an Hispanic district. The agreement on the proposed Hispanic district removed the Hispanic contingent among the *Nieves* plaintiffs as active participants at trial.

Other compromises and stipulated agreements were reached on a number of disputed issues. A stipulation between Rep. Savage and the Harold Washington Party

with the *Hastert* plaintiffs, which was subsequently joined by the *Collins* plaintiffs, brought all parties into substantial agreement over the configuration of the African–American majority 2nd Congressional District. This agreement effectively removed Rep. Savage and the Harold Washington Party from any disputes at trial. A pre-trial stipulation between plaintiff-intervenors Johnny Scott and Ben Howard, acting individually and in their representative capacities as members of the NAACP, and the *Hastert* plaintiffs to keep the minority communities in Madison and St. Clair Counties unified in a single congressional district, effectively removed Scott and Howard from this litigation.

As a consequence of the admirable efforts of counsel to come to agreement on many issues, the trial focused primarily on the redistricting proposals of the *Hastert* and *Rosebrook* plaintiffs. We are left primarily with the task of determining which of the two proposed plans best meets the goals and criteria, both constitutional and non-constitutional, enumerated by the Supreme Court. Secondarily, we must resolve a dispute between the *Collins* and the African–American *Nieves* plaintiffs over which of two African–American majority districts, the 7th or the 1st Congressional District, is the more appropriate situs for the politically significant Second Ward on Chicago's south side.

## DISCUSSION

### I. Scope of Authority

■ Reapportionment of congressional districts within a state is "'primarily a matter for legislative consideration and determination.'" *White v. Weiser*, 412 U.S. 783, 794–95, 93 S.Ct. 2348, 2354, 37 L.Ed.2d 335 (1973), quoting *Reynolds v. Sims*, 377 U.S. 533, 586, 84 S.Ct. 1362, 1394, 12 L.Ed.2d 506 (1964). This principle stands as an acknowledgement that under the United States Constitution, state legislatures are vested with the authority to re-

---

**4.** Alternatively stated, no party was permitted to place two or more redistricting plans before the court, as is occasionally permitted in redistricting trials. Our goal was to streamline the proceedings and to limit the likely confusion arising from a party arguing in support of two or more proposals simultaneously.

draw their respective congressional districts. U.S. CONST. Art. I, § 4, cl. 1.[5] Thus, the duty of reconfiguring the Illinois congressional districts to conform with the 1990 census falls first and foremost to the Illinois General Assembly. *Ryan v. State Bd. of Elections*, 661 F.2d 1130, 1132 (7th Cir.1981). The Illinois General Assembly failed to perform this duty. The task therefore falls to this court by default.

■ We do not tread unreservedly into the "political thicket" of congressional redistricting. *Colegrove v. Green*, 328 U.S. 549, 556, 66 S.Ct. 1198, 1201, 90 L.Ed. 1432 (1946). Rather, we proceed in the knowledge that the uniquely political character of congressional redistricting counsels that judicial relief is appropriate "only when a legislature fails to reapportion according to federal constitutional requisites in a timely fashion after having had an opportunity to do so." *White v. Weiser*, 412 U.S. at 794–95, 93 S.Ct. at 2354, quoting *Reynolds v. Sims*, 377 U.S. at 586, 84 S.Ct. at 1394. We note judicial intervention is again unavoidable.[6]

## II. Evaluation of Proposed Plans

All parties are in agreement that the existing congressional district plan is both unconstitutional and impracticable.[7] Consequently, we proceed directly to an evaluation of the constitutional and legal merits of the proposed *Hastert* and *Rosebrook* plans.[8]

### A. Evaluation Under Constitutional Criteria

#### 1. *Population Equality*

Evaluation of the proposed *Hastert* and *Rosebrook* redistricting plans proceeds initially on the basis of constitutional criteria developed by the Supreme Court since challenges to legislative apportionments were first found justiciable under the Fourteenth Amendment in *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). The evaluation of legislative apportionments began in earnest with *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). In *Reynolds*, the Court held that the overriding goal of an acceptable redistricting plan should be the "fair and effective representation for all

**5.** Article I, § 4, cl. 1 states in relevant part:
> The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof....

**6.** Illinois last formally enacted a congressional redistricting plan in 1961. *See,* 1961 Ill.Laws 1st Sp.Sess., p. 50, § 1, codified at Ill.Rev.Stat. ch. 46, ¶ 156f.1 (1963). That apportionment was ruled unconstitutional in *People ex rel. Scott v. Kerner*, 32 Ill.2d 539, 208 N.E.2d 561 (1965). Despite ample time to devise a constitutional redistricting plan for the 1966 congressional elections, the General Assembly avoided the task, leaving the judiciary with the task of adopting one among various provisional plans. *See People ex rel. Scott v. Kerner*, 33 Ill.2d 460, 211 N.E.2d 736 (1965). In the twenty-five years since *Kerner*, the Illinois legislature failed to enact a congressional redistricting plan on two separate occasions. As a result, this issue was defaulted to the judiciary. *See Skolnick v. State Electoral Bd.*, 336 F.Supp. 839 (N.D.Ill.1971); *In re Illinois Congressional Districts Reapportionment Cases*, No. 81–C–3915 (N.D.Ill. December 3, 1981), *aff'd sub nom. Ryan v. Otto*, 454 U.S. 1130, 102 S.Ct. 985, 71 L.Ed.2d 284 (1982). *See also Colegrove v. Green*, 328 U.S. 549, 66 S.Ct. 1198, 90 L.Ed. 1432 (1946) (recognizing General Assembly failure from 1901 to 1945 to redraw

Illinois congressional districts to reflect population changes resulted in an 8:1 ratio between the largest and smallest congressional district).

**7.** As a practical matter, the existing plan is unworkable because it apportions the state into 22 congressional districts. The existing plan therefore cannot be applied to the 1992 congressional elections in which Illinois voters will be entitled to elect only 20 individuals to the House of Representatives. As a constitutional matter, the uneven growth and movement of population in Illinois since the 1980 decennial census has resulted in constitutionally infirm deviations from the district population ideals based on both the 1980 and 1990 censuses. Under the 1990 census results, the existing districts yield total deviations of 45.96% from the 1980 population ideal of 519,021 and 41.17% from the 1990 population ideal of 571,530. Hastert Exh. 26 and 27; *compare Karcher v. Daggett*, 462 U.S. 725, 103 S.Ct. 2653, 77 L.Ed.2d 133 (1983) (striking as constitutionally infirm a congressional redistricting plan with a total deviation of 0.6984%).

**8.** Our analysis proceeds on the basis of the *Hastert* third amended redistricting plan (hereinafter "*Hastert* plan") and the *Rosebrook* first amended plan, referred to by the *Rosebrook* plaintiffs as "Rosebrook 3A" (hereinafter "*Rosebrook* plan").

citizens." *Id.* at 565–66, 84 S.Ct. at 1383. To this end, the Court enunciated a one person, one vote theory of representation for state legislatures. The Court began the "difficult process of putting flesh on the bones of *Reynolds v. Sims," Fortson v. Dorsey,* 379 U.S. 433, 440, 85 S.Ct. 498, 502, 13 L.Ed.2d 401 (1965) (Harlan, J., concurring), and, more particularly, of developing specific criteria for evaluating the validity of congressional redistricting plans in *Wesberry v. Sanders,* 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964).

In *Wesberry,* citizens of Georgia challenged that state's congressional redistricting plan because of vast disparities in the population of the resulting districts. Although the average district size was 394,-312, plaintiffs came from a district with a population of 823,680. At the other extreme, another district had a population of only 272,154. The Court deemed the gross disparities of population across districts and the resulting dilution of the voting rights of residents of the more populous districts violate the intention of the framers in enacting Article I, § 2 of the United States Constitution.[9]

After examining the debates of the Constitutional Convention, the Court concluded that "when the delegates agreed that the House should represent 'people' they intended that in allocating Congressman the number assigned to each state should be determined solely by population." *Id.* at 13, 84 S.Ct. at 533. The Court thus held that congressional districts must be drawn so that "as nearly as is practicable one man's vote in a congressional election is to be worth as much as another's." 376 U.S. at 7–8, 84 S.Ct. at 530. *Wesberry* established equality of population as the primary constitutional standard for evaluating the validity of a congressional redistricting plan.

The "as nearly as is practicable" standard accommodated the reality that perfect statistical equality may not always be possible. Indeed, in *Reynolds,* the Court con-

ceded "that it is a practical impossibility to arrange legislative districts so that each one has an identical number of residents, or citizens, or voters. Mathematical exactness or precision is hardly a workable constitutional requirement." 377 U.S. at 577, 84 S.Ct. at 1390 (footnote omitted). But this concession to the then existing limitations of cartologists was not intended to signal that the Court would not enforce the population equality principle with utmost vigor. Indeed, as stated in *Wesberry,* "[w]hile it may not be possible to draw congressional districts with mathematical precision, that is no excuse for ignoring our Constitution's plain objective of making equal representation for equal numbers of people the fundamental goal for the House of Representatives." 376 U.S. at 18, 84 S.Ct. at 535.

The "as nearly as is practicable" framing of the population equality standard in *Wesberry* left open the issue of where the statistical threshold dividing acceptable from constitutionally infirm population deviations lay. The Court responded to this question five years later in *Kirkpatrick v. Preisler,* 394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969). In *Kirkpatrick,* the State of Missouri argued that the 5.97% overall deviation embodied in its congressional redistricting plan should be considered *de minimus* so as to satisfy the "as nearly as is practicable" standard. The Court rejected the *de minimus* argument, because under that standard legislators would no longer strive for perfect population equality, but instead would strive only to meet whatever *de minimus* threshold the Court might set. *Id.* at 530–31, 89 S.Ct. at 1228–29. The Court further braced the rigor of the perfect population equality standard by holding that "the 'as nearly as is practicable' standard requires ... a good-faith effort to achieve precise mathematical equality. Unless population variances among congressional districts are shown to have resulted despite such effort, the State must justify each variance, no

---

9. Article 1, § 2, cl. 1 provides in part:
 The House of Representatives shall be composed of Members chosen every second Year

by the People of the several States....

matter how small." *Id.* Thus, the Court would permit only those population variances "which are unavoidable despite a good-faith effort to achieve absolute equality, or for which justification is shown." *Id.* at 531, 89 S.Ct. at 1229.

The Court's refusal to quantify a *de minimus* statistical threshold has permitted the "as nearly as is practicable" standard to keep pace with advances in redistricting technology.[10] The use of increasingly sophisticated computers in the congressional map drawing process has reduced population deviations to nearly infinitesimal proportions, as evidenced in the present case.[11] The population deviations contained in congressional redistricting plans following the 1980 census consistently fell within the statistical margin of error of the census data upon which the congressional districts are based.[12] This fact raised anew the issue of a *de minimus* threshold and how strictly the Court intended to require perfect mathematical equality of population.

In *Karcher v. Daggett*, 462 U.S. 725, 103 S.Ct. 2653, 77 L.Ed.2d 133 (1983), the Supreme Court affirmed the ruling of a three-judge panel rejecting as unconstitutional a New Jersey congressional redistricting plan with a total population deviation of 0.6984%. The state legislature had enacted its plan over other proposed plans with deviations as low as 0.4514%. The state defended its plan by arguing that it had achieved the functional equivalent of mathematical equality because the total deviation of its plan was less than the margin of error embodied in the 1980 decennial census. The crux of the state's argument was that population deviations smaller than the census margin of error are meaningless. Thus, states should be free to accept any plan coming within the margin of error without having to justify the deviation, even if an alternative plan contained a lower deviation figure.

The Supreme Court rejected New Jersey's position and reaffirmed its commitment to precise mathematical equality as the "the pre-eminent, if not sole, criterion on which to adjudge [the] constitutionality" of congressional districting plans. *Chapman v. Meier*, 420 U.S. 1, 23, 95 S.Ct. 751, 764, 42 L.Ed.2d 766 (1975). The Court concluded in *Karcher* that the deviations contained in the plan adopted by the New Jersey state legislature plainly were not

**10.** On the other hand, the ambiguity inhering in the "as nearly as is practicable" standard has also been the subject of criticism. Commentators and lower courts have criticized the standard as creating a moving target for congressional mapmakers. In demanding perfect mathematical equality while accepting limited deviations on a case by case basis, the population equality standard operates in a state of "entrenched ambiguity." *Carstens v. Lamm*, 543 F.Supp. 68, 81 (D.Colo.1982).

**11.** Not only do computers permit redistricters to achieve infinitesimal deviation levels, but, as noted by Justice Stevens in his concurrence in *Karcher v. Daggett*, 462 U.S. 725, 103 S.Ct. 2653, 77 L.Ed.2d 133 (1983),

Computers now make it possible to generate a large number of alternative plans, consistent with equal population guidelines and various other criteria, in a relatively short period of time, and to analyze the political characteristics of each one in considerable detail. In contrast, '[i]n the 1970's round of reapportionment, some states were barely able to generate a single reapportionment plan in the time allotted to the task.' National Conference of State Legislatures: Reapportionment: Law and Technology 55 (June 1980).

462 U.S. at 752 n. 10, 103 S.Ct. at 2671 n. 10 (Stevens, J., concurring) (citation omitted).

**12.** In *Karcher v. Daggett*, 462 U.S. 725, 103 S.Ct. 2653, 77 L.Ed.2d 133 (1983), the Supreme Court observed that estimates of the national undercount in censuses prior to 1980 ranged from 2.5% to 3.3%. Many congressional redistricting plans reviewed by the courts following the 1980 census fell well within this margin of error. *See, e.g., In re Illinois Congressional Districts Reapportionment Cases*, No. 81 C 3915 (N.D.Ill. Nov. 23, 1981) (four plans under consideration had total deviations ranging from 0.02581% to 0.1479%); *Doulin v. White*, 528 F.Supp. 1323 (E.D.Ark.1982) (rejecting legislatively approved plan with 1.87% total deviation because alternative plans had 0.78% and 0.75% deviations); *In re Pennsylvania Congressional Dist. Reapportionment Cases*, 567 F.Supp. 1507 (M.D.Pa.1982) (approving plan with total deviation 0.2354% under original census and .3990% under revised census figures); *South Carolina State Conference of Branches of NAACP v. Riley*, 533 F.Supp. 1178 (D.S.C.), *aff'd*, 459 U.S. 1025, 103 S.Ct. 433, 74 L.Ed.2d 594 (1982) (adopting plan with 0.28% total deviation); *Flanagan v. Gillmor*, 561 F.Supp. 36 (S.D.Ohio 1982) (involving plan with 0.62% total deviation).

the result of a good faith effort to achieve population equality because several other plans before the legislature had smaller maximum deviations. *See Karcher*, 462 U.S. at 738–40, 103 S.Ct. at 2662–63.[13] Thus, the state was required to justify the deviations contained in its adopted plan, " 'no matter how small.' " *Id.* at 730, 103 S.Ct. at 2658, quoting *Kirkpatrick*, 394 U.S. at 531, 89 S.Ct. at 1229. In rejecting the statistical margin of error justification, *Karcher* appears to have broken through the final barrier to requiring absolute mathematical equality of population. It is from this perspective that we analyze the *Hastert* and *Rosebrook* plans.

■ The total deviation embodied in the *Hastert* plan is 0.00017% from the ideal. *See* Hastert Memorandum in Support of Third Amended Redistricting Plan (filed Oct. 15, 1991). This figure, in the present context, constitutes mathematically perfect population equality. Of the 20 proposed congressional districts in the *Hastert* plan, 18 contain the ideal population of 571,530. *Id.* The remaining two districts have populations of 571,531. *Id.*[14] The *Rosebrook* plan nearly matches the *Hastert* figures, but not quite. The *Rosebrook* plan has a total deviation of 0.00297%. *See* Rosebrook Exh. 13. This figure arises from a configuration of congressional districts containing populations of 571,539 on the high side, nine above the ideal 571,530, and 571,522 on the low side, eight below the ideal. *Id.;* Rosebrook Exh. 53. Each of the *Rosebrook* proposed districts deviate slightly from the ideal. Rosebrook Exh. 13.

The deviation figures attained in both plans suggest that our discussion of the evolution of the population equality standard might properly be viewed as a eulogy to a principle that soon may be regarded as an administrative detail or historical curio.

We have recounted the history of this standard, however, to highlight the inescapable conclusion that *"absolute* population equality" remains "paramount" as the measure against which we must evaluate the congressional redistricting plans now before us. *Karcher*, 462 U.S. at 732, 103 S.Ct. at 2659 (emphasis added). Our obligation is to choose the plan that best satisfies this constitutional criterion. While we view the statistical deviations in the *Rosebrook* plan as *de minimus* in statistical terms, the deviations remain legally significant so long as *Kirkpatrick* and *Karcher* remain the law of the land.

The *Rosebrook* plaintiffs consequently bear the burden of demonstrating that their population deviations result from a good faith effort to achieve precise mathematical equality. Otherwise each deviation must be justified as "necessary to achieve some legitimate goal." *Karcher*, 462 U.S. at 730, 103 S.Ct. at 2658, quoting *Kirkpatrick*, 394 U.S. at 531, 89 S.Ct. at 1229. The *Rosebrook* plaintiffs do not have the first of these two options at their disposal. As *Karcher* counsels, the availability of an alternative plan with a smaller total deviation effectively invalidates a good faith effort argument. *Karcher*, 462 U.S. at 738, 103 S.Ct. at 2662. Thus, the very existence of the mathematically precise *Hastert* plan requires that the *Rosebrook* plaintiffs demonstrate legitimate goals justifying each variance in their plan.

■ The *Rosebrook* plaintiffs have not directly attempted to justify the population deviations contained in their plan. However, they have offered three arguments in support of their contention that the *Rosebrook* plan is superior to the *Hastert* plan. First, the *Rosebrook* plaintiffs assert that their plan better maximizes minority voting strength in central Illinois. Second, they contend that the *Rosebrook* plan better pre-

---

**13.** The Court left open the possibility that population deviations might be justified on the basis of flaws in the census data, but stated that a census flaw justification must be supported with a precision not shown by the state in *Karcher*. 462 U.S. at 738, 103 S.Ct. at 2662.

**14.** District population may be absolutely equipopulous only if the total population figure is perfectly divisible by the total number of districts. The total Illinois population figure of 11,430,602 is not perfectly divisible by 20, the number of districts. Thus, there is a one person variance in *Hastert* proposed 3rd and 13th districts.

serves the historic and geographic characteristics of existing congressional districts in southern Illinois. Third, they contend that their plan will bring about a fairer distribution of congressional seats along party lines than the *Hastert* plan. We will address each of these arguments in greater detail in later sections. However, for the purpose of the population equality analysis, it suffices to say that these arguments fail to address all of the population variances contained in the *Rosebrook* plan.

Specifically, the *Rosebrook* arguments do not address the population variations in the districts covering Chicago, Cook County and the immediately adjacent "collar counties," all of which contain minor variances from the 571,530 ideal. The arguments concerning the maximization of racial voting strength and preservation of historic and geographic characteristics of existing counties relate exclusively to their 17th, 18th, 19th and 20th proposed congressional districts in downstate Illinois. Additionally, the *Rosebrook* plaintiffs have not attempted to demonstrate any causal relationship between the goal of political fairness and the population variances in the remaining districts. Consequently, we find that the *Rosebrook* plaintiffs have failed to sufficiently justify the population variances contained in their plan as required under *Kirkpatrick* and *Karcher*.[15]

Because minute population deviations remain legally significant under *Wesberry*, *Kirkpatrick*, and *Karcher*, we find that

the weight of the evidence favors the adoption of the *Hastert* plan. But, rather than reduce congressional redistricting to a "hair splitting game," *Carstens v. Lamm*, 543 F.Supp. at 85, we shall focus greater attention on other constitutional criteria that may reveal a more significant distinction between the *Hastert* and *Rosebrook* plans. *See Karcher v. Daggett*, 462 U.S. at 750–53, 103 S.Ct. at 2669–71 (Stevens, J., concurring) (perfect population equality standard is a useful neutral criterion, but alone is an inadequate method for adjudging constitutionality of a redistricting plan).[16]

### 2. *Discrimination*

 We next evaluate the *Hastert* and *Rosebrook* plans for their fairness to the voting rights of racial and language minorities. Racial gerrymandering violates both the Fifteenth Amendment, *Gomillion v. Lightfoot*, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960), and the Equal Protection Clause of the Fourteenth Amendment, *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). Discrimination claims under either constitutional theory require a showing of a discriminatory motive against a minority group in the drawing of district boundaries. *Mobile v. Bolden*, 446 U.S. 55, 62–66, 100 S.Ct. 1490, 1497–99, 64 L.Ed.2d 47 (1980). The principal springboard for challenging a districting plan on discrimination grounds is § 2 of the Voting Rights Act, 42 U.S.C. § 1973.[17]

---

**15.** Notably, the *Rosebrook* plaintiffs moved at the end of the first day of trial to submit a mathematically perfect modified districting plan that also maintained the purported advantages of the plan presently under review. The court granted the motion as a request to substitute the new plan for the plan submitted before trial and afforded the option of proceeding with either plan, but not both. The *Rosebrook* plaintiffs ultimately declined to proceed with their mathematically superior modified plan. In declining to proceed with the mathematically perfect plan, the *Rosebrook* plaintiffs undermine any argument that the variances contained in the present plan were necessary to achieve the goals of maximizing racial minority voting power, preserving historic districts and political fairness.

**16.** The fact that "the rule of absolute [population] equality is perfectly compatible with 'ger-

rymander' of the worst sort." *Wells v. Rockefeller*, 394 U.S. 542, 551, 89 S.Ct. 1234, 1240, 22 L.Ed.2d 535 (1969) (Harlan, J., dissenting), would counsel careful scrutiny of both plans under other constitutional and legal criteria regardless of the marginal nature of the population deviations embodied in the *Hastert* and *Rosebrook* plans.

**17.** 42 U.S.C. § 1973 states:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.

Since amended in 1982, a claim under § 2 no longer requires only a showing that a districting plan has a discriminatory effect against a racial or language minority.[18] *Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). No allegation of discriminatory motivation has been raised against either the *Hastert* or *Rosebrook* plans, nor is one discernible from the record.[19] We therefore analyze the *Hastert* and *Rosebrook* plans for any discriminatory effects they may have on racial or language minorities solely under the terms of § 2 of the Voting Rights Act.

■ Discriminatory impact claims proceed under the theory of minority vote dilution. Vote dilution, in the legal sense, refers to the impermissible discriminatory effect of a districting plan when it operates "to minimize or cancel out the voting strength of [minority] groups." *Fortson v. Dorsey*, 379 U.S. at 439, 85 S.Ct. at 501. Dilution of minority voting strength through the drawing of district lines occurs as a result of one of two strategies. Minority voting strength is most typically diluted by fragmenting large concentrations

of minority population and dispersing them into separate political districts, thus preventing a minority community from constituting a majority within a single political district. *Beer v. United States*, 425 U.S. 130, 141, 96 S.Ct. 1357, 1363, 47 L.Ed.2d 629 (1976). Alternatively, minority vote dilution is caused by concentrating minorities into districts where they constitute an excessive majority. *See Thornburg v. Gingles*, 478 U.S. at 46 n. 11, 106 S.Ct. at 2764 n. 11 (1986), citing Engstrom & Wildgren, *Pruning Thorns from the Thicket: An Empirical Test of the Existence of Racial Gerrymandering*, 2 Legis.Stud.Q. 465, 465–66 (1977) (additional citations omitted). This second districting technique of packing minorities into a single district wastes minority voting power and unnecessarily minimizes minority influence in other districts. *Wright v. Rockefeller*, 376 U.S. 52, 57, 84 S.Ct. 603, 605, 11 L.Ed.2d 512 (1964).

### i. African–American Super-Majority Districts

■ Both the *Hastert* and *Rosebrook* plans preserve, in almost identical fashion,

(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of the protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

**18.** Prior to the 1982 amendment to § 2 of the Voting Rights Act, the Supreme Court required a showing of discriminatory motivation as part of a § 2 claim. *Mobile v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980). Congress amended § 2 for the express purpose of replacing the *Bolden* standard with the "results" test of *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), that applied in all pre-*Bolden* cases. S.Rep. No. 417, 97th Cong., 2d Sess.

27 (1982), *reprinted in* 1982 U.S.Code Cong. & Admin.News 177, 205.

**19.** To the contrary, protection of the interests of minority communities was a driving force for both the *Hastert* and *Rosebrook* plaintiffs. The success of both parties in meeting the needs of minority communities is reflected in the fact that there are no minority group objections to either plan. The agreement among the parties is remarkable for the fact that major demographic changes during the 1980's necessitated radical alterations in the configuration of the existing minority districts. Tr. 117–20 (Taylor testimony). The present minority districts (1st, 2nd, 7th) have experienced significant losses in population, *see* Hastert Exh. 2, 3, 4, 5, 26, 27, particularly African–American population, *see* Hastert Exh. 10A 13, 14, 17, 26, 27, over the past ten years. In addition, the Chicago area African–American population appears to have shifted southward between 1980 and 1990. *Id.;* Tr. 138 (Taylor testimony). Bipartisan effort to avoid minority dilution, like that exhibited in the present case, typically is sufficient to defeat a Fourteenth or Fifteenth Amendment racial discrimination challenge to a districting plan. *See Flanagan v. Gillmor*, 561 F.Supp. 36, 46 (S.D.Ohio 1982).

the three "super-majority" [20] African–American seats (the 1st, 2nd and 7th Congressional Districts) established in the 1981 congressional districting plan. Consequently, we find no "retrogression" in minority electoral representation as a result of the two plans. *Beer*, 425 U.S. at 141, 96 S.Ct. at 1363. Moreover, each of the super-majority African–American districts contains little more than the approximate 65% minority population concentration generally regarded as necessary to ensure minorities a reasonable opportunity to control a district.[21] *See Ketchum v. Byrne*, 740 F.2d 1398, 1408 n. 7 (7th Cir.1984), *cert. denied*, 471 U.S. 1135, 105 S.Ct. 2673, 86 L.Ed.2d 692 (1985); *United Jewish Organizations, Inc. v. Carey*, 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977). Consequently, we find no evidence of impermissible minority "packing" under the Voting Rights Act with respect to either plan.

We note that the proposed 7th district in each of the plans is the least secure of the African–American super-majority districts. As noted above, a concentration of 65% total population and 60% voting age minority population is generally regarded as the

---

**20.** Minority concentrations of 65% total population and 60% voting age population within a single district are regarded as necessary to provide a minority population with a reasonable opportunity to "exercise political control over that district." *United Jewish Organizations, Inc. v. Carey*, 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977). These "super-majority districts" compensate for the higher non-voting age population percentages, lower voter registration and lower voter turnout found in minority communities. *See Ketchum v. Byrne*, 740 F.2d 1398, 1413–15 (7th Cir.1984), *cert. denied*, 471 U.S. 1135, 105 S.Ct. 2673, 86 L.Ed.2d 692 (1985); *In re Congressional Districts Cases*, No. 81 81 C 3915, slip op. at 14 (N.D.Ill. Nov. 23, 1981).

**21.** MINORITY DISTRICT RACIAL/ETHNIC DATA

**1st Cong. Dist.**

| | Population | White African–American | | Afr.–Am. | | Hispanic | |
|---|---|---|---|---|---|---|---|
| | | # | (%) | # | (%) | # | % |
| Hastert | 571,530 | 147,831 | (25.87) | 396,241 | (69.33) | 20,548 | (3.60) |
| –VAP | 418,800 | 117,472 | (28.05) | 282,669 | (67.49) | 13,081 | (3.12) |
| Rosebrook | 571,533 | 142,753 | (24.98) | 402,403 | (70.41) | 20,253 | (3.54) |
| –VAP | 416,074 | 113,214 | (27.21) | 285,132 | (68.53) | 12,872 | (3.09) |

**2nd Cong. Dist.**

| | Population | White African–American | | Afr.–Am. | | Hispanic | |
|---|---|---|---|---|---|---|---|
| | | # | (%) | # | (%) | # | % |
| Hastert | 571,530 | 140,692 | (24.62) | 388,868 | (68.04) | 37,860 | (6.62) |
| –VAP | 402,216 | 111,953 | (27.83) | 263,885 | (65.61) | 23,593 | (5.87) |
| Rosebrook | 571,534 | 145,486 | (25.46) | 383,499 | (67.10) | 38,432 | (6.72) |
| –VAP | 394,542 | 115,612 | (28.72) | 260,233 | (64.64) | 23,959 | (5.95) |

**7th Cong. Dist.**

| | Population | White African–American | | Afr.–Am. | | Hispanic | |
|---|---|---|---|---|---|---|---|
| | | # | (%) | # | (%) | # | % |
| Hastert | 571,530 | 155,701 | (27.24) | 372,360 | (65.15) | 24,763 | (4.33) |
| –VAP | 406,971 | 133,925 | (32.91) | 241,469 | (59.33) | 16,854 | (4.14) |
| Rosebrook | 571,529 | 155,843 | (27.27) | 371,545 | (65.01) | 24,665 | (4.32) |
| –VAP | 409,268 | 134,380 | (32.83) | 242,655 | (59.29) | 16,804 | (4.11) |

VAP connotes Voting Age Population

threshold for creating a safe minority district. Under the *Hastert* plan, the 7th district has a 65.15% total African–American population concentration and 59.33% voting age population concentration. The *Rosebrook* plan contains corresponding concentrations of 65.01% total and 59.29% voting age African–American populations. Because both plans dip slightly below the 60% voting age population concentration level deemed to create a safe 7th congressional district, we favor the plan that comes closest to that level. The *Hastert* plan comes closest by a slight margin. Therefore, as a technical matter, the *Hastert* plan is marginally superior to the *Rosebrook* plan as it relates to the three African–American super-majority districts.

**ii. Hispanic Super–Majority District**

■ Each plan also creates a new super-majority Hispanic district with a total Hispanic population of 65% and voting age population of just over 59%.[22] The Hispanic *Nieves* plaintiffs contend, and all parties agree, that § 2 of the Voting Rights Act, as construed in *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), requires the creation of an Hispanic district at this time.[23] The extraordinary configuration of the proposed Hispanic district agreed to by all parties requires us not to accept this conclusion without scrutiny.[24]

**22.** 

### MINORITY DISTRICT RACIAL/ETHNIC DATA

| | Population | Hispanic Dist. (Proposed) White | | Afr.–Am.Black | | Hispanic | |
|---|---|---|---|---|---|---|---|
| | | # | (%) | # | (%) | # | % |
| Hastert (4th) | 571,530 | 153,186 | (26.80) | 31,528 | (5.52) | 371,663 | (65.03) |
| –VAP | 383,497 | 125,437 | (32.71) | 20,143 | (5.25) | 226,974 | (59.18) |
| Rsbrk (11th) | 571,535 | 153,331 | (26.83) | 34,141 | (5.97) | 371,500 | (65.00) |
| –VAP | 383,556 | 125,560 | (32.74) | 20,149 | (5.25) | 226,877 | (59.15) |

VAP connotes voting age population

**23.** Section 2 of the Voting Rights Act extends coverage to "language minorities" by incorporating "the guarantees set forth in [42 U.S.C. §] 1973b(f)(2)." *Chisom v. Roemer,* ___ U.S. ___, 111 S.Ct. 2354, 2362 & n. 18 (1991). Section 1973b(f)(2) states:

> No voting qualification or prerequisite to voting, or standard, practice, or procedure shall be imposed or applied by any State or political subdivision to deny or abridge the right of any citizen of the United States to vote because he is a member of a language minority group.

**24.** The Supreme Court usually applies the terms "uncouth" and "irregular" to unusual district configurations. *See Gomillion v. Lightfoot,* 364 U.S. 339 (1960) (redrawing city limits "from a square to an uncouth twenty-eight-sided figure" to exclude all but four or five of city's black residents states claim under 15th Amendment). Justice Stevens, in his concurring opinion in *Karcher v. Daggett,* 462 U.S. at 744–65, took aim at the "bizarre configuration" of New Jersey's 1982 congressional reapportionment plan. We would be remiss if we failed to observe that the proposed Hispanic district agreed to by all parties in the present action makes the "bizarre" configuration of the *Karcher* congressional districts acceptable by comparison. The Chicago Hispanic community resides principally in two dense enclaves, one on Chicago's near northwest side and one on the near southwest side. The present 7th Congressional District that runs roughly in an east-west direction along Chicago's central latitudes from Lake Michigan to the western suburbs separates the two Hispanic enclaves. Both the *Hastert* and *Rosebrook* plans connect the northwest and southwest side Hispanic enclaves by running a narrow corridor around the western end of the 7th Congressional District, creating a C-shaped configuration. To ensure a sufficient Hispanic concentration within the proposed district, both maps shoot rays out from the northwest and southwest enclaves to capture additional Hispanic population. In sum, the district looks not unlike a Rorschach blot turned on its side. Few districts have quite so an extraordinary appearance. *See generally* Congressional District Atlas: 100th Congress of the United States, United States

*Gingles* represents the Supreme Court's first attempt to construe the broad and ambiguous terms of the amended § 2 of the Voting Rights Act. The case involved a claim that the creation of certain multi-member districts in the 1982 North Carolina legislature redistricting plan impaired the ability of black citizens within those districts to elect representatives of their choice. A three-judge district court found in favor of the plaintiffs and approved a new redistricting plan that converted most of the multi-member districts into single-member districts, many of which were drawn with black population majorities. In affirming the district court in most respects, the Supreme Court reviewed the plaintiffs' claims under the "totality of circumstances" prescribed in § 2(b) of the Act, 42 U.S.C. § 1973(b).

As an initial matter, *Gingles* requires a minority group to make a threshold showing that it is: (1) sufficiently large and geographically compact to constitute a majority in a properly drawn district; (2) politically cohesive; and (3) that racial bloc voting typically frustrates the election of the minority group's preferred candidate. 478 U.S. at 50–51, 106 S.Ct. at 2766. A minority group meeting these threshold § 2 Voting Rights Act requirements is entitled to consideration of its claim on the merits under the totality of circumstances test.

The totality of circumstances test relies principally upon a set of objective factors culled from *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), and outlined in the Senate Report accompanying the 1982 amendments to § 2. S.Rep. No. 417, 97th Cong., 2d Sess. 27 (1982), *reprinted in* 1982 U.S.Code Cong. & Admin.News 177, 205 ("S.Rep. 417"). The factors relevant to a § 2 claim include: a history of official discrimination relating to minority political participation; the extent of racially polarized voting practices; the extent to which certain voting practices and

procedures with discriminatory effects have been employed in the past; the exclusion of the minority group from the candidate slating process; the extent to which the minority group bears the effects of past discrimination in education, employment and health services which hinder their ability to effectively participate in the political process; the use of racial appeals in political campaigns; the extent to which minorities have been elected to office; and the lack of responsiveness by elected officials to particular minority needs. S.Rep. No. 417 at 28–29, *reprinted in* 1982 U.S.Code Cong. & Admin.News at 205–06; *Gingles,* 478 U.S. at 44–45, 106 S.Ct. at 2762–63. No one factor or grouping of factors is dispositive of minority vote dilution. *Id.* at 29; 1982 U.S.Code Cong. & Admin.News at 207.

We discuss first whether the claim of the Hispanic *Nieves* plaintiffs satisfies the threshold *Gingles* requirements. According to the 1990 census, the Hispanic population of Chicago now totals 545,852, an increase of 29.33% over the 1980 count of 422,052. Hastert Exh. 7. The number for Cook County, which includes Chicago, now totals 694,194, an increase of 39% over the 1980 figure. *Id.* Most of the Chicago/Cook County Hispanic population is clustered into two dense enclaves, one on Chicago's near northwest side and another on the near southwest side. Hastert Exh. 8, 10; Tr. 104 (Taylor testimony). The two separate Hispanic population clusters are less than a mile from each other at their closest points. Hastert Exh. 10. The separation of the clusters is not indicative of the existence of two distinct communities, but appears to have occurred as a result of exogenous physical and institutional barriers.[25] We therefore conclude that the Chicago/Cook County Hispanic community is "sufficiently large and geographically compact" to constitute a single district majority. *Gingles,* 478 U.S. at 50, 106 S.Ct. at 2766.

Dept. of Commerce Bureau of the Census (1985).

**25.** The two Hispanic population clusters appear to be separated by Chicago's major east-west highway, the Eisenhower Expressway, as well as by expanses of land developed by the University of Illinois–Chicago Circle and various major medical institutions. Hastert Exh. 10; Nieves Exh. 2, Aff. of Dr. Felix M. Padilla.

Second, the Chicago/Cook County Hispanic community clearly is politically cohesive. The *Nieves* plaintiffs properly refer the court to previous adjudications that found the community politically cohesive and which are themselves evidence of a community acting as one to defend against politically discriminatory practices at both the state and local level. *See Ketchum v. Byrne*, 740 F.2d 1398 (7th Cir.1984) (1982 Chicago aldermanic redistricting plan violates Hispanic rights under Voting Rights Act), *on remand*, 630 F.Supp. 551 (N.D.Ill. 1985); *Rybicki v. State Board of Elections*, 574 F.Supp. 1082 (N.D.Ill.1982) (three-judge panel) (approving Voting Rights Act settlement with Hispanic community regarding 1982 state legislative redistricting).

The political cohesiveness of the Hispanic community is further reflected in the bloc voting patterns of the community. Single and bivariate regression analysis of voting patterns in Chicago precincts demonstrate significant ethnic bloc voting patterns. *See* Hastert Exh. 41; Tr. 34–36 (Engstrom testimony); Nieves Exh. 1, Aff. of Dr. Gordon G. Henderson. Previous judicial findings demonstrating a paucity of Hispanic officials in city and state-wide elected political offices, *see Ketchum*, 740 F.2d at 1406, compel the finding that ethnic bloc voting patterns have thwarted the political interests of the Hispanic community. Thus, we find that the third *Gingles* precondition is met with respect to the Hispanic community. *See Gingles*, 478 U.S. at 51, 106 S.Ct. at 2766.

Having satisfied the *Gingles* threshold requirements, the Hispanic *Nieves* plaintiffs are entitled to an adjudication of their § 2 claim under the totality of circumstances factors. The *Nieves* plaintiffs again direct the court to the previous adjudicatory findings in *Ketchum v. Byrne*, 740 F.2d 1398 (7th Cir.1984). In *Ketchum*, the Seventh Circuit affirmed the district court's findings that the ward map drawn for the Chicago City Council in 1982 impermissibly fractured the Hispanic community and thus diluted Hispanic voting strength. Although *Ketchum* involved municipal redistricting, it bears directly on the present

case because the proposed Hispanic majority congressional district now under consideration is essentially coterminous with the Hispanic community and population discussed in *Ketchum.*

In *Ketchum*, the Seventh Circuit relied in part upon the objective factors outlined in S.Rep. 417 and found many of the factors present with regard to the Chicago Hispanic community. The Court made specific reference to the history of discrimination against Chicago Hispanics in housing, education and services, which the court regarded as a cause of the historically low Hispanic voter registration and turnout. 740 F.2d at 1405. The Court also acknowledged the absence of any Hispanic representatives on the Chicago City Council from 1920 to 1980. *Id.* at 1406. Finally, the Court noted that the Hispanic population also has been adjudged the victim of intentional discrimination in the drawing of certain state legislative districts following the 1980 census. *Id.; see also Rybicki v. State Board of Elections*, 574 F.Supp. 1082 (N.D.Ill.1982). This judicially recognized history of discrimination, both past and recent, against the Chicago Hispanic community and its attendant impact on effective political participation and representation, as evidenced in *Ketchum*, satisfies this court that a Hispanic majority district is warranted under *Gingles.*

■■■ The location of the Chicago Hispanic community in two highly concentrated enclaves on either side of the 7th Congressional District on Chicago's near northwest and near southwest sides necessarily requires an odd configuration to accommodate the creation of an Hispanic district and the three super-majority African-American districts dictated under the Voting Rights Act. "Uncouthness," as defined by the Supreme Court, is not an aesthetic concept. Rather, an uncouth district configuration typically serves merely as a signal to a court that it should more closely scrutinize a districting plan for constitutional infirmities. In this instance, the configuration has been drafted to *satisfy* constitutional and statutory goals and principles. Racial and ethnic considerations are

appropriate in drawing districts to advance the goals of the Voting Rights Act. *See United Jewish Organizations, Inc. v. Carey,* 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977). We will therefore approve the proposed creation of an Hispanic majority district. *Cf. Flanagan v. Gillmor,* 561 F.Supp. 36, 46 (S.D.Ohio 1982) (bipartisan efforts to avoid minority dilution will defeat discrimination challenges).

In determining which proposed plan most effectively serves the goal of political fairness to the Hispanic community, we note that the *Hastert* and *Rosebrook* plans configure their proposed Hispanic majority districts in almost identical fashion. Hastert Exh. 43; Rosebrook Exh. 2; Tr. 106 (Taylor testimony). The *Hastert* plan creates an Hispanic district of 65.03% total and 59.18% voting age Hispanic populations. Again, the *Rosebrook* plan very nearly equals the *Hastert* Hispanic concentration figures. The Hispanic *Rosebrook* district contains corresponding concentrations of 65.00% total and 59.15% voting age Hispanic populations. The difference between the two plans is minimal, but again we must conclude that the *Hastert* plan is marginally superior to the *Rosebrook* plan because it offers the Hispanic community a slightly better opportunity to exercise political control over the Hispanic majority district.

### iii. Downstate Illinois Districts

The *Rosebrook* plaintiffs contend that the *Hastert* plan dilutes the voting strength of the Springfield and Decatur, Illinois, African–American communities by placing those two cities in separate congressional districts.[26] The *Rosebrook* plan joins both Springfield and Decatur in a single district,[27] thus maintaining the 20th Congressional District in the 1981 plan. The African–American communities of Springfield and Decatur, as aggregated un-der 1981 plan, presently comprise 5.9% of the total population and 4.7% of the voting age population of the 20th Congressional District.[28] Hastert Exh. 26, 27. The *Rosebrook* plaintiffs contend that the presence of these small, noncontiguous minority communities[29] makes the present 20th Congressional District a minority "influence district" entitled to § 2 Voting Rights Act protection.

The concept of a Voting Rights Act influence district was recognized for the first time only recently in *Armour v. Ohio,* 775 F.Supp. 1044 (N.D.Ohio 1991). The *Armour* plaintiffs were African–American residents of Youngstown and neighboring Campbell City, Ohio. The state adopted and implemented a legislative districting plan for the Ohio House of Representatives that fragmented the greater Youngstown African–American community into two single-member districts where they constituted only 24.96% and 11.11% of the respective total district populations. The plaintiffs contended that this fragmentation constituted minority vote dilution under § 2 of the Voting Rights Act. The state contended that the plaintiffs were not entitled to an adjudication of their Voting Rights Act claim on the merits because they failed to satisfy the first of the three threshold requirements set forth in *Gingles;* namely, that the plaintiff minority group was not "sufficiently large ... to constitute a majority in a single-member district." *Gingles,* 478 U.S. at 50, 106 S.Ct. at 2766.

A divided three-judge district court rejected the state's argument and held that the § 2 threshold conditions established in *Gingles* do not apply to § 2 Voting Rights Act challenges to single-member districts. *Armour,* 775 F.Supp. at 1051. The *Armour* court further recognized the plaintiffs as part of a minority influence district and found that the plaintiffs had been the vic-

---

**26.** The *Hastert* plan places Springfield in the proposed 20th district and Decatur in the proposed 19th district.

**27.** The *Rosebrook* 18th district.

**28.** The *Rosebrook* 18th district essentially preserves this minority concentration. The aggregated African–American populations of Spring-field and Decatur would comprise 5.71% of the total population and 4.81% of the voting age population of the *Rosebrook* 18th district. Rosebrook Exh. 13.

**29.** Approximately 35 miles and six townships separate Springfield and Decatur at their closest township boundaries. Hastert Exh. 21.

tims of cognizable and redressable minority vote dilution under § 2 of the Voting Rights Act. The *Armour* court justified its narrow construction of *Gingles* by noting that the *Gingles* majority had expressly limited its holding to the facts of that case involving a challenge to multi-member districting. Indeed, the Court in *Gingles* stated:

... We have no occasion to consider whether § 2 permits, and if it does, what standards should pertain to a claim brought by a minority group, that is not sufficiently large and compact to constitute a majority in a single-member district, alleging that the use of a multi-member district impairs its ability to *influence* elections.

We also note that we have no occasion to consider whether the standards we apply to respondents' claims that multi-member districts operate to dilute the vote of geographically cohesive minority groups, that are large enough to constitute majorities in single-member districts and that are contained within the boundaries of challenged multi-member districts are fully pertinent to other sorts of vote-dilution claims, such as a claim alleging that the splitting of a large and geographically cohesive minority between two or more multi-member or single-member districts resulted in the dilution of the minority vote.

*Gingles,* 478 U.S. at 46 n. 12, 106 S.Ct. at 2764 n. 12 (emphasis in original).

To further buttress its narrow construction of *Gingles,* the *Armour* court referred to the Supreme Court's most recent § 2 case, *Chisom v. Roemer,* — U.S. ——, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991), in which the Court held that § 2 governs judicial elections. In *Chisom,* the Court stated that § 2 plaintiffs must demonstrate that an electoral device diminishes both their opportunity to participate in the political process *and* their opportunity to elect candidates of their choice. 111 S.Ct. at 2365. Justice Scalia argued in dissent that the majority's requirement that a minority group always show a diminished opportunity to elect candidates of their choice would bar § 2 claims to those "minorities who

form such a small part of the electorate in a particular jurisdiction that they could on no conceivable basis 'elect representatives of their choice.'" *Id.* at 2371 (Scalia, J., dissenting). The majority responded by stating that Justice Scalia's criticism "rest[ed] on the erroneous assumption that a small group of voters can never influence the outcome of an election." *Id.* at 2365 n. 24. The *Armour* court ultimately employed the Supreme Court's limiting statements in *Gingles* and its *dicta* in both *Gingles* and *Chisom* as its point of departure for recognizing the Greater Youngstown area as a minority influence district entitled to § 2 protection.

We agree with the *Armour* court's conclusion that the Supreme Court has not foreclosed an extension of Voting Rights Act protection to groups unable to constitute a majority in a properly drawn single-member district. We are troubled, however, by the fact that the *Armour* court appears to have concluded that because the Supreme Court has not ruled out the influence district concept, the Court will likely embrace this broad interpretation of § 2 without limitation in the future. Moreover, the *Armour* court did not undertake any analysis of the statute or its legislative history that might support its holding. The *Armour* court also appears to have disregarded serious objections to the breaching of the *Gingles* single-member majority precondition raised by other courts in the context of multi-member district challenges. *See e.g., McNeil v. Springfield Park Dist.,* 851 F.2d 937 (7th Cir.1988), *cert. denied,* 490 U.S. 1031, 109 S.Ct. 1769, 104 L.Ed.2d 204 (1989).

The scope of the Voting Rights Act, as construed by the Supreme Court, has been defined principally in the context of cases addressing the impact of a districting practice upon an effective voting majority. *Gingles v. Edmisten,* 590 F.Supp. 345, 381 (E.D.N.C.1984) (three judge panel), *aff'd in part, rev'd in part sub nom., Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). Similarly, Voting Rights Act case law has developed primarily in response to challenges to a single

dilutive device—the at-large or multi-member district. *Terrazas v. Clements*, 581 F.Supp. 1329, 1347 (N.D.Tex.1984) (three judge panel); *see generally*, Abrams, *Raising Politics Up: Minority Political Participation and Section 2 of the Voting Rights Act*, 63 N.Y.U.L.Rev. 449 (1988). Because Voting Rights Act case law has focused primarily on the impact of electoral practices on the ability of minorities to *elect* representatives of their own choosing, it is hardly surprising that the Supreme Court in *Gingles* required proof of a single-member district majority as a precondition to a § 2 claim. Indeed, in stating its reason for imposing the precondition, the Court stated that "[u]nless minority voters possess the *potential* to elect representatives in the absence of the challenged structure or practice, they cannot claim to have been injured by that structure or practice." *Gingles*, 478 U.S. at 50 n. 17, 106 S.Ct. at 2766 n. 17 (emphasis in original).

Two separate but related concerns appear to animate the Court's explanation for implementing the single-member district majority pre-condition. The first is one of proof of injury. A minority voter majority demonstrating an ability to *elect* a representative provides the court with an objective brightline measure for determining whether an injury has in fact occurred. The inability of minority voters to control their own political destiny may readily be viewed as the result of a discriminatory electoral structure. Where the minority voters could not constitute a single-member district majority, injury becomes a more elusive and subjective concept. It is only through the electoral majority precondition that courts are possessed of a "clear measure of [ ] voting strength, hence a fair and workable standard by which to measure

dilution of the strength." *Gingles v. Edmisten*, 590 F.Supp. at 381.

The second concern is one of fashioning an effective remedy for § 2 violations. In the absence of an objective measure of vote dilution provided by the electoral majority precondition, a court lacks a similarly objective measure for formulating a remedy against a discriminatory structure or practice. In a case where the electoral majority precondition is satisfied, a court need only order a reconfiguration of the challenged districts to ensure that a minority community effectively controls its own political destiny. Absent this brightline test, relief becomes a truly perplexing issue necessarily requiring a court to resort to vague, subjective criteria.

The circumstantial focus of Voting Rights Act cases on the ability of racial and language minorities to win elections has left the courts with little need to grapple with the provision of § 2 protecting the "opportunity ... to participate in the political process." 42 U.S.C. § 1973(b).[30] It is this ambiguous and open-ended provision that presumably must serve as the basis for recognizing dilution of minority "influence" claims under § 2. There is little doubt that the "participation" provision, as worded, may accommodate a construction that would permit § 2 claims by minority groups lacking a single-district electoral majority. Moreover, such a construction would not cover new conceptual ground for the Supreme Court, as demonstrated by the limiting language in *Gingles* referring to the ability of minority voters to *"to influence* elections." *Gingles*, 478 U.S. at 46–47 n. 12, 106 S.Ct. at 2764 n. 12 (emphasis in original).[31]

Existing precedent offers little meaningful guidance for approaching the question of whether § 2 does in fact embrace the

**30.** This participation provision was not part of the original § 2, but was added as part of the 1982 amendments to the Voting Rights Act.

**31.** The Court also has framed much of its Fourteenth Amendment Equal Protection jurisprudence regarding claims of discrimination against minority voters in terms of voter "influence." For example, on the same day the Court issued its ruling in *Gingles,* a plurality of the

Court in *Davis v. Bandemer*, 478 U.S. 109, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986), stated in the context of a political gerrymandering claim that "unconstitutional discrimination occurs only when the electoral system is arranged in a manner that will consistently degrade a voter's or a group of voters' influence on the political process as a whole." *Id.* at 132, 106 S.Ct. at 2810.

concept of minority influence districts. A review of the legislative history accompanying the 1982 amendments to the Voting Rights Act fails to shed light on the issue. The legislative history regarding the § 2 amendments is devoted almost exclusively to the merits of replacing the *Mobile v. Bolden* intent standard for proving § 2 claims with the *White v. Regester* results/totality of circumstances test. *See generally* S.Rep. No. 417, 97th Cong., 2d Sess. 15–43 (1982). The total absence of direct legislative or judicial guidance on this matter leaves us reluctant to recognize a concept that would so radically expand the scope of the Voting Rights Act.

Additionally, we are unable to perceive, as a matter of simple logic, a principled justification for waiving the minority voter majority requirement in single-member district cases while preserving it in multi-member or at-large district cases. The concerns animating the *Gingles* electoral majority precondition for multi-member cases—concerns of proof and relief—reside equally in the single-member context.[32] Thus, we believe the *Gingles* electoral majority pre-condition may limit the Court's options when it does consider single-member district cases under the amended § 2.

Moreover, we agree with the analysis of other courts concluding that the recognition of minority influence districts may raise at least as many issues as it would resolve. For example, in cases involving challenges to multi-member districts, courts have recognized that an unrestricted breach of the *Gingles* single-district majority precondition will likely open a Pandora's box of marginal Voting Rights Act claims by minority groups of all sizes. *See McNeil v. Springfield Park Dist.*, 851 F.2d 937 (7th Cir.1988); *Skorepa v. Chula Vis-*

*ta,* 723 F.Supp. 1384 (S.D.Cal.1989); *Armour v. Ohio,* 775 F.Supp. at 1081–1082 (Batchelder, J., dissenting). The *Gingles* precondition does prevent sizable minority groups from attempting to rectify electoral practices that dilute their votes and impair their ability to participate in the political process. *Id.* at 942. However, the electoral majority precondition ensures that larger minority groups with equally meritorious but broader scale claims will not have to compete with myriad marginal Voting Rights Act claimants likely to jam the courthouse door in the absence of an electoral majority precondition. *Id.* at 943. This administrative consideration applies equally in the context of single-member district cases.

One way to contain this potential problem would be to limit "influence districts" to a certain statistical range. This response, however, highlights a second problem with breaching the *Gingles* minority voter majority precondition. We perceive the *Gingles* electoral district majority precondition as the only rational measure for limiting voter group size under the Voting Rights Act. *Gingles v. Edmisten,* 590 F.Supp. at 381; *Skorepa v. Chula Vista,* 723 F.Supp. at 1384. Once this threshold is breached, there appears to be no logical or objective measure for establishing a threshold minority group size necessary for bringing an influence claim under § 2.

■ In the present context, the *Rosebrook* plaintiffs ask that we recognize a district with a 4.9% African–American voting age population concentration as a minority influence district. The *Rosebrook* plaintiffs advocate adoption of a definition of minority influence district that has no statistical bounds as to voter group size.[33]

---

**32.** We regard the Court's disclaimer in *Gingles* limiting the scope of that holding simply as an indication that the Court did not consider the impact of its holding as it related to other conceivable types of claims under § 2. We do not read it as an indication that the Court anticipated the adoption of a different set of preconditions for single-member district cases as the *Armour* court apparently concluded.

**33.** The *Rosebrook* plaintiffs state that "[i]t is essential under the Voters (sic) Rights Act to

create districts which, to the extent possible, maximize the political voting strength of the minorities, even when the minorities are not yet sufficiently large to control electoral results." Rosebrook Trial Brief at 14. In addition to admitting of no limits as to voter group size, this position runs counter to the principle that "no racial group has a constitutional or statutory right to an apportionment structure designed to maximize its political strength."

Even if we were inclined recognize the concept of minority voter influence districts, we simply could not embrace the concept in the open-ended manner proposed by the *Rosebrook* plaintiffs. In this respect, we are in full agreement with the *Gingles* district court's statement that it was "doubtful that either the Supreme Court in developing the [vote] dilution concept in constitutional voting rights litigation, or the Congress in embodying it in amended Section 2 of the Voting Rights Act intended an application open-ended as to voter group size." *Gingles v. Edmisten*, 590 F.Supp. at 381.

Finally, we note that even if we were to embrace the *Armour* minority influence district concept, the *Rosebrook* plaintiffs have failed to provide any meaningful substantive evidence in support of the dilution claim. Only offered are the conclusory affidavits of Carol Toney of Springfield, Illinois, Dr. Jeanelle Norman of Decatur, Illinois, and Richard J. Durbin, representative of the present 20th Congressional District. No specific evidence has been offered that might demonstrate either the political cohesiveness of the Springfield and Decatur African–American communities or racial bloc voting patterns in both communities that have frustrated the efforts of the minority communities to elect candidates of their choice. Thus, the *Rosebrook* plaintiffs have failed to make the requisite showing of the second and third *Gingles* preconditions to a valid § 2 dilution claim. They have also failed to offer specific evidence proving that any of the "typical objective factors" associated with minority

vote dilution are at work in both the Springfield and Decatur communities.

In sum, we conclude that the *Gingles* electoral majority precondition cannot logically be limited to the multi-member district context. We decline the request of the *Rosebrook* plaintiffs to recognize the minority influence district concept embraced in *Armour*. We therefore reject the dilution claim regarding the Springfield and Decatur African–American communities. In addition, we find that the *Hastert* plan is marginally superior to the *Rosebrook* plan in achieving the 65% total and 60% voting age minority population concentration levels deemed necessary to ensure minority voters with a reasonable opportunity to exercise effective political control in the proposed African–American super-majority 1st, 2nd and 7th congressional districts, as well as in the proposed Hispanic district (the proposed *Hastert* 11th congressional district). Accordingly, we conclude that the *Hastert* plan better satisfies the constitutional requirement of fairness to the racial and language minority communities of Illinois.

iv. Political Fairness

■ Finally, we examine the *Hastert* and *Rosebrook* plans for political fairness. The Supreme Court has formally recognized political gerrymandering claims as justiciable under the Fourteenth Amendment Equal Protection Clause since the cycle of congressional redistricting cases following the 1980 census. *Davis v. Bandemer*, 478 U.S. 109, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986).[34] In *Bandemer*, a group of Indiana Democratic Party voters claimed

*Mississippi v. United States*, 490 F.Supp. 569, 582 (D.D.C.1979) (stated in context of § 5 Voting Rights Act claim), *aff'd mem.*, 444 U.S. 1050, 100 S.Ct. 994, 62 L.Ed.2d 739 (1980); *see Latino Political Action Comm., Inc. v. Boston*, 784 F.2d 409, 412 (1st Cir.1986); *cf.* 42 U.S.C. § 1973(b) ("... nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population").

**34.** The Court had impliedly recognized the justiciability of political gerrymander claims in numerous pre-*Bandemer* cases. The pre-*Bandemer* case most often cited for this proposition is *Gaffney v. Cummings*, 412 U.S. 735, 93 S.Ct.

2321, 37 L.Ed.2d 298 (1973), in which the Court refused to invalidate a state redistricting plan merely because its design reflected a conscious effort to be "politically fair." In so doing, the Court expressly acknowledged the inevitable role political considerations play in redistricting and held that it was permissible for a state legislature to draw a plan "with the conscious intent to create a districting plan that would achieve rought approximation of the statewide political strengths of the Democrat and Republican parties." *Id.* at 752, 93 S.Ct. at 2331; *accord In re Illinois Congressional Dist. Reapportionment Cases*, No. 81 C 3915, slip. op. at 21–22 (N.D.Ill. Nov. 23, 1981).

that the 1981 redistricting of the state legislature constituted a Republican Party gerrymander intended to disadvantage Democrats. In the 1982 election for the Indiana House of Representatives, the first election under the new districting plan, Democrats won 51.9% of the aggregated statewide vote for House seats, but won only 43% of the seats. The Democrats attributed this discrepancy to the creation of a number of multi-member districts in which Democrats received 46.6% of the vote, but won only 3 of 21 multi-member district seats. In the races for the Indiana Senate, the Democrats received 53.1% of the vote statewide and were elected to 52% of the seats up for re-election. The plaintiffs based their claim of statewide discrimination solely upon the results of the 1982 election.

Although a majority of the Court joined in recognizing the justiciability of a political gerrymander claim, only a plurality agreed to the requisite elements of proof. Plaintiffs bringing political gerrymander claims, under the plurality view, must prove both an intent of the map drawers to discriminate against an identifiable political group and an actual discriminatory effect on that group. *Id.* at 127, 106 S.Ct. at 2808, citing *Mobile v. Bolden*, 446 U.S. at 67–68, 100 S.Ct. at 1499–500. The plurality, acknowledging the active role that political considerations inevitably play in the redistricting process, implied that intent may be assumed where there is evidence of substantial discriminatory effect. *Id.* 478 U.S. at 127–28, 106 S.Ct. at 2808. Consequently, political gerrymander claims typically will rise or fall on the issue of discriminatory effect.

Under *Bandemer*, a lack of proportional representation across party lines alone is insufficient to establish a discriminatory effect of unconstitutional dimensions. In the context of a statewide claim of political gerrymandering, a finding of an equal protection violation "must be supported by evidence of continued frustration of the will of a majority of the voters or effective

denial to a minority of voters of a fair chance to influence the political process." *Id.* at 133, 106 S.Ct. at 2810–11. In the plurality's view, a plaintiff must establish "a history (actual or projected) of disproportionate results." *Id.* at 139, 106 S.Ct. at 2814. A showing of "possible transitory results" is not sufficient. *Id.* at 140, 106 S.Ct. at 2814.

The *Rosebrook* plaintiffs contend that the *Hastert* plan will result in a politically unfair redistribution of congressional seats between Democrats and Republicans. Both parties agree that on a statewide basis, the population of Illinois is fairly evenly divided between Democrats and Republicans. Tr. 189, 279 (Brace testimony); Tr. 64 (Engstrom testimony).[35] At the present time, however, the Democratic representatives in the Illinois congressional delegation outnumber their Republican counterparts by a margin of 15–7, or approximately 68%–32%. Both the *Hastert* and *Rosebrook* plans attempt to address the present discrepancy favoring the Democrats. The *Rosebrook* plaintiffs contend, however, that the *Hastert* plan overcompensates for the imbalance and will likely tip the balance in favor of the Republicans, despite the fact that Democrats arguably continue to enjoy greater aggregate support in the general population.

Substantial testimony at trial was devoted to the presentation of competing statistical analyses from the *Hastert* and *Rosebrook* experts regarding the political impact of the respective plans. *Hastert* expert Dr. Richard L. Engstrom evaluated both plans on the basis of raw election data from races for the United States House of Representatives from 1982–1990. Tr. 45 (Engstrom testimony). Dr. Engstrom disaggregated the congressional vote tallies and reapplied them to the congressional districts proposed in the two plans. The results show the *Hastert* plan producing eleven safe Democratic seats and seven safe Republican seats. *See* Hastert Exh. 32; Tr. 47 (Engstrom testimony). Two ad-

35. *Hastert* expert Dr. Richard L. Engstrom regarded the Democrats as enjoying slightly greater support in the general population, while *Rosebrook* expert Dr. Kimball W. Brace regarded the State as evenly split between Democrats and Republicans.

ditional districts purported to lean Republican, the *Hastert* 11th and 16th congressional districts, are presently held by Democratic incumbents. Tr. 47. Thus, Dr. Engstrom did not regard these districts as safely in the Republican camp. *See id.* If Republicans successfully unseat Democratic incumbents in the two Republican-leaning districts, Democrats will enjoy an 11–9 advantage in the Illinois congressional delegation.

Dr. Engstrom's application of the same congressional election data to the proposed *Rosebrook* districts yielded fairly similar results. Dr. Engstrom characterized the party split resulting from the *Rosebrook* plan as favoring the Democrats with 12 safe seats, while giving the Republicans six safe seats, with two additional seats presently held by Democratic incumbents, the *Rosebrook* 4th and 16th districts, leaning Republican. The party split would be 12–8 favoring the Democrats if Republicans could unseat Democratic incumbents in the two Republican-leaning districts.

*Rosebrook* expert Dr. Kimball W. Brace presented a starkly different assessment of the political impact of the *Hastert* and *Rosebrook* plans. Dr. Brace disaggregated election data from elections for statewide offices [36] down to the precinct level, weighted them and reapplied them to the new district configurations proposed in the each of the *Hastert* and *Rosebrook* plans. Tr. 183–84; 306–10 (Brace testimony). In his analysis, Dr. Brace weighted the results from the University of Illinois Board of Trustees elections (trustee results) most heavily. Tr. 190, 196 (Brace testimony).

Dr. Brace characterized the races for University of Illinois Trustee as "base line races." Tr. 190 (Brace testimony). In a base line race, party affiliation is regarded as the predominant voting determinant rather than issues or the personalities of the candidates. *Id.; see generally* Backstrom, Robins & Eller, *Issues in Gerrymandering: An Exploratory Measure of Partisan Gerrymandering Applied to Minnesota,* 62 Minn.L.Rev. 1121 (1978) ("Backstrom, Robins & Eller"). According to Dr. Brace, base line races yield the most relevant data for determining the true party preferences of the electorate.

Dr. Brace testified that under the *Rosebrook* statistical analysis, the *Hastert* plan yielded seven safe Republican seats,[37] with three more seats leaning Republican.[38] Rosebrook Exh. 32; Tr. 197, 199. Democrats would receive only five safe seats,[39] principally the four minority super-majority districts, with four seats leaning Democrat.[40] *Id.;* Tr. 198–99. Dr. Brace assessed the remaining seat as a toss-up, which leans Republican in presidential election years and Democrat in off-year elections. Tr. 199; Rosebrook Exh. 32. Dr. Brace viewed Democratic Party prospects under the *Hastert* plan as, at best, a 10–10 split with Republicans. Dr. Brace testified that the *Rosebrook* plan, on the other hand, would yield seven safe Democratic seats, with two others leaning Democratic,[41] eight safe Republican seats with one other seat leaning Republican and two toss-up seats which lean Republican in presidential election years and Democratic in off years.[42] Rosebrook Exh. 31; Tr. 279.

---

**36.** The statewide offices included Governor, Secretary of State, Attorney General, Secretary of State, State Treasurer, State Comptroller and the University of Illinois Board of Trustees. Tr. 310 (Brace testimony). Dr. Brace's analysis also included races for the United States Senate. *Id.*

**37.** The proposed *Hastert* 6th, 8th, 10th, 13th, 14th, 15th and 18th districts.

**38.** The proposed *Hastert* 3rd, 11th and 16th districts.

**39.** The proposed *Hastert* 1st, 2nd, 4th and 9th districts.

**40.** The proposed *Hastert* 12th, 17th, 19th and 20th districts.

**41.** The purportedly safe Democratic seats are the proposed *Rosebrook* 1st, 2nd, 7th, 9th, 11th, 19th and 20th districts. The seats said to lean Democrat are the proposed *Rosebrook* 8th and 15th districts.

**42.** The safe Republican seats are the *Rosebrook* 3rd, 6th, 10th, 12th, 13th, 14th, 16th and 17th districts. The Republican leaning seat is the proposed *Rosebrook* 4th district. The two districts which swing in opposite directions in presidential year and off-year elections are the proposed *Rosebrook* 5th and 18th districts.

We find the expert testimony and evidence regarding the political impact of the *Hastert* and *Rosebrook* plans flawed on both sides. The application of raw disaggregated congressional election results employed by the *Hastert* expert appears logical at first glance. However, we conclude that this data is an inappropriate measure of party preference because it: mixes results of races involving different candidates and issues; fails to adjust for races in which the incumbent was unopposed or faced only token opposition (which produces seriously skewed data); and fails to account for the power of incumbency.[43] *See* Backstrom, Robins & Eller, 62 Minn. L.Rev. at 1127–28. We therefore agree with the *Rosebrook* expert that statewide base line races provide a better measure of statewide party voting strength. Tr. 187–88 (Brace testimony); *see* Backstrom, Robins & Eller, 62 Minn.L.Rev. at 1127–34; *Bandemer v. Davis,* 603 F.Supp. 1479, 1501 (S.D.Ind.1984) (Pell, J., dissenting), *rev'd,* 478 U.S. 109, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986); *cf. In re Illinois Congressional Dist. Cases,* No. 81 C 3915, slip. op. at 22 (employing trustee results as a basis for political fairness analysis).

However, we are also unable to endorse the statistical analysis employed by the *Rosebrook* expert. Dr. Brace did not conduct his analysis solely on base line races. Rather, he employed a weighted average of the results from various statewide races to reach his political impact conclusions. We have no objection, as a general principle, to this type of data manipulation. But we may rely on the resulting analysis only to the extent we find that the particular weights applied to the data are themselves

reasonable. Dr. Brace was unable to provide the court with the weights he applied to the raw data from the various statewide races. Indeed, Dr. Brace conceded that his application of weights to the various election results was "subjective" and that he could not reproduce his results.[44] Tr. 312, 319. Dr. Brace's failure to substantiate the underlying basis for his analysis effectively negates its probative value.

Thus, neither the *Hastert* nor the *Rosebrook* plaintiffs have supplied the court with a sufficient evidentiary base from which to fully credit their conflicting assessments regarding the political impact of the two plans. We therefore must draw our conclusions on an alternative, necessarily less sophisticated basis. Because the *Rosebrook* plaintiffs have asserted a political gerrymander claim against the *Hastert* plan, a plan which we find superior under all other constitutional criteria, we shall review the political impact of the *Hastert* plan using the *raw* University of Illinois Trustee figures that the *Rosebrook* expert promoted and the *Hastert* expert rejected with equal vigor.

According to the trustee results, the *Hastert* districts would have yielded an 11–9 split in favor of the Democrats in the 1990 congressional elections. Rosebrook Exh. 47. In 1988, a presidential election year, Republicans would have prevailed by the same narrow 11–9 margin. *Id.* In 1986, the two parties would have each held 10 seats. *Id.* In 1984, another presidential election year, Republicans would have taken 12 seats to the Democrats 8. *Id.* But the Democrats would have won 12 to the Republicans 8 in the 1982 congressional elections. *Id.* All tolled, the parties would

---

**43.** By our rough count, out of the 394 incumbents in the House of Representatives running for reelection in 1990, 384 (96.97%) won. *See* 1991 Congressional Staff Directory.

**44.** We are at a loss to understand the unavailability of the formula employed by the *Rosebrook* plaintiffs in analyzing the political impact of the *Rosebrook* and *Hastert* plans. Even had the analysis proceeded on a trial and error basis, with constant fine-tuning of the weights to achieve the final results, the final weights applied to the various statewide races would necessarily be contained in the final computer pro-

gram upon which the *Rosebrook* analysis was ultimately based. Indeed, any computer program employed to analyze a redistricting plan or, more significantly, to generate a districting plan, is likely to be the single most telling piece of evidence regarding the motivation of a redistricting plan's proponents. This fact suggests that the implementation of mandatory computer-automated redistricting might provide the courts with a way out of the political thicket. *See generally* Note, *Computer Models and Post-Bandemer Redistricting,* 99 Yale L.J. 1379 (1990).

have each held 50 of the possible 100 seats. This 50–50 split strikes us as a perfectly fair outcome, given Dr. Brace's testimony trial testimony that "all of the election data shows the State of Illinois to be a fairly even state" with regard to the distribution of party strength in the general population. Tr. 279 (Brace testimony). On the basis of the record before us, we discern no near term unfair political advantage resulting from the *Hastert* plan.[45] Moreover, we do not foresee the *Hastert* plan as producing a "history (actual or projected) of disproportionate results," as required under *Bandemer*, 478 U.S. at 139, 106 S.Ct. at 2814.

The *Rosebrook* plaintiffs also object to the *Hastert* plan because they contend it is motivated by political considerations. The significant disparity favoring Democrats under the existing plan sharply undercuts this argument. Nor have objections to a redistricting plan on the grounds of political motivation ever been accorded serious weight by the Supreme Court.

> It would be idle, we think, to contend that any political consideration taken into account in fashioning a reapportionment plan is sufficient to invalidate it. Our cases indicate quite the contrary. *See White v. Regester* [412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973)]; *Burns v. Richardson* [384 U.S. 73, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966)]; *Whitcomb v. Chavis* [403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971)]; *Abate v. Mundt* [403 U.S. 182, 91 S.Ct. 1904, 29 L.Ed.2d 399 (1971)]. The very essence of districting is to produce a different—a 'more politically fair'—result.... Politics and political considerations are inseparable from districting and apportionment. The political profile of a State, its party registration, and voting records are available precinct by precinct, ward by ward. These subdivisions may not be identical with census tracts, but, when overlaid on a census map, it requires no special genius to recognize the political

consequences of drawing a district line along one street rather than another. It is not only obvious, but absolutely unavoidable, that the location and shape of the districts may well determine the political complexion of the area. District lines are rarely neutral phenomena.... Redistricting may pit incumbents against one another or make very difficult the election of the most experienced legislator. The reality is that districting inevitably has and is intended to have substantial political consequences.

*Gaffney v. Cummings*, 412 U.S. 735, 752–53, 93 S.Ct. 2321, 2331, 37 L.Ed.2d 298 (1973).

Under the best of circumstances, an analysis of political impact based solely on predictions of future events is bound to be a speculative undertaking. Here, we have given the *Rosebrook* plaintiffs the benefit of the raw data that they accorded the greatest weight in undertaking their analysis of the political impact of the *Hastert* plan. The data suggests that the *Hastert* plan is likely to yield a distribution of seats across party lines that mirrors the statewide partisan makeup of the voting citizenry recognized by the *Rosebrook* plaintiffs themselves. In the absence of a more fully developed record regarding the political impact of the proposed plans, we conclude that the *Hastert* plan is politically fair. Thus, the *Hastert* plan best meets the constitutional requirements of population equality and fairness to racial and language minorities, while achieving a politically fair projected distribution of congressional seats across party lines.

### B. Nonconstitutional Criteria

▮ Only one nonconstitutional issue requiring our consideration has been raised. The *Rosebrook* plaintiffs contend that the *Hastert* plan is legally infirm because the *Hastert* reconfiguration of the four southernmost districts in Illinois [46] di-

---

**45.** We find no evidence of even a "possible transitory [discriminatory] result[ ]" required by Justices Powell and Stevens in their separate concurring opinion in *Bandemer*, 478 U.S. at 140, 106 S.Ct. at 2814 (Powell, J., concurring).

**46.** The 19th, 20th, 21st and 22d Congressional Districts under the existing plan are reconfigured roughly into the proposed 12th, 19th and 20th districts under the *Hastert* plan.

vides unique historic, geographic and economic communities of interest. The essence of the claim appears to be that the particular homogeneity or diversity embodied in each of the existing southern districts renders each *sui generis*, and thus deserving of special dispensation in the redistricting process.

The *Rosebrook* plaintiffs have failed to support this novel claim with any meaningful legal precedent. Although we know of at least one court that has recognized a "community of interest" concept similar to the one now advanced,[47] we find the concept both subjective and elusive of principled application. For example, the *Rosebrook* plaintiffs contend that the character of the present 22nd Congressional District, purportedly preserved in the proposed *Rosebrook* 20th district, should be maintained because of its ethnic and socio-economic homogeneity, as well as the economic predominance of mining and forestry industries in the region. *See generally* Poshard Aff. By comparison, the present 19th Congressional District purportedly preserved in the *Rosebrook* 17th district should be preserved because it is a "microcosm of the nation." *See* Bruce Aff. at 2. The *Rosebrook* plaintiffs ask that we preserve the present 22nd Congressional District so as not to disturb its *homogeneity* and the present 19th Congressional District so as to maintain its distinctive *diversity*. The *Rosebrook* plaintiffs appear to advance another concept that has no limits.

The community of interest concept could be employed in every congressional district across the country in which a congressional incumbent feels threatened by an impending redistricting. We need look no further than the present case for evidence that supports this conclusion. We have received affidavits from most members of the Illinois congressional delegation asserting, in essence, that their districts possess unique characteristics or combinations of characteristics that deserve special consideration in the redistricting process. No doubt this is true for each district in Illinois and across the nation. We believe that there is a place where particular nonconstitutional communities of interest should be considered in the redistricting process. That place is the halls and committee chambers of the state legislature. The courtroom is not the proper arena for lobbying efforts regarding the districting concerns of local, nonconstitutional communities of interest. Consequently, we decline to recognize the *Rosebrook* community of interest claim.[48]

III. Collins—Urban League/African–American Nieves Dispute

 Finally, we address the dispute between the *Collins* plaintiffs and the African–American *Nieves* plaintiffs over which of two African–American super-majority districts, the proposed 1st or 7th congressional district, is the more appropriate situs for the politically significant Second Ward on Chicago's south side.[49] The *Collins*

---

**47.** In *Carstens v. Lamm*, 543 F.Supp. 68 (D.Colo. 1982), the court recognized communities of interest, which it defined as "distinctive units which share common concerns with respect to one or more identifiable features such as geography, demography, ethnicity, culture, socio-economic status or trade," as a relevant non-constitutional criterion in formulating a congressional districting plan. *Id.* at 91.

**48.** Even if we were to recognize the community of interest concept, the *Rosebrook* plaintiffs may have overstated their case. For example, the *Rosebrook* plaintiffs contend that the three existing congressional districts in the southernmost part of Illinois, the 19th, 21st and 22nd Congressional Districts, have a "historical tradition" dating back as far as 1818. Rosebrook Post–Trial Brief at 25. However, a cursory review of pre-

vious Illinois congressional districting maps show the southernmost part of the state divided in half in a manner nearly identical to the configuration of that area proposed in the *Hastert* plan. *See Colegrove v. Green*, 328 U.S. 549, 562, 66 S.Ct. 1198, 1206, 90 L.Ed. 1432 App. II (1946) (showing 1901–46 Illinois congressional district map dividing southernmost tip of Illinois into two districts).

**49.** The precise nature of the Second Ward's political significance is not a matter that concerns us. We note only that the *Collins* and African–American *Nieves* plaintiffs have made clear that both sides are concerned about the fact that the positioning of the Second Ward in the congressional districting map will have a significant impact on the future political prospects of the alderman of that ward.

plaintiffs effectively adopt the configuration advanced in the *Rosebrook* plan. Under this configuration, Chicago's Second Ward is positioned as the southernmost region of the 7th Congressional District. The African–American *Nieves* plaintiffs, on the other hand, have effectively adopted the configuration proposed in the *Hastert* plan. This configuration maintains the historical placement of the Second Ward within the 1st Congressional District. *See* Chicago Urban League Exh. 3–8. We have found the *Hastert* plan superior to the *Rosebrook* plan under the relevant constitutional and legal criteria. Therefore, the *Collins* plaintiffs bear the burden of demonstrating why an alteration of the otherwise constitutionally and legally preferred *Hastert* plan is warranted.

The *Collins* plaintiffs' principal contention is that the *Hastert* 1st and 7th congressional district boundary is the product of a political gerrymander. We regard this as a curious claim in two respects. First, both the *Hastert* and the *Rosebrook* plaintiffs have refused to take any position advocating one configuration over another. The claim of a *Hastert* political gerrymander in this regard rings hollow. Second, we recognize that the unique, serpentine configuration of the boundary between the *Hastert* 1st and 7th congressional districts suggests that the *Hastert* plan was influenced by the political concerns of the African–American *Nieves* plaintiffs. However, the unique configuration of the corresponding boundaries in the *Rosebrook* plan equally compels the conclusion that the political concerns of the *Collins* plaintiffs influenced the *Rosebrook* map drawers. Simply put, the *Collins* plaintiffs' political motivation objection to the *Hastert* configuration applies equally to their own proposal. This conclusion is further compelled by the fact that the *Collins* plaintiffs vigorously argue for the *removal* of the Second Ward from its historical mooring in the 1st congressional district. Quite obviously, political concerns are the primary motivators on both sides of this essentially parochial political dispute. And, as noted previously, the exercise of political considerations in the redistricting process is not alone suffi-

cient to invalidate a districting plan. *Gaffney v. Cummings*, 412 U.S. at 752–53, 93 S.Ct. at 2331; *Davis v. Bandemer*, 478 U.S. at 128–29, 106 S.Ct. at 2808.

More importantly, the *Collins* plaintiffs have failed to demonstrate any relevant politically discriminatory effects from the *Hastert* configuration. The *Collins* plaintiffs do not contend that the *Hastert* boundary configurations will "consistently degrade a voter's or a group of voters' influence on the process as a whole" or "substantially disadvantage[ ] certain voters in their opportunity to influence the political process effectively." *Bandemer*, 478 U.S. at 132–33, 106 S.Ct. at 2810. The *Collins* plaintiffs therefore have not met the requisite burden of proof for political gerrymandering claims under *Bandemer*.

Finally, we seriously question whether the factual circumstances underlying this dispute would ever support a political gerrymandering claim. Under both proposed configurations, the citizens of the Second Ward likely will be represented by an incumbent African–American Democratic representative. Thus, the dispute does not cross political party, racial or ethnic lines. The only significant political impact at issue would occur at an intra-party factional level. Any analysis of political impact of that nature that we might undertake would require subjective and extraordinarily subtle political judgments of cause and effect—judgments well beyond our capacity. For this reason, we also decline to address the various nonconstitutional arguments raised by both the *Collins* and African–American *Nieves* plaintiffs that raise peculiarly local legislative issues, including the appropriate ratio of public housing residents in each district and the proper district placement of local historical landmarks. Accordingly, we reject the claims of the *Collins* plaintiffs regarding the configuration of the *Hastert* 1st and 7th district boundaries.

## CONCLUSION

The population and demographic changes reflected in the 1990 census have rendered the existing Illinois congressional district-

ing plan implemented in *In re Illinois Congressional Dist. Reapportionment Cases*, No. 81 C 3915 (N.D.Ill. Nov. 23, 1981), unconstitutional. The existing congressional districting plan is therefore declared null and void. The *Hastert* and *Rosebrook* plaintiffs have each submitted plans that would have passed constitutional and legal muster had either plan been the product of the state legislative process. In the absence of state legislative action, however, we were constrained to establish the plan that best meets technical constitutional and legal criteria set out by the Supreme Court for evaluating congressional districting plans. We conclude that the *Hastert* third amended redistricting plan best satisfies the criteria.

First, the *Hastert* plan achieves precise mathematical equality of population across congressional districts. Second, the *Hastert* plan is superior to the *Rosebrook* plan with respect to fairness to the voting rights of racial and language minorities. We find that § 2 of the Voting Rights Act warrants the creation of an Hispanic super-majority district, as well as the preservation of the three existing African–American districts. The *Hastert* plan provides these minority communities, particularly the minority communities in the proposed 7th and Hispanic congressional districts, with a marginally superior opportunity to exercise political control in their respective communities. Third, we regard the *Hastert* plan as likely to produce a fair distribution of congressional seats across party lines.

It is therefore ordered that the *Hastert* third amended redistricting plan, now adopted as the court's redistricting plan as set forth in the appendix, shall govern the nomination and election of members of the House of Representatives from the State of Illinois, effective with respect to the 1992 primary and continuing until Illinois congressional districts are reapportioned in accordance with law.

It is further ordered that the defendant Illinois State Board of Elections, in accordance with its duties under the Illinois election laws, shall forthwith implement the terms of the court's redistricting plan, as set forth in the appendix.

The clerk is directed to enter final judgment in all cases consolidated herein in accordance with the order set forth above.

Finally, it is ordered that all parties to these consolidated cases shall bear their own costs.

### APPENDIX

Representative district No. 1 shall be comprised of the following units of census geography: Within the County of Cook: Within the MCD/CCD of Chicago city: Within Tract/BNA 3406.00: Block group(s): 1; Within block group 2: Block(s): 206; Tract/BNA(s): 3501.00, 3502.00, 3503.00, 3504.00, 3505.00, 3506.00, 3507.00, 3508.00, 3509.00, 3510.00, 3511.00, 3512.00, 3513.00, 3514.00, 3515.00, 3601.00, 3602.00, 3603.00, 3604.00, 3605.00; Within Tract/BNA 3701.00; Within block group 1: Block(s): 101, 102, 103, 104, 105, 112, 113, 114, 115, 116, 117; Within block group 2: Block(s): 201, 202, 204; Tract/BNA(s): 3801.00, 3802.00, 3803.00, 3804.00, 3805.00; Within Tract/BNA 3809.00: Within block group 1: Block(s): 101, 102, 103, 104, 105; Tract/BNA(s): 3810.00, 3811.00; Within Tract/BNA 3812.00: Within block group 2: Block(s): 201, 202; Within Tract/BNA 3820.00: Block group(s): 1, 2; Within block group 3: Block(s): 302, 303, 304, 305, 306; Tract/BNA(s): 3901.00, 3902.00, 3903.00, 3904.00, 3905.00, 3906.00, 3907.00; Within Tract/BNA 4001.00: Within block group 1: Block(s): 106, 108, 109; Within Tract/BNA 4003.00: Within block group 1: Block(s): 101, 102, 103, 104, 105, 119, 120, 121; block group(s): 2; Within Tract/BNA 4004.00: Block group(s): 2; Within block group 3: Block(s): 301, 302; Within Tract/BNA 4005.00: Block group(s): 2; Within block group 3: Block(s): 301; Within Tract/BNA 4006.00: Within block group 1: Block(s): 105, 106, 107; Block group(s): 2; Tract/BNA(s): 4007.00, 4008.00, 4101.00, 4102.00, 4103.00, 4104.00, 4105.00, 4106.00, 4107.00, 4108.00, 4109.00, 4110.00, 4111.00, 4112.00, 4113.00, 4114.00, 4201.00, 4202.00, 4203.00, 4204.00, 4205.00, 4206.00, 4207.00, 4208.00, 4209.00, 4210.00, 4211.00, 4212.00, 4301.00,

4302.00, 4303.00, 4304.00, 4305.00, 4306.00, 4308.00, 4309.00, 4310.00, 4311.00, 4312.00, 4401.00, 4402.00, 4403.00, 4404.00, 4405.00, 4406.00, 4407.00, 4408.00, 4409.00, 4501.00, 4502.00, 4503.00, 4605.00, 4701.00, 4801.00, 4802.00, 4803.00, 4804.00, 4901.00, 4902.00, 4903.00, 4904.00, 4905.00, 4906.00, 4907.00, 4908.00, 5001.00, 5103.00; Within Tract/ BNA 5805.00: Within block group 2: Block(s): 201, 203, 204, 205, 206; block group(s): 3, 4, 5; Within block group 6: Block(s): 601, 602, 604; Within block group 7: Block(s): 702; Within Tract/BNA 5806.- 00: Within block group 2: Block(s): 201, 203; Within block group 3: Block(s): 303, 304, 305, 306; Within block group 4: Block(s): 403, 405, 406; Within Tract/BNA 5807.00: Within block group 4: Block(s): 406; Tract/BNA(s): 5808.00, 5809.00, 5811.00; Within Tract/BNA 6110.00: With- in block group 2: Block(s): 204; Within Tract/BNA 6111.00: Within block group 1: Block(s): 105, 106; Block group(s): 2; Within Tract/BNA 6112.00: Within block group 2: Block(s): 202, 203, 204, 205; Within Tract/BNA 6113.00: Within block group 2: Block(s): 201; Within Tract/BNA 6114.00: Within block group 2: Block(s): 201; Within Tract/BNA 6116.00: Within block group 1: Block(s): 102, 103, 104, 106, 107, 108; block group(s): 2; Tract/BNA(s): 6117.00, 6118.00, 6119.00; Within Tract/ BNA 6120.00: Within block group 2: Block(s): 202, 203; Within block group 3: Block(s): 303, 304; Within Tract/BNA 6301.00: Within block group 1: Block(s): 115, 116; Within Tract/BNA 6302.00: Within block group 1: Block(s): 104, 105, 106, 107, 108, 109, 110; Tract/BNA(s): 6304.00; Within Tract/BNA 6305.00: With- in block group 3: Block(s): 304, 305; block group(s): 4; Within Tract/BNA 6306.00: Within block group 1: Block(s): 101, 102, 103, 105, 106, 107, 108, 109, 110, 111, 112, 113, 114, 115, 116; Within Tract/BNA 6307.00: Within block group 1: Block(s): 101; Within block group 2: Block(s): 201; Within block group 3: Block(s): 306; With- in Tract/BNA 6308.00: Within block group 1: Block(s): 103, 104, 105, 106, 107, 108; Within block group 2: Block(s): 201, 202, 203; Within block group 3: Block(s): 306,

307, 308; Within block group 4: Block(s): 401, 403; Tract/BNA(s): 6601.00; Within Tract/BNA 6602.00: Within block group 1: Block(s): 105, 106; block group(s): 2; Within block group 3: Block(s): 301; With- in block group 5: Block(s): 508; Within Tract/BNA 6603.00: Within block group 5: Block(s): 502, 503, 506, 507, 508; Within Tract/BNA 6606.00: Block group(s): 1; Within block group 2: Block(s): 201, 202, 204, 205, 206; Within block group 3: Block(s): ´301, 302, 303, 304; Within block group 5: Block(s): 506, 507, 508; Tract/ BNA(s): 6607.00; Within Tract/BNA 6608.- 00: Block group(s): 1, 2; Within block group 3: Block(s): 301, 302, 303, 304; Within block group 4: Block(s): 404, 405; Within block group 5: Block(s): 502, 505, 507, 508; Within Tract/BNA 6609.00: Block group(s): 1, 2, 3; Within block group 4: Block(s): 401, 402, 403, 404, 405, 406, 407, 408, 411, 412, 413, 414, 417, 418; Tract/BNA(s): 6610.00; Within Tract/BNA 6611.00: Block group(s): 1; Within block group 2: Block(s): 201, 202, 203, 204, 205, 206, 207, 208, 209, 211; block group(s): 3; Tract/BNA(s): 6701.00, 6702.00, 6703.00, 6704.00, 6705.00, 6706.00, 6707.00, 6708.00, 6709.00; Within Tract/BNA 6801.00: With- in block group 1: Block(s): 104, 105; block group(s): 2, 3; Within Tract/BNA 6802.00: Within block group 1: Block(s): 104, 105; block group(s): 2, 3; Within Tract/BNA 6802.00: Within block group 1: Block(s): 111, 112, 113, 114, 115, 116, 117, 119, 120, 121; block group(s): 2, 3; Within block group 4: Block(s): 405, 406, 407, 416, 417; Within Tract/BNA 6803.00: Within block group 1: Block(s): 104, 105; block group(s): 2; Within block group 3: Block(s): 301, 302, 303; Within Tract/BNA 6804.00: Within block group 1: Block(s): 104, 105, 106, 107, 108, 109, 110, 111; With- in block group 2: Block(s): 203, 204, 205, 206, 207, 208, 209, 210, 211; Within Tract/ BNA 6805.00: Within block group 1: Block(s): 102, 103, 104, 105, 106; block group(s): 2, 3; Tract/BNA(s): 6806.00, 6807.00, 6808.00, 6809.00, 6812.00, 6813.00, 6901.00, 6902.00, 6903.00, 6904.00, 6905.00, 6906.00, 6907.00, 6908.00, 6909.00, 6910.00, 6911.00, 6912.00, 6913.00, 6914.00, 6915.00; Within Tract/BNA 7001.00: Block

group(s): 1; Within block group 2: Block(s): 201, 206, 207, 208, 225; Tract/BNA(s): 7005.00, 7101.00, 7109.00, 7115.00, 7201.00, 7202.00, 7203.00, 7204.00, 7205.00, 7206.00; Within Tract/BNA 7207.00: Within block group 2: Block(s): 204, 205, 206; block group(s): 3, 4; Tract/BNA(s): 7301.-00, 7305.00, 7401.00, 7402.00, 7403.00, 7404.00; Within Tract/BNA 7502.00: Within block group 2: Block(s): 207, 208, 212, 213; block group(s): 3, 4; Tract/BNA(s): 7503.00, 7504.00; Within Tract/BNA 7505.-00: Block group(s): 5; Within block group 6: Block(s): 601, 602, 603, 604, 605, 606, 607, 608, 609, 610, 611, 613; Tract/BNA(s): 8233.04; Within the MCD/CCD of Worth: Tract/BNA(s): 7404.00, 8216.00, 8217.00, 8218.00, 8219.00; Within Tract/BNA 8226.-02: Within block group 2: Block(s): 201, 202; Within Tract/BNA 8227.02: Within block group 1: Block(s): 101, 102, 103, 104, 105, 106; block group(s): 2; Within block group 3: Block(s): 301, 302, 304, 305, 306, 307, 308, 309, 310; Within block group 4: Block(s): 403, 405, 406, 407, 408, 409, 410, 411, 412, 413; block group(s): 5; Within Tract/BNA 8228.01: Within block group 2: Block(s): 201, 202, 203, 204, 205, 206, 207; Within block group 3: Block(s): 301, 302, 303, 305; block group(s): 4; Tract/BNA(s): 8228.02, 8233.02, 8233.03, 8233.04; Within Tract/BNA 8234.00: Block group(s): 1, 2; Within block group 3: Block(s): 301, 302, 303, 304, 305, 306, 307, 308, 309, 310, 311, 313, 314, 317, 318, 312A, 312B, 399B; block group(s): 4, 5, 9; Tract/BNA(s): 8235.00.

Representative district No. 2 shall be comprised of the following units of census geography: Within the County of Cook: Within the MCD/CCD of Bloom: Tract/BNA(s): 8286.01, 8286.02, 8287.01, 8287.02, 8288.01, 8288.02, 8289.00, 8290.00, 8291.00, 8292.00, 8293.01, 8293.02, 8294.01; Within Tract/BNA 8297.00: Block group(s): 1; Within block group 3: Block(s): 316, 317, 318, 319, 320, 321, 324, 301A, 302A, 301B, 302B; block group(s): 4, 5; Within block group 9: Block(s): 906, 907, 901A, 903A, 904A, 905A, 908A, 909A, 910A, 901B, 903B, 904B, 905B, 908B, 909B, 910B, 901C, 904C, 905C, 908C, 901D, 908D, 901E, 908E; Within the MCD/CCD of Bremen: Tract/BNA(s): 8243.00, 8244.00, 8247.02, 8248.00, 8249.00, 8251.00, 8252.00, 8255.01, 8255.03, 8255.04, 8255.05, 8256.00, 8299.01; The MCD/CCD(s): Calumet; Within the MCD/CCD of Chicago city: Tract/BNA(s): 4307.-00, 4313.00, 4314.00, 4601.00, 4602.00, 4603.00, 4604.00, 4606.00, 4607.00, 4608.00, 4609.00, 4610.00, 4805.00, 4909.00, 4910.00, 4911.00, 4912.00, 4913.00, 4914.00, 5002.00, 5003.00; Within Tract/BNA 5102.00: Within block group 1: Block(s): 107, 108, 109, 110, 111, 114; Within block group 2: Block(s): 201, 209, 210, 211; block group(s): 3, 4; Within Tract/BNA 5104.00: Within block group 8: Block(s): 801, 802, 803, 804, 805, 806, 807, 899; Within block group 9: Block(s): 907, 908, 912, 913, 914, 915, 999A, 999B, 999D; Tract/BNA(s): 5105.00, 5301.-00, 5302.00, 5303.00, 5304.00, 5305.00, 5306.00, 5401.00; Within Tract/BNA 5502.-00: Block group(s): 4; Tract/BNA(s): 6710.00, 6711.00, 6712.00, 6713.00, 6714.00, 6715.00, 6716.00, 6717.00, 6718.00, 6719.00, 6720.00, 6810.00, 6811.00, 6814.00, 7102.00, 7103.00, 7104.00, 7105.00, 7106.00, 7107.00, 7108.00, 7110.00, 7111.00, 7112.00, 7113.00, 7114.00; Within Tract/BNA 7207.00: Block group(s): 1; Within block group 2: Block(s): 201, 202, 203; Tract/BNA(s): 7302.00, 7303.00, 7304.00, 7306.00, 7307.00, 7501.00; Within Tract/BNA 7502.00: Block group(s): 1; Within block group 2: Block(s): 201, 202, 203, 204, 205, 206, 209, 210, 211, 214; Within Tract/BNA 7505.00: Block group(s): 1, 2, 3, 4; Within block group 6: Block(s): 612; Tract/BNA(s): 7506.00; Within the MCD/CCD of Rich: Tract/BNA(s): 8298.00, 8299.01, 8299.02, 8300.03, 8300.04, 8300.05, 8300.06, 8301.00; Within the MCD/CCD of Thornton: Within Tract/BNA 8257.00: Within block group 2: Block(s): 226, 229; Within block group 3: Block(s): 301, 302, 303, 304, 305, 306, 307, 308, 312, 313, 314, 315; Tract/BNA(s): 8258.01; Within Tract/BNA 8258.02: Block group(s): 1, 2; Within block group 3: Block(s): 304, 305, 306, 312, 313; block group(s): 4, 5; Within Tract/BNA 8258.03: Block group(s): 1, 2, 3, 4, 5; Within block group 6: Block(s): 602, 603, 604, 605, 606, 607, 610, 611, 612, 613; Within Tract/BNA 8262.01: Block group(s): 2, 3, 4; Tract/BNA(s): 8263.01, 8263.03, 8263.04, 8264.01,

8264.02, 8265.00, 8266.00, 8267.00, 8268.00, 8269.01, 8269.02, 8270.00, 8271.00, 8272.00, 8273.00, 8274.00, 8275.00, 8276.00, 8277.00; Within Tract/BNA 8283.00: Within block group 6: Block(s): 602A, 604A, 605A, 606A, 604B, 606B; Tract/BNA(s): 8284.01, 8284.02; Within the MCD/CCD of Worth: Within Tract/BNA 8234.00: Within block group 3: Block(s): 315, 316, 399A; Tract/BNA(s): 8236.03.

Representative district No. 3 shall be comprised of the following units of census geography: Within the County of Cook: The MCD/CCD(s) of: Berwyn; Within the MCD/CCD of Bremen: Tract/BNA(s): 8245.03, 8245.05, 8245.97, 8245.98, 8246.01, 8246.02, 8247.01, 8250.00, 8253.01, 8253.02, 8254.00; Within the MCD/CCD of Chicago city: Within Tract/BNA 2524.00: Within block group 2: Block(s): 203, 204, 205, 206, 207, 208, 209, 210, 211, 212, 213, 214, 215; Tract/BNA(s): 5601.00, 5602.00, 5603.00, 5604.00, 5605.00, 5606.00, 5607.00, 5608.00, 5609.00, 5610.00, 5611.00, 5612.00, 5613.00, 5701.00, 5702.00, 5703.00, 5704.00, 5705.00; Within Tract/BNA 5803.00: Within block group 1: Block(s): 106; Within Tract/BNA 5804.00: Within block group 1: Block(s): 102, 103, 104, 105, 108, 111; block group(s): 2, 3, 4; Tract/BNA(s): 5810.00, 6201.00, 6202.00, 6203.00, 6204.00, 6303.00, 6309.00, 6401.00, 6402.00, 6403.00, 6404.00, 6405.00, 6406.00, 6407.00, 6408.00, 6501.00, 6502.00, 6503.00, 6504.00, 6505.00, 6604.00, 6605.00; Within Tract/BNA 6609.00: Within block group 4: Block(s): 409, 410, 415, 416, 419, 499A, 499B; Within Tract/BNA 6611.00: Within block group 2: Block(s): 210; block group(s): 4, 5, 6; Within Tract/BNA 7001.-00: Within block group 2: Block(s): 210, 211, 212, 213, 214; block group(s): 3; Tract/BNA(s): 7002.00, 7003.00, 7004.00, 8209.02; Within the MCD/CCD of Cicero: Within Tract/BNA 8134.00: Within block group 1: Block(s): 104, 105, 106, 107; block group(s): 2, 3, 4, 5, 6; Tract/BNA(s): 8135.00, 8136.00; Within Tract/BNA 8137.-00: Within block group 5: Block(s): 509; Within block group 6: Block(s): 607, 608; Within Tract/BNA 8138.00: Within block group 3: Block(s): 306; Within block group 6: Block(s): 607; Within Tract/BNA 8139.- 00: Block group(s): 1; Within block group 2: Block(s): 202, 203, 204, 205, 206; block group(s): 3, 4, 5; Tract/BNA(s): 8140.00; Within Tract/BNA 8141.00: Within block group 1: Block(s): 102, 103, 106, 107, 108; Within block group 3: Block(s): 301, 302, 303, 305, 306, 307; Within Tract/BNA 8142.00: Within block group 1: Block(s): 106, 108, 109; Within block group 2: Block(s): 203, 204, 205; Within block group 3: Block(s): 305, 306, 307, 308, 309, 310, 311; Within block group 4: Block(s): 402, 403, 404, 405, 407, 412; Within block group 5: Block(s): 501, 508; Within block group 6: Block(s): 601, 607, 608, 611; Tract/BNA(s): 8143.00, 8144.00, 8145.00; The MCD/CCD(s): Lyons; Within the MCD/CCD of Oak Park: Within Tract/BNA 8131.00: Within block group 1: Block(s): 105, 106, 107, 108; block group(s): 2, 3; Within block group 4: Block(s): 401, 402, 403, 404; Within block group 5: Block(s): 501, 502, 506, 507, 508, 509, 510, 511, 512, 513; Within Tract/BNA 8132.00: Within block group 1: Block(s): 106, 107, 108, 109; block group(s): 2, 3; Within block group 4: Block(s): 401, 402, 403, 404, 405; Within block group 5: Block(s): 503, 504, 505, 506, 507, 508, 509; block group(s): 6; Within the MCD/CCD of Palos: Tract/BNA(s): 8236.05, 8237.03; Within Tract/BNA 8238.-03: Block group(s): 1; Within block group 2: Block(s): 201, 202, 203, 217, 218; Within block group 3: Block(s): 301, 306; Within Tract/BNA 8238.04: Block group(s): 1, 2; Within block group 3: Block(s): 301, 303, 306, 307, 302A, 302B, 302C; block group(s): 7, 8; Within Tract/BNA 8239.01: Within block group 4: Block(s): 405; Within block group 8: Block(s): 838, 801A, 899A, 899C, 801D, 899J; Within Tract/BNA 8239.03: Block group(s): 1, 2, 3; Within block group 4: Block(s): 401, 402, 403, 404, 405, 406, 409, 410, 411, 413, 415, 416, 417, 419, 412A, 414A, 418A, 412B, 414B, 418B; Tract/BNA(s): 8239.04; Within the MCD/CCD of Proviso: Within Tract/BNA 8161.00: Within block group 1: Block(s): 104, 105, 106, 107, 108, 109, 110, 111; block group(s): 2, 3, 4, 5; Within block group 6: Block(s): 601, 602, 603, 604, 605, 606, 608, 609, 614, 617A, 617B, 617C, 617D; Within Tract/BNA 8187.00: Within block group 3:

Block(s): 301, 311, 312, 313, 314, 315, 316, 317; block group(s): 4; Within Tract/BNA 8188.00: Within block group 3: Block(s): 311; Within the MCD/CCD of Riverside: Within Tract/BNA 8156.00: Block group(s): 1, 2, 3; Tract/BNA(s): 8157.01, 8157.02; Within Tract/BNA 8158.00: Within block group 1: Block(s): 105, 106, 107, 108, 109, 199; block group(s): 2, 3, 4; Within the MCD/CCD of Stickney: Within Tract/BNA 8207.00: Block group(s): 1, 2, 3, 4; Within block group 5: Block(s): 502, 503, 504, 505, 506, 507, 508, 509, 599; Tract/BNA(s): 8208.00, 8209.01, 8209.02, 8210.01, 8210.02, 8211.01, 8211.02; Within the MCD/CCD of Worth: Tract/BNA(s): 8220.00, 8221.01, 8221.02, 8222.00, 8223.01, 8223.02, 8224.00, 8225.00, 8226.01; Within Tract/BNA 8226.02: Within block group 2: Block(s): 203, 204, 205, 206, 207, 208, 209, 210, 212, 213, 215, 216, 217, 218, 219, 220, 221, 222, 223, 224; block group(s): 3, 6; Tract/BNA(s): 8227.01; Within Tract/BNA 8227.02: Within block group 1: Block(s): 107, 108; Within block group 3: Block(s): 303; Within block group 4: Block(s): 401, 402, 404; Within Tract/BNA 8228.01: Block group(s): 1; Within block group 2: Block(s): 208, 209, 210; Within block group 3: Block(s): 304; Tract/BNA(s): 8229.00, 8230.01, 8230.02, 8231.01, 8231.02, 8232.00, 8236.02, 8236.04, 8236.05.

Representative district No. 4 shall be comprised of the following units of census geography: Within the County of Cook: Within the MCD/CCD of Chicago city: Within Tract/BNA 0510.00: Within block group 1: Block(s): 103, 104, 105, 106, 107, 108; Within Tract/BNA 0511.00: Within block group 1: Block(s): 105, 108; Within Tract/BNA 0513.00: Within block group 1: Block(s): 109; Within block group 2: Block(s): 202, 203, 204, 205, 207; Tract/BNA(s): 0514.00; Within Tract/BNA 0515.-00: Within block group 1: Block(s): 101, 102, 103, 105, 107, 108, 109, 110, 111, 112; Within Tract/BNA 0706.00: Within block group 1: Block(s): 104; Within block group 2: Block(s): 206; Within Tract/BNA 0707.-00: Within block group 1: Block(s): 102, 107; Within block group 2: Block(s): 201, 202, 203, 204, 205, 207, 208, 209, 210, 211;

Within Tract/BNA 0708.00: Within block group 3: Block(s): 303; Within Tract/BNA 1401.00: Within block group 1: Block(s): 105, 106; Within block group 2: Block(s): 201, 202, 204, 205; Within Tract/BNA 1406.00: Within block group 1: Block(s): 101, 102, 105; Within Tract/BNA 1407.00: Block group(s): 1, 2, 3, 4, 5; Within block group 6: Block(s): 602, 603, 604; Within Tract/BNA 1408.00: Block group(s): 4; Within block group 5: Block(s): 501, 503, 504, 505, 506, 507, 508, 510; Within Tract/BNA 1605.00: Block group(s): 1; Within block group 2: Block(s): 201, 202; Within block group 3: Block(s): 301, 302, 303, 305; Within block group 4: Block(s): 401, 402, 404, 405; block group(s): 5; Within block group 6: Block(s): 603, 604, 605, 606; Within Tract/BNA 1606.00: Within block group 2: Block(s): 204, 205; block group(s): 3, 4; Within block group 5: Block(s): 501, 505, 506; Within Tract/BNA 1607.00: Within block group 3: Block(s): 301, 303, 304, 305, 306; Within block group 4: Block(s): 401; Within block group 5: Block(s): 502, 503, 504, 505, 506; Within block group 6: Block(s): 601, 602; Within Tract/BNA 1901.00: Within block group 1: Block(s): 106, 107, 108, 109, 111; Within Tract/BNA 1902.00: Within block group 3: Block(s): 301, 308; Within block group 4: Block(s): 401, 408; Within Tract/BNA 1906.00: Within block group 4: Block(s): 403; Within block group 5: Block(s): 503, 504; Within Tract/BNA 1908.00: Within block group 1: Block(s): 101, 104, 105; Within block group 2: Block(s): 202, 203, 206; Within block group 3: Block(s): 301, 302, 303, 304, 305, 306; Within block group 4: Block(s): 401, 402; Tract/BNA(s): 1909.00, 1910.00; Within Tract/BNA 1911.-00: Block group(s): 1, 2; Within block group 3: Block(s): 302, 303, 304, 305, 306; block group(s): 4; Within block group 5: Block(s): 504, 505, 506, 507, 508, 509; Within block group 6: Block(s): 603, 604, 605, 606; Within Tract/BNA 1912.00: Within block group 1: Block(s): 107, 108, 109; Within block group 2: Block(s): 201, 202, 203, 207, 208; Within Tract/BNA 1913.00: Within block group 1: Block(s): 101, 103, 104, 105, 106, 107, 108; Within block group 2: Block(s): 201, 204, 205, 206, 207; Within

block group 3: Block(s): 302, 303, 304, 305, 306; block group(s): 4; Within block group 5: Block(s): 501, 502, 503, 504, 509, 510; block group(s): 6; Within block group 7: Block(s): 703, 704, 705, 706, 707, 708; Within Tract/BNA 1914.00: Within block group 1: Block(s): 104, 105, 106, 107, 109; Within Tract/BNA 2001.00: Within block group 1: Block(s): 102, 106; Within block group 2: Block(s): 201, 202, 203, 204, 206, 207, 208; Within block group 3: Block(s): 301, 306, 307, 310, 311, 312; Tract/BNA(s): 2002.00, 2003.00, 2004.00, 2005.00, 2006.00; Within Tract/BNA 2101.00: Block group(s): 1, 2; Within block group 3: Block(s): 301, 305, 311; Within Tract/BNA 2102.00: Within block group 1: Block(s): 102, 103, 104, 105, 106, 107, 108, 112, 113; Within Tract/BNA 2104.00: Within block group 2: Block(s): 201, 204; Within Tract/BNA 2105.00: Within block group 2: Block(s): 208, 209; Within Tract/BNA 2106.00: Block group(s): 1, 2, 3; Within block group 4: Block(s): 401, 402, 405; Within block group 6: Block(s): 606; Tract/BNA(s): 2107.00, 2108.00, 2109.00, 2201.00, 2202.00, 2203.00, 2204.00, 2205.00, 2206.00, 2207.00, 2208.00, 2209.00, 2210.00, 2211.00, 2212.00, 2213.00, 2214.00, 2215.00, 2216.00, 2217.00, 2218.00, 2219.00, 2220.00, 2221.00, 2222.00, 2223.00, 2224.00, 2225.00, 2226.00, 2227.00, 2228.00, 2229.00, 2301.00, 2302.00, 2303.00, 2304.00; Within Tract/BNA 2305.00: Block group(s): 1, 2; Within block group 3: Block(s): 301, 302, 303, 304, 307, 308; Within Tract/BNA 2306.00: Block group(s): 1; Within block group 2: Block(s): 201; Within block group 3: Block(s): 302, 303, 304, 305, 306; Within block group 4: Block(s): 401, 402, 403, 404, 405; Within block group 5: Block(s): 502; Within block group 6: Block(s): 601, 603, 604, 605, 606, 607, 608, 609; Within Tract/BNA 2307.00: Block group(s): 1, 2; Within block group 3: Block(s): 301, 307, 308, 309; block group(s): 4; Tract/BNA(s): 2308.00, 2309.00; Within Tract/BNA 2310.00: Within block group 1: Block(s): 101, 103, 104; Within Tract/BNA 2401.00: Within block group 1: Block(s): 112, 113; Tract/BNA(s): 2402.00, 2403.00, 2404.00, 2405.00, 2406.00, 2407.00, 2408.00, 2409.00, 2410.00, 2411.00, 2412.00, 2413.00, 2414.00, 2415.00, 2416.00; Within Tract/BNA 2418.00: Within block group 1: Block(s): 103, 105; Within Tract/BNA 2419.00: Within block group 1: Block(s): 104, 105, 106, 107; block group(s): 2; Tract/BNA(s): 2420.00, 2421.00, 2422.00; Within Tract/BNA 2423.00: Within block group 1: Block(s): 101, 103, 104, 106; Within block group 2: Block(s): 202, 203, 206, 207, 208; Within Tract/BNA 2424.00: Within block group 1: Block(s): 102, 103; Tract/BNA(s): 2425.00, 2426.00, 2427.00; Within Tract/BNA 2429.00: Within block group 2: Block(s): 202, 203, 204; Within block group 3: Block(s): 304, 305, 306, 307; Within Tract/BNA 2430.00: Block group(s): 1; Within block group 2: Block(s): 201, 202; Within block group 3: Block(s): 302, 303, 304, 305, 306, 307; Within Tract/BNA 2431.00: Block group(s): 1, 2; Within block group 3: Block(s): 302; Within Tract/BNA 2432.00: Block group(s): 1; Within block group 2: Block(s): 201, 202, 203, 204; block group(s): 4; Within Tract/BNA 2433.00: Block group(s): 1, 2; Within block group 3: Block(s): 301, 302, 303, 304, 305; Within Tract/BNA 2434.00: Block group(s): 1; Within block group 2: Block(s): 201, 203, 204, 205, 206, 207; Within block group 3: Block(s): 304, 306, 307, 308, 309; Within Tract/BNA 2435.00: Within block group 2: Block(s): 202, 204, 208; Within block group 3: Block(s): 312; Within block group 4: Block(s): 401, 404, 406, 407, 408, 409, 411; Within block group 5: Block(s): 501, 502, 504, 505, 506, 513; Within Tract/BNA 2501.00: Within block group 1: Block(s): 101, 102, 103, 105, 106; Within Tract/BNA 2502.00: Within block group 1: Block(s): 101, 102, 103, 104; Within Tract/BNA 2505.00: Within block group 1: Block(s): 101; Within block group 5: Block(s): 501, 502, 503, 504, 505; Within block group 7: Block(s): 703, 704; Within Tract/BNA 2524.00: Within block group 1: Block(s): 104, 105, 106, 107, 108, 109, 110; Within block group 2: Block(s): 201, 202, 216, 217; Within Tract/BNA 2827.00: Within block group 2: Block(s): 201, 202, 203, 204, 206, 207, 208; block group(s): 3; Within Tract/BNA 2828.00: Within block group 1: Block(s): 102, 103, 104, 105, 106, 107, 108,

109; Within Tract/BNA 2829.00: Within block group 4: Block(s): 407, 408; Within Tract/BNA 2830.00: Within block group 2: Block(s): 202, 204; Within Tract/BNA 2842.00: Block group(s): 2; Tract/BNA(s) 2843.00; Within Tract/BNA 2915.00: Within block group 1: Block(s): 101, 107, 108; Within block group 2: Block(s): 202, 204, 205, 206, 207, 208, 209; Within block group 3: Block(s): 301; Tract/BNA(s): 2916.00, 3001.00, 3002.00; Within Tract/BNA 3003.-00: Within block group 1: Block(s): 103, 104; Tract/BNA(s): 3005.00, 3006.00, 3007.00, 3008.00, 3009.00, 3010.00, 3011.00, 3012.00, 3013.00, 3014.00, 3015.00, 3016.00, 3017.00, 3018.00, 3019.00, 3020.00; Within Tract/BNA 3101.00: Within block group 1: Block(s): 107, 108, 109, 110, 116, 118, 120; Tract/BNA(s): 3102.00, 3103.00, 3104.00, 3105.00, 3106.00, 3107.00, 3108.00, 3109.00, 3110.00, 3111.00, 3112.00, 3113.00, 3114.00, 3115.00; Within Tract/BNA 3402.00: Within block group 4: Block(s): 401, 404, 406, 409, 415, 417; Tract/BNA(s): 5801.00, 5802.00; Within Tract/BNA 5803.00: Within block group 1: Block(s): 101, 102, 103, 104, 105, 107, 108, 109, 110, 111, 112, 113; Within Tract/BNA 5804.00: Within block group 1: Block(s): 101, 106, 107, 109, 110; Within Tract/BNA 5805.00: Block group(s): 1; Within block group 2: Block(s): 202; Within block group 6: Block(s): 603, 605; Within block group 7: Block(s): 701, 703, 704, 705, 706; block group(s): 8; Within Tract/BNA 5806.00: Block group(s): 1; Within block group 2: Block(s): 202, 204; Within block group 3: Block(s): 301, 302; Within block group 4: Block(s): 401, 402, 404; Within Tract/BNA 5807.00: Block group(s): 1, 2, 3; Within block group 4: Block(s): 401, 402, 403, 404, 405; Tract/BNA(s): 5901.00, 5902.00, 5903.00, 5904.00, 5905.00, 5906.00, 5907.00, 6005.00, 6006.00, 6007.00; Within Tract/ BNA 6008.00: Within block group 1: Block(s): 102, 103, 104, 105, 106; block group(s): 2, 3; Tract/BNA(s): 6009.00, 6013.00, 6014.00, 6015.00; Within Tract/ BNA 6016.00: Within block group 1: Block(s): 101, 102, 103, 104, 105, 106, 108, 109; Within Tract/BNA 6101.00: Within block group 1: Block(s): 102, 103, 104, 107,

108, 111, 113; block group(s): 2; Tract/ BNA(s): 6102.00, 6103.00, 6104.00, 6105.00, 6106.00, 6107.00; Within Tract/BNA 6108.-00: Within block group 1: Block(s): 114; block group(s): 2; Within Tract/BNA 6109.00: Within block group 1: Block(s): 112, 115; Within Tract/BNA 6110.00: Within block group 1: Block(s): 101, 102, 103, 110; Within block group 2: Block(s): 207, 208, 209; Within Tract/BNA 6111.00: Within block group 1: Block(s): 101, 102, 103, 104; block group(s): 3; Within Tract/ BNA 6112.00: Block group(s): 1; Within block group 2: Block(s): 201; block group(s): 3; Within Tract/BNA 6113.00: Block group(s): 1; Within block group 2: Block(s): 202, 203, 204, 205; block group(s): 3; Within Tract/BNA 6114.00: Block group(s): 1; Within block group 2: Block(s): 202, 203, 204, 205; block group(s): 3; Tract/BNA(s): 6115.00; Within Tract/ BNA 6116.00: Within block group 1: Block(s): 101; Within Tract/BNA 6301.00: Within block group 1: Block(s): 101, 102, 103, 104, 105, 106, 107, 108, 109, 110, 111, 112, 113, 114, 117, 118; Within Tract/BNA 6302.00: Within block group 1: Block(s): 101, 102, 103, 111, 112, 113, 114; Within Tract/BNA 6305.00: Block group(s): 1, 2; Within block group 3: Block(s): 301, 302, 303, 306, 307, 308; Within Tract/BNA 6306.00: Within block group 1: Block(s): 104; Within Tract/BNA 6307.00: Within block group 1: Block(s): 102, 103, 104, 105, 106, 107, 108; Within block group 2: Block(s): 202, 203, 204, 205, 206, 207; Within block group 3: Block(s): 301, 302, 303, 304, 305, 307; block group(s): 4; Within Tract/BNA 6308.00: Within block group 1: Block(s): 101, 102; Within block group 2: Block(s): 204, 205, 206, 207, 208; Within block group 3: Block(s): 301, 302, 303, 304, 305; Within block group 4: Block(s): 402, 404, 405, 406, 407, 408; Within Tract/BNA 6602.00: Within block group 1: Block(s): 101, 102, 103, 104; Within block group 3: Block(s): 302, 303, 304, 305, 306; block group(s): 4; Within block group 5: Block(s): 501, 502, 503, 504, 505, 506, 507; Within Tract/BNA 6603.00: Block group(s): 1, 2, 3, 4; Within block group 5: Block(s): 501, 504, 505; Within Tract/BNA 6606.00: Within block group 2: Block(s):

203; Within block group 3: Block(s): 305, 306; block group(s): 4; Within block group 5: Block(s): 501, 502, 503, 504, 505; Within Tract/BNA 6608.00: Within block group 3: Block(s): 305, 306; Within block group 4: Block(s): 401, 402, 403, 406; Within block group 5: Block(s): 501, 503, 504, 506; Within the MCD/CCD of Cicero: Tract/BNA(s): 8133.00; Within Tract/BNA 8134.-00: Within block group 1: Block(s): 101, 102, 103; Within Tract/BNA 8137.00: Block group(s): 1, 2, 3, 4; Within block group 5: Block(s): 503, 504, 505, 506, 507, 508; Within block group 6: Block(s): 601, 602, 603, 604, 605, 606; Within Tract/BNA 8138.00: Block group(s): 1, 2; Within block group 3: Block(s): 301, 302, 303, 304, 305; block group(s): 4, 5; Within block group 6: Block(s): 601, 602, 603, 604, 605, 606; block group(s): 7; Within Tract/BNA 8139.00: Within block group 2: Block(s): 201; Within Tract/BNA 8141.00: Within block group 1: Block(s): 101, 104, 105; block group(s): 2; Within block group 3: Block(s); 304; Within Tract/BNA 8142.00: Within block group 1: Block(s): 101, 102, 103, 104, 105, 107, 110, 111, 112; Within block group 2: Block(s): 201, 202, 206, 207, 208, 209, 211; Within block group 3: Block(s): 303, 304; Within block group 4: Block(s): 401, 406, 408, 409, 410, 411; Within block group 5: Block(s): 502, 503, 504, 505, 506, 507; Within block group 6: Block(s): 602, 603, 604, 605, 606, 609, 610, 612, 613; Within the MCD/CCD of Leyden: Within Tract/BNA 8109.00: Within block group 2: Block(s): 206, 207, 208, 209, 210; Within block group 5: Block(s): 505; Within Tract/BNA 8110.-00: Within block group 2: Block(s): 207, 208, 209, 210, 211, 212; Within block group 5: Block(s): 509; Within Tract/BNA 8111.-00: Within block group 3: Block(s): 301, 302; Within Tract/BNA 8112.00: Within block group 3: Block(s): 302; Within the MCD/CCD of Oak Park: Within Tract/BNA 8131.00: Within block group 1: Block(s): 104; Within block group 4: Block(s): 405, 409, 410; Within block group 5: Block(s): 514; Within Tract/BNA 8132.-00: Within block group 1: Block(s): 101, 102, 103, 104, 105; Within block group 4: Block(s): 406, 407, 408; Within block group 5: Block(s): 501, 502; Within the MCD/CCD of Proviso: Within Tract/BNA 8160.-00: Within block group 4: Block(s): 413; Within Tract/BNA 8161.00: Within block group 1: Block(s): 101, 102, 103, 112; Within block group 6: Block(s): 607, 610, 611, 612, 613, 615, 616, 620; Within Tract/BNA 8162.00: Within block group 1: Block(s): 104, 101A, 101B; Within Tract/BNA 8164.01: Within block group 1: Block(s): 109, 116, 117; Within block group 2: Block(s): 201, 207, 208, 209, 210, 211; Within block group 3: Block(s): 303, 304, 305, 306, 308, 309, 310, 311; block group(s): 4; Within Tract/BNA 8164.02: Within block group 2: Block(s): 204, 205, 211, 218, 219, 220, 222; Within block group 3: Block(s): 319, 320, 326, 327, 328, 329; block group(s): 4; Within Tract/BNA 8165.00: Within block group 1: Block(s): 106, 107, 108, 112, 114; Within block group 2: Block(s): 204; Within block group 3: Block(s): 301, 302, 303, 308, 309, 311, 315, 316, 317, 321, 322, 323; Within Tract/BNA 8166.00: Within block group 1: Block(s): 102, 103, 105, 106, 107, 108, 109, 110, 111, 112, 113, 114; block group(s): 2; Within block group 3: Block(s): 301, 302, 303, 304, 305, 306, 317, 318, 319, 320, 321, 322; Within Tract/BNA 8167.00: Within block group 2: Block(s): 216; Within block group 4: Block(s): 401, 408, 410, 411, 412, 413, 414; Within Tract/BNA 8168.00: Within block group 1: Block(s): 101, 102, 103, 104, 108, 110, 111; Within block group 3: Block(s): 324; Within block group 4: Block(s): 408, 413, 421, 416A, 416B; Within Tract/BNA 8174.00: Within block group 1: Block(s): 101, 102, 109, 110, 114, 115; Within block group 2: Block(s): 216, 218, 223, 224, 225, 226; Within block group 3: Block(s): 301, 302, 307, 308, 310, 311, 312, 313, 314, 315, 316, 317, 318, 323, 324, 325, 326, 327, 328, 329; Within Tract/BNA 8175.00: Within block group 1: Block(s): 111; Within Tract/BNA 8180.00: Within block group 4: Block(s): 411B, 412B; Within block group 5: Block(s): 521, 522, 524A, 524B; Within Tract/BNA 8181.00: Within block group 1: Block(s): 122; Within block group 2: Block(s): 201, 202, 203, 216, 224; Within Tract/BNA 8184.01: Within block group 1: Block(s): 116, 111A, 111B, 115B, 115C;

Within block group 2: Block(s): 206, 212; Within block group 3: Block(s): 302, 301B, 301C, 301D, 301E; Within Tract/BNA 8184.02: Within block group 2: Block(s): 209, 211, 210B; Within Tract/BNA 8186.00: Within block group 1: Block(s): 101; Within block group 5: Block(s): 509B; Within Tract/BNA 8187.00: Within block group 1: Block(s): 119A, 119B; Within the MCD/CCD of River Forest: Within Tract/BNA 8119.00: Within block group 6: Block(s): 613, 614; Within the MCD/CCD of Riverside: Within Tract/BNA 8156.00: Within block group 4: : 404, 405; Within Tract/BNA 8158.00: Within block group 1: Block(s): 101, 102, 103, 104; Within the MCD/CCD of Stickney: Within Tract/BNA 8207.00: Within block group 5: Block(s): 501.

Representative district No. 5 shall be comprised of the following units of census geography: Within the County of Cook: Within the MCD/CCD of Chicago city: Within Tract/BNA 0207.00: Block group(s): 3, 4; Within block group 5: Block(s): 501, 502, 503; Within Tract/BNA 0208.00: Block group(s): 4, 5, 6; Within Tract/BNA 0319.00: Within block group 1: Block(s): 104, 105; Within block group 2: Block(s): 201, 202, 203; Within Tract/BNA 0401.00: Within block group 1: Block(s): 109; Within block group 2: Block(s): 202, 203, 204, 205, 206, 207, 208, 209; block group(s): 3; Tract/BNA(s): 0402.00, 0403.-00, 0404.00, 0405.00, 0406.00, 0407.00, 0408.00, 0409.00, 0410.00, 0501.00, 0502.00, 0503.00, 0504.00, 0505.00, 0506.00, 0507.00, 0508.00, 0509.00; Within Tract/BNA 0510.-00: Within block group 1: Block(s): 101, 102; Within Tract/BNA 0511.00: Within block group 1: Block(s): 101, 102, 103, 104, 106, 107; Tract/BNA(s): 0512.00; Within Tract/BNA 0513.00: Within block group 1: Block(s): 101, 102, 103, 104, 105, 106, 107, 108, 110, 111; Within block group 2: Block(s): 201, 206; Within Tract/BNA 0515.00: Within block group 1: Block(s): 104, 106; Tract/BNA(s): 0601.00, 0602.00, 0603.00, 0604.00; Within Tract/BNA 0605.-00: Within block group 1: Block(s): 104, 105, 106, 107; Within Tract/BNA 0611.00: Within block group 1: Block(s): 105, 106, 107; Tract/BNA(s): 0612.00, 0613.00, 0614.00, 0615.00; Within Tract/BNA 0616.-00: Within block group 1: Block(s): 102, 103, 104, 105, 106; Within Tract/BNA Within block group 1: Block(s): 104, 105, 110, 112, 113; Tract/BNA(s): 0622.00, 0623.00, 0624.00, 0625.00, 0626.00, 0627.00, 0628.00, 0629.00; Within Tract/BNA 0630.-00: Within block group 1: Block(s): 102, 103, 104, 105, 106, 107, 108, 109; block group(s): 2; Tract/BNA(s): 0701.00, 0702.-00, 0703.00, 0704.00, 0705.00; Within Tract/BNA 0706.00: Within block group 1: Block(s): 101, 102, 103; Within block group 2: Block(s): 201, 202, 203, 204, 205, 207; Within Tract/BNA 0707.00: Within block group 1: Block(s): 101, 103, 104, 105, 106; Within block group 2: Block(s): 206; Within Tract/BNA 0708.00: Block group(s): 1, 2; Within block group 3: Block(s): 301, 302, 304, 305, 306, 307, 308, 309, 310; Tract/BNA(s): 0709.00, 0710.00, 0711.00, 0712.00, 0713.00, 0714.00; Within Tract/BNA 0715.00: Block group(s): 1, 2, 3; Within block group 4: Block(s): 403, 404, 405, 406, 407, 409; Tract/BNA(s): 0716.00; Within Tract/BNA 0717.00: Within block group 1: Block(s): 101, 102, 103, 105; Within Tract/BNA 0718.00: Within block group 1: Block(s): 101, 102, 103, 104, 105, 106, 107, 108; Within Tract/BNA 0719.00: Block group(s): 1; Within block group 2: Block(s): 201; Within Tract/BNA 0720.00: Within block group 1: Block(s): 101, 102, 103, 104, 105, 106, 110; block group(s): 2; Tract/BNA(s): 0801.00; Within Tract/BNA 0802.00: Within block group 1: Block(s): 101, 102, 103, 104, 107, 108, 109, 114, 115; Within Tract/BNA 0812.00: Block group(s): 1, 2; Within block group 3: Block(s): 301, 303, 304, 305; Within Tract/BNA 0813.00: Within block group 1: Block(s): 104; Within block group 2: Block(s): 204, 205; Within Tract/BNA 1005.00: Within block group 4: Block(s): 403, 406, 407, 411; block group(s): 5, 6, 7; Within Tract/BNA 1102.00: Within block group 2: Block(s): 201; Within Tract/BNA 1104.00: Block group(s): 2, 3, 4; Within Tract/BNA 1105.00: Within block group 1: Block(s): 104, 105, 106, 107, 108; block group(s): 2, 3, 4, 5; Within block group 6: Block(s): 601, 602, 603, 604, 606, 607, 608;

Within block group 8: Block(s): 806, 807, 808; Within Tract/BNA 1203.00: Within block group 3: Block(s): 310, 311, 312, 313, 314, 315; Within Tract/BNA 1204.00: Within block group 1: Block(s): 108, 109, 110, 111, 112, 113; block group(s): 2, 3; Within Tract/BNA 1301.00: Within block group 5: Block(s): 511; Within Tract/BNA 1302.00: Within block group 1: Block(s): 105, 106, 107, 108, 109, 110, 111, 114, 115, 116, 117, 118, 119, 120, 121, 122, 123, 124, 125, 126, 127, 128, 129; Tract/BNA(s): 1303.00, 1304.00, 1305.00; Within Tract/ BNA 1401.00: Within block group 1: Block(s): 101, 102, 103; Within block group 2: Block(s): 203, 206; Tract/BNA(s): 1402.00, 1403.00, 1404.00, 1405.00; Within Tract/BNA 1406.00: Within block group 1: Block(s): 103, 104, 106, 107, 108, 109, 110, 111, 112, 113; block group(s): 2; Within Tract/BNA 1407.00: Within block group 6: Block(s): 601; Within Tract/BNA 1408.00: Block group(s): 1, 2, 3; Within block group 5: Block(s): 502, 509; Tract/BNA(s): 1501.00, 1502.00, 1503.00, 1504.00, 1505.00, 1506.00, 1507.00, 1508.00, 1509.00, 1510.00, 1511.00, 1512.00, 1601.00, 1602.00, 1603.00, 1604.00; Within Tract/BNA 1605.00: Within block group 2: Block(s): 203, 204, 205; Within block group 3: Block(s): 304; Within block group 4: Block(s): 403; Within block group 6: Block(s): 601, 602; Within Tract/BNA 1606.00: Block group(s): 1; Within block group 2: Block(s): 201, 202, 203; Within block group 5: Block(s): 502, 503, 504; block group(s): 6; Within Tract/ BNA 1607.00: Block group(s): 1, 2; Within block group 3: Block(s): 302; Within block group 4: Block(s): 402, 403, 404, 405, 406; Within block group 5: Block(s): 501; Within block group 6: Block(s): 603, 604, 605, 606; Tract/BNA(s): 1608.00, 1609.00, 1610.00, 1611.00, 1612.00, 1613.00, 1701.00, 1702.00, 1703.00, 1704.00, 1705.00, 1706.00, 1707.00, 1708.00, 1709.00, 1710.00, 1711.00, 1801.00, 1802.00, 1803.00; Within Tract/ BNA 1901.00: Within block group 1: Block(s): 101, 102, 103, 104, 105, 110; Within Tract/BNA 1902.00: Block group(s): 1, 2; Within block group 3: Block(s): 302, 303, 304, 305, 306, 307; Within block group 4: Block(s): 402, 403, 404, 405, 406, 407; Tract/BNA(s): 1903.00, 1904.00, 1905.00; Within Tract/BNA 1906.00: Block group(s): 1, 2, 3; Within block group 4: Block(s): 401, 402, 404, 405, 406, 407, 408; Within block group 5: Block(s): 501, 502, 505, 506, 507, 508; block group(s): 6, 7; Tract/BNA(s): 1907.00; Within Tract/BNA 1908.00: Within block group 1: Block(s): 102, 103, 106; Within block group 2: Block(s): 201, 204, 205; Within block group 3: Block(s): 307, 308; Within block group 4: Block(s): 403, 404, 405, 406; block group(s): 5; Within Tract/BNA 1911.00: Within block group 5: Block(s): 501, 502, 503; Within Tract/BNA 1912.00: Within block group 1: Block(s): 101, 102, 104, 105, 106, 110, 111; Within Tract/BNA 1913.00: Within block group 1: Block(s): 102; Within block group 5: Block(s): 505, 506, 507, 508; Within Tract/BNA 1914.00: Within block group 1: Block(s): 101, 102, 103; Within Tract/BNA 2001.00: Within block group 1: Block(s): 101, 103, 104, 105, 107; Within block group 2: Block(s): 205; Within block group 3: Block(s): 302, 303, 304, 305, 308, 309; Within Tract/BNA 2101.00: Within block group 3: Block(s): 302, 303, 304, 306, 307, 308, 309, 310; Within Tract/ BNA 2102.00: Within block group 1: Block(s): 101, 109, 110, 111, 115; Tract/ BNA(s): 2103.00; Within Tract/BNA 2104.-00: Block group(s): 1; Within block group 2: Block(s): 202, 203, 205; Within Tract/ BNA 2105.00: Block group(s): 1; Within block group 2: Block(s): 201, 202, 203, 204, 205, 206, 207, 210, 211, 212; block group(s): 3; Within Tract/BNA 2106.00: Within block group 4: Block(s): 404, 406; block group(s): 5; Within block group 6: Block(s): 601, 602, 603, 604, 605; Within Tract/BNA 2401.00: Within block group 1: Block(s): 101, 102, 103, 104, 105, 106, 107, 108, 109, 110, 111; Tract/BNA(s): 2417.00; Within Tract/BNA 2505.00: Within block group 5: Block(s): 506, 507, 508, 509, 510; block group(s): 6; Within block group 7: Block(s): 701, 702; Tract/BNA(s): 7608.00; Within Tract/BNA 7708.00: Block group(s): 1; Tract/BNA(s): 7709.00, 8104.-00, 8106.00; Within the MCD/CCD of Leyden: Tract/BNA(s): 7709.00, 8107.01, 8107.02, 8108.00; Within Tract/BNA 8109.-00: Block group(s): 1; Within block group

2: Block(s): 201, 202, 203, 204, 205; Within block group 5: Block(s): 506, 507, 508, 509, 510, 511, 512; Within Tract/BNA 8110.00: Block group(s): 1; Within block group 2: Block(s): 201, 202, 203, 204, 205, 206; Within Tract/BNA 8111.00: Block group(s): 1, 2; Within block group 3: Block(s): 303, 304, 305, 307, 308, 309, 310, 311, 312; block group(s): 4; Within Tract/BNA 8112.00: Block group(s): 1, 2; Within block group 3: Block(s): 301, 303, 304, 305, 307, 308, 309, 310, 311, 312, 313, 314, 315, 317, 318, 320, 306A, 316A, 319A, 306B, 316B, 319B; block group(s): 4, 5, 6; Tract/BNA(s): 8113.01, 8113.02, 8114.01, 8114.02, 8115.00, 8116.00, 8117.01, 8117.02, 8118.00; Within the MCD/CCD of Norwood Park: Tract/BNA(s): 1005.00, 7709.00; Within Tract/BNA 8104.00: Block group(s): 5, 7, 8; Tract/BNA(s): 8105.01, 8105.02; Within Tract/BNA 8106.00: Block group(s): 1, 2; Within block group 3: Block(s): 301, 302, 303, 304, 305, 306, 307, 309, 310, 311, 313, 314A, 314B; Within the MCD/CCD of Proviso: Tract/BNA(s): 8113.02; Within Tract/BNA 8162.00: Within block group 1: Block(s): 102, 105, 106, 107, 108, 109, 110, 111, 103A, 103B; block group(s): 2, 3, 4, 5; Tract/BNA(s): 8163.00; Within Tract/BNA 8164.01: Within block group 1: Block(s): 101, 102, 103, 104, 105, 106, 107, 108, 110, 111, 112, 113, 114, 115, 118; Within block group 2: Block(s): 202, 203, 204, 205, 206; Within block group 3: Block(s): 301, 302, 307, 312, 313, 314, 315; Within Tract/BNA 8164.02: Block group(s): 1; Within block group 2: Block(s): 201, 202, 203, 206, 207, 208, 209, 210, 212, 213, 214, 215, 216, 217, 221, 223; Within block group 3: Block(s): 301, 302, 303, 304, 305, 306, 307, 308, 309, 310, 311, 312, 313, 314, 315, 316, 317, 318, 321, 322, 323, 324, 325; Within Tract/BNA 8165.00: Within block group 1: Block(s): 101, 102, 103, 104, 105, 109, 110, 111, 113, 115; Within block group 2: Block(s): 201, 202, 203, 205, 206, 207, 208, 209, 210, 211, 212; Within block group 3: Block(s): 304, 305, 306, 307, 310, 312, 313, 314, 318, 319, 320; block group(s): 4; Within Tract/BNA 8166.00: Within block group 1: Block(s): 101, 104; Within block group 3: Block(s): 307, 308, 309, 310, 311, 312, 313, 314, 315, 316; Within Tract/BNA 8167.00: Block group(s): 1; Within block group 2: Block(s): 201, 202, 203, 204, 205, 206, 207, 208, 209, 210, 211, 212, 215; block group(s): 3; Within block group 4: Block(s): 402, 403, 404, 405, 406, 407, 409; Within Tract/BNA 8174.00: Within block group 2: Block(s): 227, 228, 229; Within block group 3: Block(s): 309.

Representative district No. 6 shall be comprised of the following units of census geography: Within the County of Cook: Within the MCD/CCD of Chicago city: Within Tract/BNA 0901.00: Within block group 4: Block(s): 414; Tract/BNA(s): 7609.00, 7705.00, 7706.00, 7707.00; Within Tract/BNA 7708.00: Block group(s): 2; Tract/BNA(s): 8116.00, 8117.01; Within the MCD/CCD of Elk Grove: Tract/BNA(s): 7609.00, 7702.00, 7703.00, 7704.00, 7705.00; Within Tract/BNA 8049.01: Within block group 1: Block(s): 101, 102, 103, 104, 105, 106, 107, 108, 109, 110, 111, 112, 116, 117, 118, 119, 120, 121, 122, 123, 124, 125, 126, 127, 128; Within block group 2: Block(s): 201, 202, 203, 204, 205, 206, 207, 208, 209, 210, 212, 213, 214, 215, 216, 217, 218, 219, 220; block group(s): 3, 4; Within block group 5: Block(s): 504, 505, 506, 507, 508, 509, 510, 511, 512, 513, 514, 523; block group(s): 6; Tract/BNA(s): 8049.02; Within Tract/BNA 8050.02: Block group(s): 4; Tract/BNA(s): 8051.11, 8051.12; Within the MCD/CCD of Leyden: Tract/BNA(s): 7609.00, 7707.00, 7708.00, 8057.02, 8308.98; Within the MCD/CCD of Maine: Tract/BNA(s): 0903.00, 7609.00, 7706.00, 7707.00; Within Tract/BNA 8054.01: Within block group 1: Block(s): 102, 103, 104, 105, 107, 108, 109, 110, 111, 112, 113, 114, 115, 116, 117, 118, 119; Within block group 2: Block(s): 202, 203, 204, 205, 206, 207, 208, 209, 210, 211, 212, 213, 214, 215, 216, 217; block group(s): 3; Tract/BNA(s): 8055.01, 8055.02, 8056.00, 8057.01, 8058.01, 8058.02, 8059.01, 8059.02, 8060.01, 8060.02, 8060.03; Within Tract/BNA 8060.04: Within block group 2: Block(s): 202, 203, 205, 206, 211, 212, 213, 214, 204A, 209A, 210A, 204B, 209B, 210B, 204C; Within block group 3: Block(s): 304, 305, 306, 307; Within block group 4: Block(s): 402, 403, 404, 405, 406, 407, 408, 409, 411, 412, 413, 410A, 410B,

410C; Tract/BNA(s): 8061.01, 8061.02, 8062.00, 8063.00, 8064.00, 8065.01, 8065.02, 8066.00; Within the MCD/CCD of Norwood Park: Within Tract/BNA 8104.00: Block group(s): 1, 2, 3, 4; Within the MCD/CCD of Proviso: Within Tract/BNA 8184.01: Within block group 1: Block(s): 117; block group(s): 4, 5; Within Tract/BNA 8184.02: Within block group 2: Block(s): 210A; block group(s): 3; Tract/BNA(s): 8185.00; Within Tract/BNA 8186.-00: Within block group 1: Block(s): 102, 103, 104, 105, 106, 107, 108, 109; block group(s): 2, 3, 4; Within block group 5: Block(s): 501, 502, 503, 504, 505, 506, 507, 508, 509A; block group(s): 6, 7; Within Tract/BNA 8187.00: Within block group 1: Block(s): 104, 107, 108, 109, 110, 111, 112, 113, 114, 115, 116, 117, 118; block group(s): 2; Within block group 3: Block(s): 302, 303, 304, 305, 306, 307, 308, 309, 310; Within Tract/BNA 8188.00: Block group(s): 1, 2; Within block group 3: Block(s): 301, 302, 303, 304, 305, 306, 307, 308, 309, 310, 312; block group(s): 4, 5, 6, 7; Tract/BNA(s): 8189.00, 8190.00; Within the County of DuPage: The MCD/CCD(s) of: Addison, Bloomingdale, Chicago city; Within the MCD/CCD of Milton: Tract/BNA(s): 8417.01, 8417.02, 8418.00, 8419.00, 8420.00, 8421.00, 8422.00, 8423.00, 8424.00, 8425.00; Within Tract/BNA 8426.03: Block group(s): 1, 2, 3, 4, 5, 6, 7; Within block group 8: Block(s): 801, 802, 803, 804, 805, 806, 807, 808, 809, 812, 810A, 811A, 810B, 810C, 811C; Within Tract/BNA 8426.04: Block group(s): 1; Within block group 2: Block(s): 202, 203, 204, 205, 206, 201A, 207A, 201B, 207B, 201C, 207C; Within block group 3: Block(s): 301, 302, 303, 304, 305, 306, 307, 308, 309, 310; Tract/BNA(s): 8427.03; Within Tract/BNA 8427.04: Block group(s): 1, 2; Within block group 3: Block(s): 301, 302, 303, 304, 305, 306, 308, 310, 309A, 309B, 309C; Within block group 4: Block(s): 401; Within Tract/BNA 8427.-05: Block group(s): 1, 2, 3; Within Tract/BNA 8427.06: Block group(s): 1; Within Tract/BNA 8427.07: Within block group 3: Block(s): 302, 303, 304, 310, 311, 312, 313, 301A, 305A, 314A, 315A, 301B, 314B, 305D; Within the MCD/CCD of York: Tract/

BNA(s): 8428.00, 8429.00, 8430.00, 8431.00, 8432.00, 8433.00, 8434.00, 8435.00, 8436.00, 8437.00, 8438.00, 8439.00, 8440.00, 8441.00, 8442.01, 8442.02, 8443.01, 8443.02; Within Tract/BNA 8444.00: Within block group 1: Block(s): 103, 104, 106, 107, 108, 109, 199, 101A, 102A, 101B, 110B; block group(s): 2, 3, 4, 6, 7, 9; Within Tract/BNA 8445.00: Block group(s): 1, 2; Within Tract/BNA 8446.00: Block group(s): 1; Within block group 2: Block(s): 203, 204, 205, 206, 225, 201A, 202A, 201B, 202B; block group(s): 3, 4, 5; Within block group 9: Block(s): 901, 902, 903, 904, 905, 906, 907, 908.

Representative district No. 7 shall be comprised of the following units of census geography: Within the County of Cook: Within the MCD/CCD of Chicago city: Within Tract/BNA 0715.00: Within block group 4: Block(s): 408; Within Tract/BNA 0717.00: Within block group 1: Block(s): 104, 109; block group(s): 2; Within Tract/BNA 0718.00: Within block group 1: Block(s): 111, 112; Within Tract/BNA 0719.00: Within block group 2: Block(s): 202, 203, 204, 205, 206, 207; Within Tract/BNA 0720.00: Within block group 1: Block(s): 107, 108, 109; Within Tract/BNA 0802.00: Within block group 1: Block(s): 106, 110, 111; Tract/BNA(s): 0803.00, 0804.00, 0805.00, 0806.00, 0807.00, 0808.00, 0809.00, 0810.00, 0811.00; Within Tract/BNA 0812.00: Within block group 3: Block(s): 306, 307, 308, 309, 310, 311, 312; Within Tract/BNA 0813.00: Within block group 1: Block(s): 101, 102, 105, 106, 107; Within block group 2: Block(s): 202, 203, 206, 207, 208; Tract/BNA(s): 0814.00, 0815.00, 0816.00, 0817.00, 0818.00, 0819.00; Within Tract/BNA 1911.00: Within block group 3: Block(s): 301; Within block group 6: Block(s): 607, 608; Within Tract/BNA 1912.00: Within block group 2: Block(s): 204, 205; Within Tract/BNA 1913.00: Within block group 2: Block(s): 203, 208; Within block group 3: Block(s): 301; Within block group 7: Block(s): 701; Within Tract/BNA 1914.00: Within block group 1: Block(s): 108; Within Tract/BNA 2305.00: Within block group 3: Block(s): 305, 306; Within Tract/BNA 2306.00: Within block group 2: Block(s): 202, 203, 204, 205, 206; Within block group 3: Block(s): 301; With-

in block group 4: Block(s): 406; Within block group 5: Block(s): 501, 503, 504, 505, 506; Within block group 6: Block(s): 602; Within Tract/BNA 2307.00: Within block group 3: Block(s): 302, 303, 304, 305, 306; Within Tract/BNA 2310.00: Within block group 1: Block(s): 102, 105, 106, 107, 109, 110; block group(s): 2; Tract/BNA(s): 2311.00, 2312.00, 2313.00, 2314.00, 2315.00, 2316.00, 2317.00, 2318.00; Within Tract/BNA 2418.00: Within block group 1: Block(s): 101, 102, 104, 106, 107, 108, 109; block group(s): 2; Within Tract/BNA 2419.00: Within block group 1: Block(s): 101, 102, 103, 108, 109; Within Tract/BNA 2423.00: Within block group 1: Block(s): 102, 105, 107, 108; Within block group 2: Block(s): 201, 204, 205; Within Tract/BNA 2424.00: Within block group 1: Block(s): 101, 105, 106, 107, 108; block group(s): 2; Tract/BNA(s): 2428.00; Within Tract/BNA 2429.00: Block group(s): 1; Within block group 2: Block(s): 205, 206, 207; Within block group 3: Block(s): 301, 302, 303; Within Tract/BNA 2430.00: Within block group 2: Block(s): 203, 204, 205, 206; Within block group 3: Block(s): 301; Within Tract/BNA 2431.00: Within block group 3: Block(s): 301, 303, 304, 305, 306, 307; Within Tract/BNA 2432.00: Within block group 2: Block(s): 205; block group(s): 3; Within Tract/BNA 2433.00: Within block group 3: Block(s): 306, 308; Within Tract/BNA 2434.00: Within block group 2: Block(s): 202, 208; Within block group 3: Block(s): 301, 302, 303, 305, 310; Within Tract/BNA 2435.00: Block group(s): 1; Within block group 2: Block(s): 201, 203, 205, 206, 207, 209, 210; Within block group 3: Block(s): 301, 302, 303, 304, 305, 306, 307, 308, 311; Within block group 4: Block(s): 402, 403, 405, 410; Within block group 5: Block(s): 503, 511, 512, 514, 515; Tract/BNA(s): 2436.00; Within Tract/BNA 2501.00: Within block group 1: Block(s): 104, 107, 108; Within Tract/BNA 2502.00: Within block group 1: Block(s): 105, 106; block group(s): 2, 3; Tract/BNA(s): 2503.-00, 2504.00; Within Tract/BNA 2505.00: Within block group 1: Block(s): 102, 103, 104, 105, 106, 107, 108, 109, 110, 111, 112; block group(s): 2, 3, 4; Within block group 7: Block(s): 705, 706, 707, 708, 709, 710, 711, 712; Tract/BNA(s): 2506.00, 2507.00, 2508.00, 2509.00, 2510.00, 2511.00, 2512.00, 2513.00, 2514.00, 2515.00, 2516.00, 2517.00, 2518.00, 2519.00, 2520.00, 2521.00, 2522.00, 2523.00; Within Tract/BNA 2524.00: Within block group 1: Block(s): 101, 102, 103; Tract/BNA(s): 2601.00, 2602.00, 2603.00, 2604.00, 2605.00, 2606.00, 2607.00, 2608.00, 2609.00, 2610.00, 2701.00, 2702.00, 2703.00, 2704.00, 2705.00, 2706.00, 2707.00, 2708.00, 2709.00, 2710.00, 2711.00, 2712.00, 2713.00, 2714.00, 2715.00, 2716.00, 2717.00, 2718.00, 2719.00, 2801.00, 2802.00, 2803.00, 2804.00, 2805.00, 2806.00, 2807.00, 2808.00, 2809.00, 2810.00, 2811.00, 2812.00, 2813.00, 2814.00, 2815.00, 2816.00, 2817.00, 2818.00, 2819.00, 2820.00, 2821.00, 2822.00, 2823.00, 2824.00, 2825.00, 2826.00; Within Tract/BNA 2827.-00: Block group(s): 1; Within block group 2: Block(s): 205; Within Tract/BNA 2828.-00: Within block group 1: Block(s): 101; Within Tract/BNA 2829.00: Block group(s): 1, 2, 3; Within block group 4: Block(s): 401, 402, 403, 404, 409; Within Tract/BNA 2830.00: Block group(s): 1; Within block group 2: Block(s): 201, 203, 205, 206, 207, 210; Tract/BNA(s): 2831.00, 2832.00, 2833.00, 2834.00, 2835.00, 2836.00, 2837.00, 2838.00, 2839.00, 2840.00, 2841.00; Within Tract/BNA 2842.00: Block group(s): 1; Tract/BNA(s): 2901.00, 2902.-00, 2903.00, 2904.00, 2905.00, 2906.00, 2907.00, 2908.00, 2909.00, 2910.00, 2911.00, 2912.00, 2913.00, 2914.00; Within Tract/BNA 2915.00: Within block group 1: Block(s): 102, 103, 104, 105, 106; Within block group 2: Block(s): 201, 203; Within block group 3: Block(s): 304, 305, 306, 307, 308, 309; Tract/BNA(s): 2917.00, 2918.00, 2919.00, 2920.00, 2921.00, 2922.00, 2923.00, 2924.00, 2925.00, 2926.00, 2927.00; Within Tract/BNA 3003.00: Within block group 1: Block(s): 101, 102, 105, 106; Tract/BNA(s): 3004.00; Within Tract/BNA 3101.00: Within block group 1: Block(s): 101, 102, 103, 104, 105, 106, 111, 112, 113, 114, 115, 117, 124; Tract/BNA(s): 3201.00, 3202.00, 3203.00, 3204.00, 3205.00, 3206.00, 3301.00, 3302.00, 3303.00, 3304.00, 3305.00, 3401.00; Within Tract/BNA 3402.00: Block group(s): 1, 2, 3; Within block group 4: Block(s): 402, 403, 405, 407, 408, 410, 416,

419, 420, 422; Tract/BNA(s): 3403.00, 3404.00, 3405.00; Within Tract/BNA 3406.-00: Within block group 2: Block(s): 201, 202, 203, 204, 205; Within Tract/BNA 3701.00: Within block group 1: Block(s): 106, 107, 108, 109, 110, 111; Within block group 2: Block(s): 203, 206, 207, 208, 210; Tract/BNA(s): 3702.00, 3703.00, 3704.00, 3806.00, 3807.00, 3808.00; Within Tract/BNA 3809.00: Within block group 1: Block(s): 106; block group(s): 2; Within Tract/BNA 3812.00: Block group(s): 1; Within block group 2: Block(s): 203, 204, 205; block group(s): 3; Tract/BNA(s): 3813.00, 3814.00, 3815.00, 3816.00, 3817.00, 3818.00, 3819.00; Within Tract/BNA 3820.-00: Within block group 3: Block(s): 301; Within Tract/BNA 4001.00: Within block group 1: Block(s): 107; block group(s): 2; Tract/BNA(s): 4002.00; Within Tract/BNA 4003.00: Within block group 1: Block(s): 106, 107, 108, 109, 110, 111, 112, 113, 114, 115, 116, 117, 118; Within Tract/BNA 4004.00: Block group(s): 1; Within block group 3: Block(s): 305; block group(s): 4; Within Tract/BNA 4005.00: Block group(s): 1; Within block group 3: Block(s): 302, 303, 304, 305; Within Tract/BNA 4006.00: Within block group 1: Block(s): 101, 102, 103, 104; Tract/BNA(s): 6001.00, 6002.00, 6003.00, 6004.00; Within Tract/BNA 6008.00: Within block group 1: Block(s): 101; Tract/BNA(s): 6010.00, 6011.00, 6012.00; Within Tract/BNA 6016.-00: Within block group 1: Block(s): 107, 110A, 110B; Within Tract/BNA 6101.00: Within block group 1: Block(s): 101, 105, 106, 109, 110, 112, 114, 115, 116, 117, 118; Within Tract/BNA 6108.00: Within block group 1: Block(s): 102, 103, 104, 105, 106, 107, 108, 109, 110, 111, 112, 113, 115, 101A, 101B; Within Tract/BNA 6109.00: Within block group 1: Block(s): 101, 102, 103, 104, 105, 106, 107, 108, 109, 110, 111, 113, 114, 116, 117; Within Tract/BNA 6110.00: Within block group 1: Block(s): 104, 105, 106, 107, 108, 109, 111; Within block group 2: Block(s): 201, 202, 203, 205, 206; Within Tract/BNA 6120.00: Block group(s): 1; Within block group 2: Block(s): 201, 204, 205; Within block group 3: Block(s): 301, 302, 305, 306; Tract/BNA(s): 6121.00, 6122.00; Within Tract/BNA 6801.00: Within block group 1: Block(s): 101, 102, 103; Within Tract/BNA 6802.00: Within block group 1: Block(s): 101, 102, 103, 104, 105, 106, 107, 108, 109, 110, 118; Within block group 4: Block(s): 401, 402, 403, 404, 409, 410, 413, 419; Within Tract/BNA 6803.00: Within block group 1: Block(s): 101, 102, 103; Within block group 3: Block(s): 304, 305; Within Tract/BNA 6804.00: Within block group 1: Block(s): 101, 102, 103; Within block group 2: Block(s): 201, 202; Within Tract/BNA 6805.00: Within block group 1: Block(s): 101; Within the MCD/CCD of Leyden: Within Tract/BNA 8109.-00: Block group(s): 3, 4; Within block group 5: Block(s): 501, 502, 503, 504; Within Tract/BNA 8110.00: Block group(s): 3, 4; Within block group 5: Block(s): 501, 502, 503, 504, 505, 507, 508; Within the MCD/CCD of Oak Park: Tract/BNA(s): 8121.00, 8122.00, 8123.00, 8124.00, 8125.00, 8126.00, 8127.00, 8128.00, 8129.00, 8130.00; Within Tract/BNA 8131.00: Within block group 1: Block(s): 101, 102, 103; Within block group 4: Block(s): 406, 407, 408; Within the MCD/CCD of Proviso: Tract/BNA(s): 8159.00; Within Tract/BNA 8160.00: Block group(s): 1, 2, 3; Within block group 4: Block(s): 401, 402, 403, 404, 405, 406, 407, 408, 409, 410; Within Tract/BNA 8168.00: Within block group 1: Block(s): 105, 106, 107, 109, 112, 113, 114, 115, 116, 117, 118, 119, 120, 121, 122; block group(s): 2; Within block group 3: Block(s): 301, 302, 303, 304, 305, 306, 307, 308, 309, 310, 311, 312, 313, 314, 315, 319, 320, 322, 323; Within block group 4: Block(s): 401, 402, 403, 404, 405, 406, 407, 409, 410, 411, 412, 418; Tract/BNA(s): 8169.00, 8170.00, 8171.01, 8171.02, 8172.00, 8173.00; Within Tract/BNA 8174.00: Within block group 1: Block(s): 103, 104, 105, 106, 107, 108, 111, 112, 113, 116, 117, 118, 119, 120, 121, 122, 123, 124, 125, 126, 127, 128; Within block group 2: Block(s): 201, 202, 203, 204, 205, 206, 207, 208, 209, 210, 211, 212, 213, 214, 215, 219, 220, 221, 222; Within block group 3: Block(s): 303, 304, 305, 306, 319, 320, 321, 322, 330; Within Tract/BNA 8175.00: Within block group 1: Block(s): 102, 103, 104, 105, 106, 107, 108, 109, 110, 117, 118, 119, 120, 121, 122, 123,

124, 125, 126, 128, 130, 101A, 101B; block group(s): 2, 3, 4; Tract/BNA(s): 8176.00, 8177.00, 8178.00, 8179.00; Within Tract/BNA 8180.00: Block group(s): 1, 2, 3; Within block group 4: Block(s): 401, 402, 403, 404, 405, 407, 408, 409, 410, 413, 414, 415, 406A, 411A, 412A, 406B; Within block group 5: Block(s): 501, 502, 503, 504, 505, 506, 507, 508, 509, 510, 511, 512, 513, 514, 515, 516, 517, 518, 519, 520, 523; Within Tract/BNA 8181.00: Within block group 1: Block(s): 101, 102, 103, 104, 106, 107, 108, 109, 110, 111, 112, 113, 114, 115, 116, 117, 123; Within block group 2: Block(s): 204, 205, 206, 207, 208, 209, 210, 211, 212, 213, 214, 215, 217, 218, 219, 220, 221, 222; Tract/BNA(s): 8182.00, 8183.00; Within Tract/BNA 8184.01: Within block group 1: Block(s): 101, 102, 103, 104, 105, 106, 107, 108, 109, 110, 112, 113, 114, 115A; Within block group 2: Block(s): 201, 202, 203, 204, 205, 207, 208, 209, 210, 211, 213, 214, 215, 216, 217, 218, 219, 220; Within block group 3: Block(s): 301A; Within Tract/BNA 8184.02: Block group(s): 1; Within block group 2: Block(s): 201, 202, 203, 204, 205, 206, 207, 208; Within the MCD/CCD of River Forest: Within Tract/BNA 8119.00: Block group(s): 1, 2, 3, 4, 5; Within block group 6: Block(s): 601, 602, 603, 604, 605, 606, 607, 608, 609, 610, 611, 612; Tract/BNA(s): 8120.00, 8159.00; Within the MCD/CCD of Riverside: Within Tract/BNA 8156.00: Within block group 4: Block(s): 406, 407, 408, 409, 410, 411, 412, 413; block group(s): 5, 6.

Representative district No. 8 shall be comprised of the following units of census geography: Within the County of Cook: The MCD/CCD(s) of: Barrington; Within the MCD/CCD of Elk Grove: Within Tract/BNA 8049.01: Within block group 1: Block(s): 113, 114, 115; Within block group 2: Block(s): 211; Within block group 5: Block(s): 501, 502, 503, 515, 516, 517, 518, 519, 520, 521, 522; Tract/BNA(s): 8050.01; Within Tract/BNA 8050.02: Block group(s): 1, 2, 3, 5, 6; Tract/BNA(s): 8051.05, 8051.06, 8051.07, 8051.08, 8051.09, 8051.10; The MCD/CCD(s): Hanover, Palatine, Schaumburg; Within the MCD/CCD of Wheeling: Within Tract/BNA 8028.01:

Block group(s): 5; Within Tract/BNA 8028.02: Within block group 1: Block(s): 104, 105, 106, 107, 108, 109; Within block group 2: Block(s): 206, 207, 208, 209, 210, 211, 212, 213, 214, 215, 216, 217, 218; Within block group 3: Block(s): 309, 310, 311, 312, 313, 314, 315, 316, 317, 318, 319, 320; Within block group 4: Block(s): 409, 410, 411, 412; block group(s): 5; Within Tract/BNA 8030.06: Block group(s): 3; Within block group 4: Block(s): 403, 404, 408, 409, 410, 411, 412, 413, 414, 415; Within Tract/BNA 8032.00: Within block group 1: Block(s): 101, 102, 103, 104, 105, 107, 108, 110, 112, 117, 118, 119, 120, 121, 122, 123, 124, 125, 130, 132, 109A, 111A, 113A, 114A, 126A, 127A, 129A, 109B, 111B, 113B, 114B, 126B, 127B, 129B, 114C, 126C, 127C, 114D; Within block group 2: Block(s): 201, 202, 203, 204, 205, 207, 209, 211, 212, 219, 220, 222, 223, 226, 227; block group(s): 3; Within Tract/BNA 8033.00: Within block group 4: Block(s): 405, 406, 407, 408, 409, 410, 411, 412, 413, 414, 415, 416, 417, 418, 419, 420, 421, 422, 423, 425, 428, 429, 430; Tract/BNA(s): 8034.00, 8035.00, 8051.10; Within the County of Lake: The MCD/CCD(s) of: Antioch, Avon, Cuba, Ela, Fremont, Grant, Lake Villa, Newport, Warren, Wauconda.

Representative district No. 9 shall be comprised of the following units of census geography: Within the County of Cook: Within the MCD/CCD of Chicago city: Tract/BNA(s): 0101.00, 0102.00, 0103.00, 0104.00, 0105.00, 0106.00, 0107.00, 0108.00, 0109.00, 0201.00, 0202.00, 0203.00, 0204.00, 0205.00, 0206.00; Within Tract/BNA 0207.00: Block group(s): 1, 2; Within block group 5: Block(s): 508, 509, 510, 511, 512, 513, 514; block group(s): 6; Within Tract/BNA 0208.00: Block group(s): 1, 2, 3, 7, 8; Tract/BNA(s): 0209.00, 0301.00, 0302.00, 0303.00, 0304.00, 0305.00, 0306.00, 0307.00, 0308.00, 0309.00, 0310.00, 0311.00, 0312.00, 0313.00, 0314.00, 0315.00, 0316.00, 0317.00, 0318.00; Within Tract/BNA 0319.00: Within block group 1: Block(s): 101, 102, 103; Within block group 2: Block(s): 204, 205; Tract/BNA(s): 0320.00, 0321.00; Within Tract/BNA 0401.00: Within block group 1: Block(s): 101, 102, 103, 104, 105, 106, 107, 108, 199; Within block group 2: Block(s):

201; block group(s): 4; Within Tract/BNA 0605.00: Within block group 1: Block(s): 101, 102; Tract/BNA(s): 0606.00, 0607.00, 0608.00, 0609.00, 0610.00; Within Tract/ BNA 0611.00: Within block group 1: Block(s): 101, 102, 103, 104, 108, 109, 110; Within Tract/BNA 0616.00: Within block group 1: Block(s): 101; Tract/BNA(s): 0617.00, 0618.00, 0619.00, 0620.00; Within Tract/BNA 0621.00: Within block group 1: Block(s): 101, 102, 103, 106, 107, 108, 109, 111; Within Tract/BNA 0630.00: Within block group 1: Block(s): 101; Tract/ BNA(s): 0631.00, 0632.00, 0633.00, 0634.00; Within Tract/BNA 0901.00: Block group(s): 1, 2, 3; Within block group 4: Block(s): 401, 402, 403, 404, 405, 406, 407, 408, 409, 410, 411, 412, 413; Tract/BNA(s): 0902.00, 0903.00, 1001.00, 1002.00, 1003.00, 1004.00; Within Tract/BNA 1005.00: Block group(s): 1, 2, 3; Within block group 4: Block(s): 401, 402, 404, 405, 408, 409, 410; Tract/BNA(s): 1006.00, 1007.00, 1101.00; Within Tract/BNA 1102.00: Block group(s): 1; Within block group 2: Block(s): 203, 204, 205, 206, 207, 208, 209, 210, 211, 212, 213, 214, 215, 216; Tract/ BNA(s): 1103.00; Within Tract/BNA 1104.- 00: Block group(s): 1; Within Tract/BNA 1105.00: Within block group 1: Block(s): 101, 102, 103; Within block group 6: Block(s): 605; block group(s): 7; Within block group 8: Block(s): 801, 802, 803, 804, 805; Tract/BNA(s): 1201.00, 1202.00; Within Tract/BNA 1203.00: Block group(s): 1, 2; Within block group 3: Block(s): 301, 302, 303, 304, 305, 306, 307, 308, 309, 316; block group(s): 4, 5, 6; With- in Tract/BNA 1204.00: Within block group 1: Block(s): 101, 102, 103, 104, 105, 106, 107; Within Tract/BNA 1301.00: Block group(s): 1, 2, 3, 4; Within block group 5: Block(s): 501, 502, 503, 504, 505, 506, 507, 509, 510; Within Tract/BNA 1302.00: Within block group 1: Block(s): 101, 102, 103, 104, 112, 113; The MCD/CCD(s): Ev- anston; Within the MCD/CCD of Maine: Tract/BNA(s): 0901.00, 8052.01, 8052.02, 8053.01, 8053.02; Within Tract/BNA 8054.- 01: Within block group 1: Block(s): 101, 106; Within block group 2: Block(s): 201; Tract/BNA(s): 8054.02; Within Tract/BNA

8060.04: Block group(s): 1; Within block group 2: Block(s): 201, 207, 208, 215; Within block group 3: Block(s): 301, 302, 303, 308, 310, 311, 309A, 309B; Within block group 4: Block(s): 401; The MCD/ CCD(s): Niles; Within the MCD/CCD of Norwood Park: Within Tract/BNA 8106.- 00: Within block group 3: Block(s): 308.

Representative district No. 10 shall be comprised of the following units of census geography: Within the County of Cook: The MCD/CCD(s) of: New Trier, North- field; Within the MCD/CCD of Wheeling: Tract/BNA(s): 8024.01, 8024.02, 8025.02, 8025.03, 8025.04, 8026.01, 8026.05, 8026.06, 8027.01, 8027.02; Within Tract/BNA 8028.- 01: Block group(s): 1, 2, 3, 4; Within Tract/BNA 8028.02: Within block group 1: Block(s): 101, 102, 103; Within block group 2: Block(s): 201, 202, 203, 204, 205, 219, 220, 221, 222, 223; Within block group 3: Block(s): 301, 302, 303, 304, 305, 306, 307, 308, 321, 322, 323, 324, 325, 326, 327, 328; Within block group 4: Block(s): 401, 402, 403, 404, 405, 406, 407, 408, 413, 414, 415, 416, 417, 418, 419, 420, 421, 422, 423; Tract/BNA(s): 8029.00, 8030.04, 8030.05; Within Tract/BNA 8030.06: Block group(s): 1, 2; Within block group 4: Block(s): 401, 402, 405, 406, 407; Tract/ BNA(s): 8030.07, 8030.08, 8030.09, 8030.10, 8030.11, 8031.00; Within Tract/BNA 8032.- 00: Within block group 1: Block(s): 106, 131; Within block group 2: Block(s): 213, 214, 215, 216, 217, 225; Within Tract/BNA 8033.00: Block group(s): 1, 2, 3; Within block group 4: Block(s): 401, 402, 403, 404, 424, 426, 427; Within the County of Lake: The MCD/CCD(s) of: Benton, Deerfield, Libertyville, Shields, Vernon, Waukegan, West Deerfield, Zion.

Representative district No. 11 shall be comprised of the following units of census geography: Within the County of Cook: Within the MCD/CCD of Bloom: Tract/ BNA(s): 8285.03, 8285.04, 8285.05, 8285.06, 8294.02, 8295.00, 8296.00; Within Tract/ BNA 8297.00: Within block group 3: Block(s): 303, 304; block group(s): 6; Within block group 9: Block(s): 911, 912, 914, 915, 916, 902A, 913A, 917A, 902B, 913B, 917B, 902C, 913C, 913D, 913E, 908F, 913F, 913G, 913H, 913J, 913K; Within the

MCD/CCD of Chicago city: Tract/BNA(s): 5101.00; Within Tract/BNA 5102.00: Within block group 1: Block(s): 101, 102, 103, 104, 105, 106, 112; Within block group 2: Block(s): 202, 203, 204, 205, 206; Within Tract/BNA 5104.00: Within block group 8: Block(s): 814, 815; Within block group 9: Block(s): 901, 902, 903, 904, 905, 906, 909, 910, 911, 916, 917, 999C; Tract/BNA(s): 5201.00, 5202.00, 5203.00, 5204.00, 5205.00, 5206.00, 5501.00; Within Tract/BNA 5502.-00: Block group(s): 1, 2, 3; Within the MCD/CCD of Rich: Tract/BNA(s): 8300.-01, 8300.02, 8302.01, 8302.02, 8303.00, 8304.00, 8305.00; Within the MCD/CCD of Thornton: Tract/BNA(s): 5502.00; Within Tract/BNA 8257.00: Block group(s): 1; Within block group 2: Block(s): 201, 202, 203, 204, 205, 206, 207, 208, 209, 210, 211, 212, 213, 220, 231, 233, 234; Within block group 3: Block(s): 309, 310, 311, 318, 319, 324, 331, 333, 334, 336, 399; Within Tract/BNA 8258.02: Within block group 3: Block(s): 301, 302, 303, 307, 308, 309, 310, 311, 314, 315, 316, 317, 318, 319; Within Tract/BNA 8258.03: Within block group 6: Block(s): 601, 608, 609, 614; block group(s): 7; Tract/BNA(s): 8259.00, 8260.00, 8261.-00; Within Tract/BNA 8262.01: Block group(s): 1; Tract/BNA(s): 8262.02, 8278.-01, 8278.02, 8278.04, 8278.05, 8279.01, 8279.02, 8280.00, 8281.00, 8282.01, 8282.02; Within Tract/BNA 8283.00: Block group(s): 1, 2, 3, 4, 5; Within block group 6: Block(s): 607, 608, 611, 601A, 603A, 609A, 610A, 601B, 602B, 603B, 605B, 609B, 610B, 601C, 602C, 603C, 606C, 610C, 610D; block group(s): 9; The County(s) of Grundy; Within the County of Kankakee: Within the MCD/CCD of Aroma: Tract/BNA(s): 0108.00; Within Tract/BNA 0112.00: Block group(s): 1; Within block group 2: Block(s): 203, 206, 207, 209, 216, 217, 218, 219, 202A, 205A, 299A, 205B, 299B; Within Tract/BNA 0113.00: Within block group 1: Block(s): 104, 105, 106, 196, 197, 102A, 103A, 199A, 102B, 103B, 102C; Within block group 2: Block(s): 203, 204, 205, 206, 207, 208, 209, 210, 211, 212, 213, 214, 215, 216, 217, 218, 219, 223, 220A, 221A, 222A, 220B, 221B, 222B, 220C, 220D; block group(s): 3, 4; The MCD/CCD(s): Bour-bonnais, Essex, Ganeer, Limestone, Manteno, Momence, Pembroke, Rockville, St. Anne, Salina, Sumner, Yellowhead; Within the County of La Salle: The MCD/CCD(s) of: Allen, Brookfield, Bruce, Dayton, Deer Park, Dimmick, Eagle, Eden, Fall River, Farm Ridge, Freedom, Grand Rapids, Groveland, Hope, La Salle, Manlius, Miller, Mission, Ophir, Osage, Ottawa, Otter Creek, Peru, Richland, Rutland, Serena, South Ottawa, Troy Grove, Utica, Vermillion, Wallace, Waltham; Within the County of Will: The MCD/CCD(s) of: Channahon, Crete, Custer, Florence, Frankfort, Green Garden, Jackson, Joliet; Within the MCD/CCD of Lockport: Within Tract/BNA 8807.00: Block group(s): 3, 4, 5, 9; The MCD/CCD(s): Manhattan, Monee, New Lenox, Peotone, Reed; Within the MCD/CCD of Troy: Within Tract/BNA 8832.04: Within block group 2: Block(s): 218, 299; block group(s): 3; Within block group 6: Block(s): 602, 603, 604, 605, 606, 607, 699, 601A, 601B, 601C, 601D; block group(s): 7; Tract/BNA(s): 8832.05, 8832.06, 8832.07, 8833.01; The MCD/CCD(s): Washington, Wesley, Will, Wilmington, Wilton.

Representative district No. 12 shall be comprised of the following units of census geography: County(s) Alexander, Jackson; Within the County of Madison: The MCD/CCD(s) of: Alton, Chouteau, Granite City, Nameoki, Venice; Within the MCD/CCD of Wood River: Tract/BNA(s): 4010.00, 4011.-00, 4012.00, 4013.00, 4014.00, 4015.00, 4016.00, 4017.01; Within Tract/BNA 4017.-02: Block group(s): 1, 2, 3, 4; Within block group 5: Block(s): 501, 502, 503, 504, 505, 507, 508, 509, 510, 511, 512, 513, 514, 515, 516, 517, 518, 519, 520, 521, 522, 523, 524, 525, 526; block group(s): 6; Tract/BNA(s): 4018.00, 4019.01, 4020.00, 4024.00, 4028.01, 4028.02, 4028.03; The County(s) of Monroe, Perry, Randolph, St. Clair, Union; Within the County of Williamson: Within the MCD/CCD of Blairsville: Within Tract/BNA 0201.00: Block group(s): 1; Within block group 2: Block(s): 218, 220, 221, 222, 223, 224, 225, 226, 227, 228, 290, 291, 292, 293, 294, 295, 296, 297, 299; Within block group 3: Block(s): 305, 306, 307, 308, 309, 311, 312, 313, 314, 315, 316, 317, 318, 319, 320, 321, 322, 323, 324, 301A, 302A, 303A,

304A, 310A, 399A, 302B, 303B, 304B, 310B, 399B, 302C, 302D; block group(s): 4; Tract/BNA(s): 0202.00; The MCD/CCD(s): Carterville, Grassy.

Representative district No. 13 shall be comprised of the following units of census geography: Within the County of Cook: The MCD/CCD(s) of: Lemont, Orland; Within the MCD/CCD of Palos: Tract/BNA(s): 8237.02, 8237.04, 8237.05, 8238.01; Within Tract/BNA 8238.03: Within block group 2: Block(s): 204, 205, 206, 207, 208, 209, 210, 211, 212, 213, 214, 215, 216, 219, 220, 221, 222, 223, 224; Within block group 3: Block(s): 302, 303, 304, 305; block group(s): 4, 5; Within Tract/BNA 8238.04: Within block group 3: Block(s): 304, 305; block group(s): 4, 5, 6; Within Tract/BNA 8239.01: Within block group 4: Block(s): 401, 402, 403, 412, 417, 419, 420, 428, 429, 431; block group(s): 5, 6, 7; Within block group 8: Block(s): 802, 803, 804, 805, 806, 807, 808, 809, 810, 812, 813, 814, 828, 829, 830, 833, 834, 844, 811A, 832A, 801B, 811B, 832B, 899B, 801C, 832C, 899D, 899E, 899F, 899G, 899H, 899K; Within Tract/BNA 8239.03: Within block group 4: Block(s): 407, 408; Within the County of DuPage: The MCD/CCD(s) of: Downers Grove, Lisle; Within the MCD/CCD of Milton: Within Tract/BNA 8427.04: Within block group 3: Block(s): 307; Within block group 4: Block(s): 402, 403; block group(s): 5, 6, 7, 8; Within Tract/BNA 8427.05: Block group(s): 4, 5; Within Tract/BNA 8427.06: Block group(s): 2, 3, 4; Within Tract/BNA 8427.07: Block group(s): 1, 2; Within block group 3: Block(s): 306, 307, 308, 316, 317, 318, 319, 321, 322, 323, 324, 325, 399, 309A, 320A, 305B, 309B, 315B, 320B, 305C, 315C, 315D, 315E; block group(s): 4; The MCD/CCD(s): Naperville; Within the MCD/CCD of York: Within Tract/BNA 8444.00: Within block group 1: Block(s): 105, 111, 110A, 102B, 110C; block group(s): 5; Within Tract/BNA 8445.00: Block group(s): 3, 4, 5, 9; Within Tract/BNA 8446.00: Within block group 2: Block(s): 207, 208, 209, 212, 214, 215, 216, 217, 218, 222, 223, 226; block group(s): 6; Within block group 9: Block(s): 909, 910, 911, 912, 913, 914, 915, 916, 917, 918, 919, 920, 921, 922, 924, 925, 927, 929, 930, 931, 999, 923A, 926A, 928A, 923B, 926B, 928B, 923C; Within the County of Will: The MCD/CCD(s) of: Du Page, Homer; Within the MCD/CCD of Lockport: Tract/BNA(s): 8805.01, 8805.02, 8806.00; Within Tract/BNA 8807.00: Block group(s): 1, 2, 6; Tract/BNA(s): 8808.00, 8809.00; The MCD/CCD(s): Plainfield; Within the MCD/CCD of Troy: Tract/BNA(s): 8832.03; Within Tract/BNA 8832.-04: Within block group 2: Block(s): 201, 202, 203, 204, 205, 206, 207, 208, 209, 210, 211, 212, 213, 214, 215, 216, 217; Within block group 6: Block(s): 608, 609; The MCD/CCD(s): Wheatland.

Representative district No. 14 shall be comprised of the following units of census geography: County(s) DeKalb; Within the County of DuPage: Within the MCD/CCD of Milton: Tract/BNA(s): 8426.02; Within Tract/BNA 8426.03: Within block group 8: Block(s): 811B; Within Tract/BNA 8426.-04: Within block group 2: Block(s): 210, 211, 212, 208A, 209A, 208B, 209B, 209C, 201D; Within block group 3: Block(s): 311; The MCD/CCD(s): Wayne, Winfield; The County(s) of Kane, Kendall; Within the County of La Salle: The MCD/CCD(s) of: Adams, Earl, Mendota, Meriden, Northville; The County(s) of Lee.

Representative district No. 15 shall be comprised of the following units of census geography: County(s) Champaign, De Witt, Douglas, Edgar, Ford, Iroquois; Within the County of Kankakee: Within the MCD/CCD of Aroma: Within Tract/BNA 0112.-00: Within block group 2: Block(s): 204, 210, 211, 212, 213, 214, 215, 225, 226, 227, 228, 229, 230, 231, 232, 233, 234, 235, 236, 237, 238, 239, 240, 241, 208A, 208B, 299C; Within Tract/BNA 0113.00: Within block group 1: Block(s): 101A, 199B, 103C, 199C; Within block group 2: Block(s): 201A, 202A, 201B, 202B; Tract/BNA(s): 0114.00; The MCD/CCD(s): Kankakee, Norton, Otto, Pilot; The County(s) of Livingston; Within the County of McLean: The MCD/CCD(s) of: Anchor, Arrowsmith, Bellflower, Bloomington, Bloomington City, Blue Mound, Cheney's Grove, Chenoa, Cropsey, Dawson, Downs, Empire, Gridley, Hudson, Lawndale, Lexington, Martin, Money Creek, Normal, Oldtown; Within the MCD/

CCD of Randolph: Within Tract/BNA 0054.00: Within block group 3: Block(s): 315, 316, 317, 318, 319, 320, 329, 331, 332, 333, 334, 335, 336, 347, 348, 349, 350, 351, 362, 313C; Within block group 5: Block(s): 517, 518, 519, 546, 547, 548, 549, 551, 578, 579, 580, 581, 582, 583, 586, 594, 595, 596, 597, 516B, 550B, 565B, 566B; Within block group 6: Block(s): 601B, 608B; The MCD/CCD(s): Towanda, West, Yates; The County(s) of Piatt, Vermilion.

Representative district No. 16 shall be comprised of the following units of census geography: County(s) Boone, Jo Daviess, McHenry; Within the County of Ogle: The MCD/CCD(s) of: Byron, Dement, Flagg, Lafayette, Leaf River, Lynnville, Marion, Maryland, Monroe; Within the MCD/CCD of Mount Morris: Tract/BNA(s): 9607.00; Within Tract/BNA 9608.00: Within block group 2: Block(s): 252, 253, 254, 257, 242B, 243B, 245C; Within block group 5: Block(s): 502B, 503B; Within Tract/BNA 9609.00: Within block group 1: Block(s): 101A, 102B, 167B; Within block group 4: Block(s): 401, 402, 403, 428, 429, 430, 404B; Tract/BNA(s): 9614.00; The MCD/CCD(s): Nashua, Oregon, Pine Rock, Rockvale, Scott, Taylor, White Rock; The County(s) of Stephenson, Winnebago.

Representative district No. 17 shall be comprised of the following units of census geography: Within the County of Adams: The MCD/CCD(s) of: Camp Point, Ellington, Gilmer, Honey Creek, Houston, Keene, Lima; Within the MCD/CCD of Melrose: Within Tract/BNA 0011.00: Block group(s): 1; Within block group 2: Block(s): 227B, 233B, 234B, 235B, 214C, 233C, 238C, 240C, 214D, 238D; Within block group 3: Block(s): 303D, 303E; Within Tract/BNA 0106.00: Within block group 1: Block(s): 102; The MCD/CCD(s): Mendon, Quincy, Riverside, Ursa; The County(s) of Bureau, Carroll, Fulton, Hancock, Henderson, Henry, Knox, McDonough, Mercer; Within the County of Ogle: The MCD/CCD(s) of: Brookville, Buffalo, Eagle Point, Forreston, Grand Detour, Lincoln; Within the MCD/CCD of Mount Morris: Within Tract/BNA 9608.00: Within

block group 2: Block(s): 255, 256, 258, 259, 260, 261, 262; Within block group 5: Block(s): 555, 523B, 524B, 554B; Within Tract/BNA 9609.00: Within block group 1: Block(s): 104, 105, 106, 107, 108, 109, 110, 111, 112, 114, 116, 117, 122, 123, 124, 125, 127, 165, 166, 168, 102A, 103A, 113A, 115A, 118A, 119A, 120A, 167A, 103B, 113B, 115B, 119B, 126B, 128B, 113C; block group(s): 2, 3; Within block group 4: Block(s): 406, 407, 408, 409, 410, 411, 412, 413, 414, 415, 416, 417, 418, 419, 420, 421, 422, 423, 424, 425, 426, 427, 404A, 405A, 405B, 405C; The MCD/CCD(s): Pine Creek, Woosung; The County(s) of Rock Island, Warren, Whiteside.

Representative district No. 18 shall be comprised of the following units of census geography: County(s) Cass, Logan; Within the County of McLean: The MCD/CCD(s) of: Allin, Dale, Danvers, Dry Grove, Funks Grove, Mount Hope; Within the MCD/CCD of Randolph: Within Tract/BNA 0054.00: Within block group 3: Block(s): 321, 322, 323, 324, 325, 326, 327, 328, 330, 352, 353, 354, 355, 356, 357, 358, 359, 360, 361, 363, 364, 399; Within block group 5: Block(s): 520, 521, 522, 523, 524, 525, 526, 527, 528, 529, 530, 531, 532, 533, 535, 536, 537, 538, 539, 540, 541, 542, 543, 544, 545, 599, 534A, 534B; Within block group 6: Block(s): 604, 605, 606, 607, 609, 610, 611, 612, 613, 614, 615, 616, 617, 618, 619, 620, 621, 622, 623, 624, 625, 627, 628, 629, 630, 631, 632, 633, 635, 636, 601A, 602A, 603A, 608A, 626A, 634A, 602B, 603B, 626B, 634B, 634C; block group(s): 7; The MCD/CCD(s): White Oak; Within the County of Macon: The MCD/CCD(s) of: Austin; Within the MCD/CCD of Hickory Point: Within Tract/BNA 0029.-01: Block group(s): 1; Within block group 2: Block(s): 203, 204, 205, 206, 207, 208, 209, 210, 211, 212, 213, 214, 215, 216, 217, 218, 219, 220, 221, 222, 224, 226, 202A, 223A, 227A, 228A, 227B; block group(s): 7, 9; Within Tract/BNA 0029.02: Within block group 1: Block(s): 103, 106, 107, 108, 109, 110, 117, 118, 119, 120, 121, 122, 123, 124, 125, 126, 127, 128, 129, 130, 131, 132, 133, 134, 135, 138, 139, 151, 155, 156, 157, 158, 159, 160, 162, 163, 164, 165, 166, 167, 168, 169, 170, 101A, 102A, 104A, 112A, 113A, 101B, 102B, 104B, 112B, 113B, 150B,

101C, 102C, 112C, 113C, 113D, 113E, 113F; block group(s): 4, 9; Within Tract/BNA 0029.04: Within block group 4: Block(s): 404, 407, 408, 409, 410, 411, 416, 417, 418, 419, 420, 421, 422, 423, 424, 427, 401A, 405A, 406A, 414A, 415A, 426A, 405B, 406B, 414B, 415B, 401C, 401D; block group(s): 9; The MCD/CCD(s): Illini, Niantic; The County(s) of Marshall, Mason, Menard, Morgan, Peoria, Putnam; Within the County of Sangamon: The MCD/CCD(s) of: Auburn, Buffalo Hart; Within the MCD/CCD of Capital: Within Tract/BNA 0001.00: Block group(s): 1, 2; Within block group 3: Block(s): 301A, 303A, 301B, 304B; block group(s): 4; Tract/BNA(s): 0002.00; Within Tract/BNA 0003.00: Within block group 1: Block(s): 114A, 115A, 114B; Within block group 4: Block(s): 416, 421, 405A, 432A, 432B; Within Tract/BNA 0005.01: Within block group 1: Block(s): 103, 104, 105, 106, 107, 101A, 102A; Within block group 2: Block(s): 201A, 203A; Within Tract/BNA 0005.02: Within block group 1: Block(s): 101A; Within Tract/BNA 0006.-00: Within block group 2: Block(s): 201, 205A; Tract/BNA(s): 0010.00, 0011.00; Within Tract/BNA 0012.00: Block group(s): 4, 5; Within Tract/BNA 0013.00: Within block group 5: Block(s): 501, 502, 503, 504, 505, 506; Tract/BNA(s): 0020.00; Within Tract/BNA 0029.00: Block group(s): 1, 2, 3; Within block group 4: Block(s): 402, 403, 407, 408, 409, 410, 413, 414, 415, 416, 417, 418, 419, 420, 421, 401A, 404A, 405A, 406A; Within Tract/BNA 0031.00: Within block group 1: Block(s): 109, 110, 111, 112, 103A, 113A, 113B; Within block group 2: Block(s): 201, 208, 209, 210, 212, 214, 213A; Within block group 3: Block(s): 302, 303, 301A, 304A; Within Tract/BNA 0036.00: Block group(s): 1, 2, 3; Within block group 4: Block(s): 401A, 427A, 428A, 482A; Tract/BNA(s): 0037.00; Within Tract/BNA 0038.00: Within block group 9: Block(s): 903, 904, 914, 915, 917, 918, 920, 922, 902A, 905A, 906A, 907A, 909A, 910A, 912A, 913A, 921A, 923A, 924A, 905B, 909B, 910B, 913B, 921B, 909C, 921C, 909D; Within Tract/BNA 0039.00: Block group(s): 8; The MCD/CCD(s): Cartwright, Chatham; Within the MCD/CCD of

Clear Lake: Tract/BNA(s): 0001.00; Within Tract/BNA 0005.01: Within block group 2: Block(s): 201B; Tract/BNA(s): 0037.00, 0038.00, 0039.00; The MCD/CCD(s): Cooper, Curran, Fancy Creek, Gardner, Illiopolis, Island Grove, Lanesville, Loami, Maxwell, Mechanicsburg, New Berlin, Rochester; Within the MCD/CCD of Springfield: Within Tract/BNA 0001.00: Block group(s): 1, 2; Within block group 3: Block(s): 302, 309, 303B, 301C, 304C, 301D, 301E; block group(s): 4; Tract/BNA(s): 0002.00; Within Tract/BNA 0003.00: Within block group 1: Block(s): 101, 115B; block group(s): 4; Within Tract/BNA 0005.01: Block group(s): 1; Tract/BNA(s): 0010.00, 0011.00, 0036.00, 0037.00; The MCD/CCD(s): Talkington, Williams; Within the MCD/CCD of Woodside: Tract/BNA(s): 0020.00; Within Tract/BNA 0029.-00: Block group(s): 1, 2; Within block group 4: Block(s): 401B, 404B; Within Tract/BNA 0031.00: Within block group 1: Block(s): 103C; The County(s) of Stark, Tazewell, Woodford.

Representative district No. 19 shall be comprised of the following units of census geography: Within the County of Christian: The MCD/CCD(s) of: Assumption, Locust, May, Mosquito, Pana, Prairieton, Rosamond, Stonington; The County(s) of Clark, Clay, Coles, Crawford, Cumberland, Edwards, Effingham, Franklin, Gallatin, Hamilton, Hardin, Jasper, Johnson, Lawrence; Within the County of Macon: The MCD/CCD(s) of: Blue Mound, Decatur, Friends Creek, Harristown; Within the MCD/CCD of Hickory Point: Within Tract/BNA 0029.01: Within block group 2: Block(s): 201, 225, 229, 230, 231, 202B, 223B, 228B; block group(s): 5; Within Tract/BNA 0029.02: Within block group 1: Block(s): 105, 111, 114, 115, 116, 137, 171, 172, 142A, 149A, 150A, 142B, 149B, 142C, 142D, 142E, 142F, 142G; block group(s): 5; Tract/BNA(s): 0029.03; Within Tract/BNA 0029.04: Block group(s): 2, 3; Within block group 4: Block(s): 425, 428, 402A, 403A, 412A, 413A, 429A, 401B, 402B, 403B, 412B, 413B, 426B, 429B, 402C; block group(s): 5; The MCD/CCD(s): Long Creek, Maroa, Milam, Mount Zion, Oakley, Pleasant View, South Macon, South Wheatland, Whitmore;

The County(s) of Massac, Moultrie, Pope, Pulaski, Richland, Saline, Shelby, Wabash, Wayne, White; Within the County of Williamson: Within the MCD/CCD of Blairsville: Within Tract/BNA 0201.00: Within block group 2: Block(s): 201, 202, 203, 204, 205, 206, 207, 208, 209, 210, 211, 212, 213, 214, 215, 216, 217, 219, 229, 230, 231, 232, 233, 234, 235, 236, 237, 239, 241, 242, 243, 244, 245, 246, 247, 248, 249, 250, 251, 252, 253, 254, 255, 256, 257, 258, 259, 260, 261, 262, 263, 264, 266, 267, 268, 269, 270, 272, 273, 274, 275, 276, 277, 278, 279, 280, 281, 282, 283, 284, 285, 286, 287, 288, 289, 238A, 240A, 265A, 271A, 238B, 240B, 265B, 271B, 238C; Within block group 3: Block(s): 301B; Tract/BNA(s): 0203.00, 0204.00, 0206.00; The MCD/CCD(s): Corinth, Crab Orchard, Creal Springs, East Marion, Herrin, Lake Creek, Southern, Stonefort, West Marion.

Representative district No. 20 shall be comprised of the following units of census geography: Within the County of Adams: The MCD/CCD(s) of: Beverly, Burton, Clayton, Columbus, Concord, Fall Creek, Liberty, McKee; Within the MCD/CCD of Melrose: Tract/BNA(s): 0008.00, 0009.00, 0010.02; Within Tract/BNA 0011.00: Within block group 2: Block(s): 238B; Within block group 3: Block(s): 301, 304, 316, 317, 318, 319, 313B, 315B, 303C, 302D; Tract/BNA(s): 0104.00; Within Tract/BNA 0106.-00: Within block group 1: Block(s): 101, 104, 105, 106, 107, 108, 109, 110, 111, 112, 113, 114, 115, 116, 117, 118, 119, 120, 123, 126, 127, 128, 129, 130, 131, 132, 133, 134, 135, 136, 137, 138, 139, 199, 103B, 121C, 121D, 122D; block group(s): 2, 3, 4; The MCD/CCD(s): Northeast, Payson, Richfield; The County(s) of Bond, Brown, Calhoun; Within the County of Christian: The MCD/CCD(s) of: Bear Creek, Buckhart, Greenwood, Johnson, King, Mount Auburn, Ricks, South Fork, Taylorville; The County(s) of Clinton, Fayette, Greene, Jefferson, Jersey, Macoupin; Within the County of Madison: The MCD/CCD(s) of: Alhambra, Collinsville, Edwardsville, Fort Russell, Foster, Godfrey, Hamel, Helvetia, Jarvis, Leef, Marine, Moro, New Douglas, Olive, Omphghent, Pin Oak, St. Jacob, Saline;

Within the MCD/CCD of Wood River: Within Tract/BNA 4017.02: Within block group 5: Block(s): 527, 529, 530, 531, 532, 533; The County(s) of Marion, Montgomery, Pike; Within the County of Sangamon: The MCD/CCD(s) of: Ball; Within the MCD/CCD of Capital: Within Tract/BNA 0001.00: Within block group 3: Block(s): 304A, 310A, 328A, 329A, 330A, 331A, 332A, 333A, 334A, 335A, 310B, 328B, 334B, 328C; Within Tract/BNA 0003.00: Within block group 1: Block(s): 102, 103, 104, 105, 106, 107, 108, 109, 110, 111, 112, 113, 116, 126, 128, 129, 130, 131, 132, 133, 134, 135, 136, 137, 138, 139, 140, 141, 142, 143, 144, 145, 146, 117A, 123A, 124A, 125A, 127A, 124B; block group(s): 2, 3; Within block group 4: Block(s): 401, 402, 406, 407, 408, 409, 410, 411, 412, 413, 414, 415, 417, 418, 419, 420, 422, 423, 424, 425, 404A; Tract/BNA(s): 0004.00; Within Tract/BNA 0005.01: Within block group 1: Block(s): 108, 109, 110, 111, 112, 113, 114; Within block group 2: Block(s): 206, 207, 208, 209, 211, 212, 213, 204A, 205A, 210A, 204B; Within Tract/BNA 0005.02: Within block group 1: Block(s): 105, 106, 107, 108, 109, 110, 111, 112, 113, 104B, 104C; block group(s): 2, 3, 4, 5, 6, 7, 8; Within Tract/BNA 0006.00: Block group(s): 1; Within block group 2: Block(s): 206, 207, 208, 209, 210, 211, 212, 202A, 203A, 204A, 213A, 203B, 204B, 205B, 213B, 203C, 203D; block group(s): 4, 5, 6, 7; Tract/BNA(s): 0007.00, 0008.00, 0009.-00; Within Tract/BNA 0012.00: Block group(s): 1, 2, 3; Within Tract/BNA 0013.-00: Block group(s): 1, 2, 3, 4; Within block group 5: Block(s): 507, 508, 509, 510; Tract/BNA(s): 0014.00, 0015.00, 0016.00, 0017.00, 0018.00, 0019.00, 0021.00, 0022.00, 0023.00, 0024.00, 0025.00, 0026.00, 0027.00, 0028.00; Within Tract/BNA 0029.00: Within block group 4: Block(s): 412A; Tract/BNA(s): 0030.00; Within Tract/BNA 0031.-00: Within block group 1: Block(s): 104, 105, 101A, 102A, 106A, 102B, 106B; Within block group 2: Block(s): 202, 203, 204, 205, 206, 207, 211, 226, 215A, 216A, 218A, 219A, 220A, 224A, 227A, 299A, 215B, 216B, 218B, 224B, 227B, 299B, 215C, 216C, 218C, 227C, 299C, 215D, 216D, 218D, 227D, 215E, 218E, 227E, 215F, 218F, 227F, 215G, 227G, 215H, 215J; Within block group 3: Block(s): 329,

310A, 315A, 317A, 318A, 321A, 322A, 325A, 327A, 328A, 399A, 304B, 308B, 315B, 317B, 318B, 322B, 325B, 328B, 399B, 315C, 322C, 325C, 315D, 322D, 325D, 322E, 325E, 322F, 325F, 322G, 325G, 322H, 325H, 322J, 325J, 325K, 325L, 325M; block group(s): 4, 5; Tract/BNA(s): 0032.00; Within Tract/BNA 0036.00: Within block group 4: Block(s): 422A, 424A, 483A, 499A, 499B; Within Tract/BNA 0038.00: Within block group 9: Block(s): 948, 947A; Within Tract/BNA 0039.00: Block group(s): 9; Within the MCD/CCD of Clear Lake: Within Tract/BNA 0005.01: Within block group 2: Block(s): 202; Tract/BNA(s): 0006.00; The MCD/CCD(s): Cotton Hill, Divernon, Pawnee; Within the MCD/CCD of Springfield: Within Tract/BNA 0001.00: Within block group 3: Block(s): 305, 306, 307, 308, 311, 312, 313, 314, 315, 316, 317, 318, 319, 320, 321, 322, 323, 324, 325, 326, 327, 329B, 330B, 331B, 332B, 333B, 335B, 310C, 329C, 333C, 334C, 335C, 310D, 328D, 329D, 310E; Within Tract/BNA 0003.00: Within block group 1: Block(s): 118, 119, 120, 121, 122, 117B, 123B, 125B, 127B, 114C, 117C, 124C, 125C; Tract/BNA(s): 0004.00; Within Tract/BNA 0005.01: Block group(s): 2; Tract/BNA(s): 0005.02, 0006.00, 0007.00, 0016.00, 0024.00, 0039.00; Within the MCD/CCD of Woodside: Tract/BNA(s): 0016.00, 0021.00, 0024.00, 0025.00, 0026.00, 0027.00, 0028.00; Within Tract/BNA 0029.-00: Within block group 4: Block(s): 412B; Tract/BNA(s): 0030.00; Within Tract/BNA 0031.00: Within block group 1: Block(s): 101C, 106C, 102D; block group(s): 2, 3, 4, 5; Tract/BNA(s): 0032.00, 0036.00, 0039.-00; The County(s) of Schuyler, Scott, Washington.